IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| CERTAIN UNDERWRITERS AT LLOYD'S AND THOSE COMPANIES SEVERALLY SUBSCRIBING TO BOEING POLICY NUMBER MARCW150053 AND RELATED POLICIES GOVERNING THE CARGO,<br><br>    *Plaintiffs,*<br><br>v.<br><br>SOUTHERN PRIDE TRUCKING, INC., THUNDER ROLLS EXPRESS, INC., BAUER BUILT INC., and ROAD STAR CARRIER, INC.<br><br>    *Defendants.* | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:  **Case No.:**<br>:  **8:16-cv-00116-JMG-CRZ** |

**PLAINTIFFS' AMENDED MEMORANDUM OF LAW IN
OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT OF
DEFENDANTS ROAD STAR CARRIER, INC. (D.E. 116)
AND BAUER BUILT, INC. (D.E. 122)**

| | |
|---|---|
| David T. Maloof, Esq.<br>Thomas M. Eagan, Esq.<br>Maloof Browne & Eagan LLC<br>411 Theodore Fremd. Ave., Suite 190<br>Rye, New York 10580<br>Tel: (914) 921-1200<br>Fax: (914) 921-1023<br>Emails: dmaloof@maloofandbrowne.com<br>teagan@maloofandbrowne.com | Brandon J. Crainer, Esq.<br>Fraser Stryker PC LLO<br>500 Energy Plaza<br>409 South 16th Street<br>Omaha, NE 68102<br>Tel: (402) 978-5378<br>Fax: (402) 341-8290<br>Email: bcrainer@fraserstryker.com |

*Attorneys for Plaintiffs Certain Underwriters at Lloyds and Those Companies Severally
Subscribing to Boeing Policy Number MARCW150053 and Related Policies Governing the
Cargo*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... v

SUMMARY OF THE FACTS OF THE CASE ......................................................... 1

SUMMARY OF WHY THE ACCIDENT OCCURRED, INCLUDING ADDITIONAL EXPOSITION OF THE FACTS IN LIGHT OF THE COURT'S SEPTEMBER 27, 2017 DECISION ............................................................................................................... 5

INTRODUCTION TO THE LEGAL ISSUES........................................................... 14

I. PLAINTIFFS' STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS ("SOUMF") REQUIRING DENIAL OF DEFENDANTS' MOTIONS .................................... 18

II. ROAD STAR'S STATEMENT OF FACTS AND EXPERT REPORT SHOULD BE STRICKEN........................................................................................................... 35

   A. Road Star's Entire Motion Including Much of Its Statement of Facts Relies Largely Upon the Report of the HRYCAY Canadian Engineering Firm which (i) Has Repeatedly Been Found in the Past by Both Canadian and American Courts to Issue Biased Reports, (ii) In this Instance Relies Upon a 20-Year Old Study Later Found By Its Own Author to Be Based On Erroneous Data, and (iii) Fails to Comply With F.R.C.P. 26(a)(2)(B).................................................................................................. 35

      1. HRYCAY's Reports Have Been Judicially Found By Courts in Two Countries to Lack Objectivity ..................................................................................................... 35

      2. Outdated and Misleading Findings.................................................................. 38

      3. HRYCAY's Failure to Comply with Federal Rules of Civil Procedure .......................... 38

   B. Road Star's Statement of Facts Should Be Stricken Because They Contain Irrelevant and Immaterial Facts, Legal Conclusions and Mischaracterizations of the Record in Violation of Local Rule 56.1 ........................................................................................... 40

III. PLAINTIFFS' RESPONSE TO ROAD STAR'S STATEMENT OF UNDISPUTED FACTS ...................................................................... 41

IV. PLAINTIFFS' RESPONSE TO BAUER BUILT'S STATEMENT OF UNDISPUTED FACTS ...................................................................... 60

ARGUMENT........................................................................................................... 67

V. GIVEN THE MYRIAD OF FACTUAL ISSUES IN DISPUTE, SUMMARY JUDGMENT FOR DEFENDANTS ROAD STAR AND BAUER BUILT SHOULD BE DENIED; A DETERMINATION AS TO THE PROXIMATE CAUSE OF THE ACCIDENT MUST BE MADE BY THE JURY .......................................................................................................67

VI. NEITHER ROAD STAR NOR BAUER BUILT ARE ENTITLED TO SUMMARY JUDGMENT .............................................................................................................68

   A. Plaintiffs' Tort Claims Against Road Star Are Subject to Federal Common Law and Against Bauer Built Are Subject to Nebraska State Law ....................................................68

   B. Road Star's Violations of 49 C.F.R. § 392 Renders Them Negligent *Per Se* Under Federal Law ..........................................................................................................76

   C. It Is Clear That Road Star Violated Federal Law. Road Star's Brief Completely Misapplies 49 C.F.R. § 392.22; the Appropriate Provision for this Situation Requires that Three Reflective Triangles be Placed at Specified Distances of up to 500 Feet to Warn Oncoming Traffic, and It is Undisputed that Road Star Failed to Comply with this Federal Safety Regulation, Putting Their Triangles Out Only 20% of Even the Minimum Distance ....................................................................................................77

   D. Plaintiffs Further Contend that the Appropriate and Safest Distance for the Third Triangle Here was 500 Feet. In Any Event, Road Star Cannot Prevail on Summary Judgment as to the Adequacy and Effect of the Deficient Reflective Triangle Warning Placement because There Is a Genuine Issue of Fact as to Its Effect ...............................81

   E. The Canadian Trucker Road Star also Violated Numerous Other Provisions of the U.S. Federal Safety Regulations Governing Commercial Motor Carriers and Disregarded Standards Set Forth in the Nebraska Commercial Driver's Manual ...................................84

   F. The Overwhelming Evidence of Road Star's Negligence Also Warrants Denial of Summary Judgment Because Any Overcorrection by Womack Cannot Be the Sole Legal Cause of the Accident "As a Matter of Law" ..........................................................90

      1. Established Case Law Makes Clear That Womack's Conduct Was Not an Intervening Cause Because There Was a Direct Collision Between Womack and the Negligently Parked Truck .....................................................................................................92

      2. Road Star's Active Preexisting Negligence Was Not A Passive Condition ....................95

   G. Plaintiffs' Overwhelming Evidence, Including Testimony from Four Competent Professors of Accident Reconstruction/Conspicuity Experts, Demonstrate that Bauer Built's Breach of Its Duty of Care Was Also One of the Proximate Causes of this Accident .............................................................................................................99

VII. CHOICE OF LAW: UNDER BOTH SUPREME COURT AND FEDERAL CIRCUIT COURT PRECEDENTS, WHICH APPLY HERE, THE POST-SETTLEMENT LIABILITY OF THE NON-CARMACK DEFENDANTS IS JOINT AND SEVERAL, WITH NO CONTRIBUTION FROM THE CARMACK CARRIERS, WHOSE SETTLEMENT PAYMENT WILL ULTIMATELY BE DEDUCTED *PRO TANTO*........................................112

A. A Recent Settlement Took Place Under the Carmack Amendment..................................112

B. Per the Supreme Court's *McDermott* Decision, Federal Common Law, Not State Law, Normally Determines the Effect of a Settlement Reached Under a Federal Claim. This Is Particularly True When the Settlement Is Reached Under a Federal Statute ...................113

C. Under Federal Common Law Rules, Both Pre- and Post-*McDermott*, the Leading Cases Require the Use of a *Pro Tanto* Set Off When a Claim Is Settled Under a Federal Statute. Road Star and Bauer Built Thus Still Remain Jointly and Severally Liable in Negligence for the Full Loss of the Damaged Jet Engine, after Deducting the Truckers' Settlement of $250,000........................................................................................................................117

D. The Carmack Amendment By Its Savings Clause Requires the Preservation of Federal Common Law Claims........................................................................................................122

E. Most Significantly, Where, as Here, the Settling Defendants Are Strictly Liable, That Also Excludes Their "Percentage" of Fault from Being Deducted After a Settlement..............123

F. Road Star and Bauer Built Are Not Entitled to Contribution Either..................................126

G. Defendants' Ninth Circuit Case Law Conflicts with Precedents from Both Supreme Court and Other Circuits and Relies Upon a Particularity of California Law Holding Strictly Liable Defendants To Be Joint Tortfeasors.......................................................................128

H. Even If Nebraska Law Applies to Determine the Effect of the Settlement Under the Carmack Amendment, Which It Does Not, the Result Is the Same ..................................131

VIII. ADDITIONAL REASONS WHY BAUER BUILT CANNOT PREVAIL ON ITS MOTION FOR SUMMARY JUDGMENT GIVEN THE OVERWHELMING EVIDENCE OF ITS CAUSATIVE NEGLIGENCE...........................................................................................134

A. Contrary to Bauer Built's Assertions, the Testimony of Joseph Womack, a Nonparty Employee of a Co-Defendant, Cannot Legally Bind The Plaintiffs .................................134

B. Contrary to Bauer Built's Assertions, Whether Womack's Conduct was an Intervening Cause Cannot Be Resolved on Summary Judgment .......................................................135

CONCLUSION....................................................................................................................141

# <u>TABLE OF AUTHORITIES</u>

**<u>Statutes and Regulations</u>**

45 U.S.C. § 51 ................................................................................................ 118

49 U.S.C. § 13103 ..........................................................................................123

49 U.S.C. § 14706 ......................................................................................passim

49 U.S.C. § 11706 .......................................................................................... 119

F.R.C.P. 26(a)(2)(B).....................................................................................passim

F.R.C.P. 26(b)(4)(A) ........................................................................................39

49 C.F.R. § 390 ...............................................................................................84

49 C.F.R. § 392 ...............................................................................................76

49 C.F.R. § 392.22 ........................................................................................ passim

49 C.F.R. § 392.22(b)...........................................................................46, 80, 91

49 C.F.R. § 392.22(b)(1)...................................................................................79

49 C.F.R. § 392.22(b)(2)(iv)........................................................................passim

49 C.F.R. § 392.22(b)(2)(v)..........................................................................78, 84

49 C.F.R. § 392.8 .............................................................................................85

49 C.F.R. § 393.95 ...........................................................................................84

37 Fed. Reg. 5038 ...........................................................................................94

Nebraska District Local Rule 56.1(a)(1) ........................................................40

Nebraska District Local Rule 56.1(a)(2) ...................................................passim

Neb. Rev. Stat. § 25-21,185.11 .............................................................. 132, 133

Neb. Rev. Stat. § 60-6,120 ............................................................................138

Neb. Rev. Stat. § 60-6,378 .............................................................................56

Neb. Rev. Stat. § 60-6,140 ................................................................................136

Neb. Rev. Stat. § 60-6,142 ................................................................................136

Neb. Rev. Stat. § 60-661................................................................................93

## **Cases**

*Adams Express Co. v. Croninger*, 226 U.S. 491 (1913) ...................................... 129

*AIG Aviation, Inc. v. On Time Express, Inc.*,
2005 WL 2416382 (D. Ariz. Sept. 30, 2005) ........................................123

*Alfoaddy v. Will Transport, Inc.*,
2015 WL 3649828 (E.D. Ark. Mar. 19, 2015) ......................................140

*Alford v. Neal*, 229 Neb. 67 (1988)...................................................................134

*Allstate Ins. Co. v. Kumar*,
2013 WL 2395748 (S.D.N.Y. June 3, 2013)........................................ 116

*Ameripride Servs. v. Tex. E. Overseas, Inc.*,
782 F.3d 474 (9th Cir. 2015) ............................................................ 116

*Anderson v. Byrd*, 275 N.W. 825 (Neb. 1937) ...................................................98

*Anderson v. Durham D & M, LLC*,
2009 WL 585653 (W.D. Mo. Mar. 4, 2009) .............................................40

*Arkwright-Boston Mfrs. Mut. Ins. Co. v. Great Western Airlines, Inc.*,
767 F.2d 425 (8th Cir. 1985) ..................................................................70

*Atlas Aerospace LLC v. Advanced Transportation, Inc.*,
2012 WL 5398027 (D. Kan. Nov. 2, 2012) ........................................... 68

*Audio Visual Services Corp. v. Felter International, Inc.*,
2006 WL 1030078 (S.D. Tex. Apr. 18, 2006) ...................................... 69

*Bale v. Nastasi*, 982 F. Supp. 2d 250 (S.D.N.Y. 2013).................................67

*Bartosh v. Schlautman*, 181 Neb. 130 (1966) ............................................. 137

*Baumann v. Zhukov*, 802 F.3d 950 (8th Cir. 2015).............................................passim

*Becarra v. Sulhfoff*, 21 Neb.App. 178, 193 (2013) ....................................98

*Bishop v. Wagner Trucking,*
2014 WL 636987 (N.D. Ala. Feb. 18, 2014)............................................................91

*Blue Dane Simmental Corp. v. American Simmental Ass'n,*
952 F. Supp. 1399 (D. Neb. 1997) ........................................................................ 69

*Boykin v. China Steel Corp.*, 73 F.3d 539 (4th Cir. 1996)....................................... 124, 125, 130

*Bringewatt v. Mueller*, 201 Neb. 736 (1978)............................................................97

*Brummet v. Farel*, 217 Ill. App. 3d 264 (Ill. App. Ct., 5th Dist., 1991) ....................................135

*Bruno v. Gunnison Contractors, Inc.*, 176 Neb. 462 (1964)........................................97

*Burk v. Thorson, Inc.*, 66 F. Supp. 2d 1069 (D. Minn. 1999) ....................................67

*Burnett v. Swift Transportation, Inc.,*
2011 WL 533603 (M.D. Penn. Feb. 8, 2011) ..........................................................90

*Byrton Dairy Products, Inc. v. Harborside Refrigerated Services Inc.,*
991 F. Supp. 977 (N.D. Ill. 1997) .................................................................72, 115

*Certain Underwriters at Interest at Lloyds v. United Parcel Services of America, Inc.,*
762 F.3d 332 (3d Cir. 2014) ................................................................ 119, 120, 124

*Chesler v. Trinity Industries, Inc.,*
2002 WL 1733250 (N.D. Ill. July 25, 2002) .......................................................96, 98

*Childers v. LCW Apartments*, 214 Neb. 291 (1983) ..................................................97

*Chisolm v. UHP Projects, Inc.*, 205 F.3d 731 (4th Cir. 2000) .................................. 124, 126, 130

*Citizens Insurance Company of America v. Polony,*
2008 WL 2813337 (Mich. Ct. App. July 22, 2008)....................................................37

*Clipper Wonsild Tankers Holding A/S v. Biodiesel Ventures, LLC,*
851 F. Supp. 2d 504 (S.D.N.Y. 2012) ................................................................. 115

*Commercial Union Ins. Co. v. Forward Air, Inc,*
50 F. Supp. 2d 255 (S.D.N.Y. 1999)................................................................72, 131

*Connolley v. Omaha Public Power Dist.,*
185 Neb. 501 (1970) ........................................................................................97

*Cuellar-Aguilar v. Deggeller Attractions, Inc.,*
812 F.3d 614 (8th Cir. 2015) ............................................................................. 69

*Cutten v. Allied van Lines, Inc.*,
349 F. Supp. 907 (C.D. Cal. 1972) ................................................................131

*Darling v. J.B. Exped. Services, Inc.*,
2006 WL 2238913 (M.D. Tenn. Aug. 3, 2006) ...............................................84

*Delaware, By and Through Delaware v. Valls*,
226 Neb. 140 (1987) .............................................................................93, 95, 97

*Dmitruk v. George and Sons' Repair Shop, Inc.*,
217 Fed. App'x 765 (10th Cir. 2007) ..............................................................76

*Doyle v. Graske*, 565 F. Supp. 2d 1069 (D. Neb. 2008),
*rev'd in part and aff'd in part*, 579 F.3d 898 (8th Cir. 2009)........................127

*Edmonds v. Compagnie Generale Transatlantique*,
443 U.S. 256 (1979)....................................................................... 117, 118

*EFS National Bank v. Averitt Express, Inc.*,
164 F. Supp. 2d 994 (W.D. Tenn. 2001) ................................................113, 131

*Eli Lilly Do Brasil, Ltd. v. Federal Exp. Corp.*,
2005 WL 2312547 (S.D.N.Y. Sept. 21, 2005) ..........................................74, 75

*Fanselow v. Rice*, 213 F. Supp. 2d 1077 (D. Neb. 2002)........................... 75

*Fireman's Fund Ins. Co. v. Panalpina, Inc.*,
153 F. Supp. 2d 1339 (S.D. Fla. 2001) ............................................................ 72

*First Tennessee Bank, N.A. v. Wilson Freight Lines, Inc.*,
907 F.2d 1122 (11th Cir. 1990) ......................................................................112

*Florea v. Werner Enterprises, Inc.*,
2009 WL 2421853 (D. Mont. July 29, 2009) ..................................................91

*Franklin Stainless Corp. v. Marlo Transport Corp.*,
748 F.2d 865 (4th Cir. 1984) .........................................................................130

*Freightways, Inc. v. Stafford*, 217 F.2d 831 (8th Cir. 1955) ......................111

*Frey v. Bekins Van Lines, Inc.*,
748 F. Supp. 2d 176 (E.D.N.Y. 2010).............................................................123

*Fyke Trading USA, Inc. v. New England Motor Freight*,
2008 WL 4443222 (W.D.N.Y. Sept. 28, 2008)..............................................123

*Gordon H. Mooney, Ltd. v. Farrell Lines, Inc.*,
616 F.2d 619 (2d Cir. 1980) .................................................................. 115, 131

*Hageman v. TSI, Inc.*, 786 P.2d 452, (Colo. App. 1989),
*citing Interstate Motor Lines, Inc. v. Great Western Ry Co.*,
161 F.2d 968 (10th Cir. 1947) ..............................................................84

*Harmon v. Grande Tire Co., Inc.*, 821 F.2d 252 (5th Cir. 1987) ................................................90

*Harrington v. Wilber*, 743 F. Supp. 2d 1013 (S.D. Iowa 2010)................................................ 116

*Hartog Trading Corp. v. M/V Presidente Ibanez*,
1991 WL 33605 (E.D. La. Mar. 6, 1991) ............................................... 115

*Haust v. United States*, 953 F. Supp. 2d 353 (N.D.N.Y. 2013)................................................140

*Heatherly v. Alexander*, 421 F.3d 638 (8th Cir. 2005) .......................................................passim

*Holt v. Bose*, 2011 WL 5130256 (D. Neb. Oct. 27, 2011) .........................................................76

*Hoover v. Allied van Lines, Inc.*,
205 F. Supp. 2d 1232 (D. Kan. 2002) ....................................................123

*Horak v. Argosy Gaming Co.*, 648 N.W.2d 137 (Iowa 2002)................................................... 115

*Hughes v. American Jawa, Ltd.*, 529 F.2d 21 (8th Cir. 1976)......................................... 67, 92, 93

*In re Derailment Cases*, 416 F.3d 787 (8th Cir. 2005) .........................................................76, 114

*In re Martin K. Eby Const. Co., Inc.*,
2003 WL 23335931 (M.D. Fla. Dec. 16, 2003) ...................................... 125

*In re Oswego Barge Corp.*, 664 F.2d 327 (2d Cir. 1981) ......................................................... 115

*Ingram Micro, Inc. v. Airoute Cargo Express, Inc.*,
154 F. Supp. 2d 834  (S.D.N.Y. 2001) ............................................. 70, 71, 75

*Jameson v. Liquid Controls Group*, 260 Neb. 489 (2000) ...................................................... 131

*Jarosh v. Van Meter*, 171 Neb. 61 (1960)..............................................................................97

*Jay v. Moog Automotive, Inc.*, 264 Neb. 875 (2002) .............................................................. 132

*Jessica Howard Ltd. v. Norfolk S. Ry. Co.*,
316 F. 3d 165 (2d Cir. 2003) ................................................................. 131

*Johnson v. Gmeinder*, 2000 WL 246585 (D. Kan. Feb. 10, 2000)......................................91, 111

*Johnson v. Metropolitan Utilities Dist.*, 176 Neb. 276 (1964).....................................................98

*Johnson v. Welsh Equip., Inc.*,
518 F. Supp. 2d 1080 (D. Minn. 2007) ................................................................................. 69

*Johnson & Johnson v. Azam Int'l Trading*,
2013 WL 4048295 (E.D.N.Y. Aug. 9, 2013) ........................................................................ 116

*Just Take Action, Inc. v. GST (Americas) Inc.*,
2005 WL 1080597 (D. Minn. May 6, 2005) ........................................................................131

*Kaiser Aluminum & Chemical Corp. v. Illinois Cent. Gulf R. Co.*,
615 F.2d 470 (8th Cir. 1980) ...............................................................................................70

*Kasper v. Carlson*, 232 Neb. 170 (1989) ................................................................................ 136

*Kohr v. Allegheny Airlines, Inc.*, 504 F.2d 400 (7th Cir. 1974) ...............................................131

*Looney v. Pickering*, 232 Neb. 32 (1989)...........................................................................95, 96

*Malburg v. Grate*, 2014 WL 4473786 (E.D. Mich. Sept. 9, 2014)............................................85

*Mantz v. Continental Western Ins. Co.*, 228 Neb. 447 (1988) ................................................ 136

*Maresh v. Nebraska*, 241 Neb. 496 (1992) ........................................................................96, 98

*Martin v. Beight*, 2015 WL 1956506 (W.D.N.Y. Apr. 29, 2015)............................................140

*Mason and Dixon Intermodal, Inc. v. Lapmaster International, LLC*,
632 F.3d 1056 (9th Cir. 2011) ............................................................................................128

*Mason v. State Farm Mutual Auto Ins. Co.*,
2010 WL 2870667 (E.D. Mo. July 19, 2010) ......................................................................140

*Mayo v. Triborough Bridge and Tunnel Auth.*,
179 A.D.2d 471 (N.Y. App. Div., 1st Dept., 1992)...............................................................111

*McClure v. Burlington Northern Santa Fe Ry. Co.*,
2005 WL 174877 (D. Neb. Jan. 26, 2005) .............................................................. 44, 47, 51

*McClymont v. Morgan*, 238 Neb. 390 (1991).........................................................................139

*McDermott v. AmClyde*, 511 U.S. 202 (1994) ............................................................. 114, 115

x

*McGarity v. FM Carriers, Inc.*,
2012 WL 1028593 (S.D. Ga. Mar. 26, 2012) ................................................................ 81, 91, 92

*Mercer Transp. Co. v. Greentree Transp. Co.*,
341 F.3d 1192 (10th Cir. 2003) ...................................................................... 126

*Michigan Central R. R. Co. v. Myrick*, 107 U.S. 102 (1883) ...................................................69

*Mid-Continent Intern. v. Evergreen Marine Corp.*,
1987 WL 28266, 1988 A.M.C. 1371 (N.D. Ill. Dec. 14, 1987) .................................72

*Missouri Pacific R.R. Co. v. Elmore & Stahl*, 377 U.S. 134 (1964) ......................................... 124

*Mitsui OSK Lines, Ltd. v. MAK Transp., Inc.*,
2006 WL 2987711 (S.D. Tex. Oct. 17, 2006) .................................................... 72, 73

*Murphy v. Florida Keys Elec. Co-Op. Ass'n, Inc.*,
29 F.3d 1311 (11th Cir. 2003) ...................................................................... 125

*Nebraska Plastics, Inc. v. Holland Colors Americas, Inc.*,
408 F.3d 410 (8th Cir. 2005) .................................................................. 132, 133

*Norfolk & Western Ry. Co. v. Ayers*, 538 U.S. 135 (2003) .................................................. passim

*Norfolk Southern Ry. Co. v. Kirby*, 543 U.S. 14 (2004)........................................... 69, 70, 75

*North American Van Lines, Inc. v. Pinkerton Security Systems, Inc.*,
89 F.3d 452 (7th Cir. 1996) ......................................................................127

*Northwest Bank and Trust Co. v. First Illinois Nat'l Bank*,
354 F.3d 721 (8th Cir. 2003) ........................................................................40

*Norton v. Canadian American Tank Lines*,
2009 WL 86603 (W.D. Ky. Jan. 12, 2009) ............................................................92

*Nunez v. B&B Dredging, Inc.*,
108 F. Supp. 2d 656, 663 (E.D. La. 2000),
*rev'd on other grounds*, 288 F.3d 271 (5th Cir. 2002) ............................................ 116

*Oliver Products Co. v. Foreway Management Services, Inc.*,
2006 WL 2711515 (W.D. Mich. May 24, 2006) ......................................................123

*Owner-Operator Independent Drivers Ass'n, Inc. v. Landstar Inway, Inc.*,
2007 WL 473995 (M.D. Fla. Jan. 12, 2007) ........................................................123

*Palenchar v. Jarrett*, 507 F. Supp. 2d 502 (D. Md. 2007) ......................................................140

*Palmer v. Union Pacific R. Co.*,
311 S.W.3d 843 (Mo. Ct. App. 2010) ........................................................ 122

*People v. Lopez*, 197 Cal. App. 3d 93 (4th Dist. 1987) ............................ 93

*Pinchback v. Armistead Homes Corp.*,
907 F.2d 1447 (4th Cir. 1990) ................................................................. 112

*Prime, Inc. v. Younglove Const. Co.*, 227 Neb. 423 (1988) ..................... 137

*Quasar Co. v. Atchison, Topeka & Santa Fe Railway Co.*,
632 F. Supp. 1106 (N.D. Ill. 1986) .............................................. 72, 73, 74

*Project Hope v. M/V IBN SINA*, 250 F.3d 67 (2d Cir. 2001) .................... 131

*Reinicke v. Aeroground, Inc.*,
167 S.W.3d 385 (Tex. App., 14th Dist., 2005) ........................................ 77

*Rohren v. Centennial Public School Dist. 67-R*,
2008 WL 486602 (D. Neb. Feb. 19, 2008) ....................................... 40, 44

*Royal & Sun Alliance Ins., PLC v. Rogers Transport Management Services, Inc.*,
737 F. Supp. 2d 154 (S.D.N.Y. 2010) ...................................................... 72

*Royal & Sun Alliance Ins., PLC v. UPS Supply Chain Solutions, Inc.*,
2011 WL 3874874 (S.D.N.Y. Aug. 31, 2011) ......................................... 72

*Schadel v. Iowa Interstate R.R., Ltd.*, 381 F.3d 671 (7th Cir. 2004) ................ 120, 121

*Scott v. Western Express, Inc.*,
2009 WL 1065840 (W.D. Mo. Apr. 21, 2009) ...................................... 140

*Shaw v. Stewart's Transfer*,
2010 WL 2943202 (D. Me. July 22, 2010) ....................................... 91, 92

*Shelton v. Young's Welding and Machine Shop, LLC*,
2015 WL 247834 (D. Neb. Jan. 20, 2015) ............................................. 131

*Shipler v. General Motors Corp.*, 271 Neb. 194 (2006) ................... 131, 132

*Short v. Marinas USA Ltd. Partnership*,
78 Mass. App. Ct. 848 (2011) ................................................................ 125

*Singer v. Olympia Brewing Co.*, 878 F.2d 596 (2d Cir. 1989) ............... 116

*Smith & Kelly Co. v. S/S Concordia Tadj*,
718 F.2d 1022 (11th Cir. 1983) ............................................................... 131

*Snow v. Oneill*, 2006 WL 1837910 (M.D.N.C. June 5, 2006)...................... 90, 91, 111

*Sompo Japan Ins. Co. of America v. Norfolk Southern Ry. Co.*,
762 F.3d 165 (2d Cir. 2014)...................................................................... 124

*Southeastern Express Co. v. Pastime Amusement Co.*,
299 U.S. 28 (1930) ................................................................................. 129

*Southwestern Truck Sales & Rental Co. v. Johnson*,
165 Neb. 407 (1957) ...............................................................................134

*State Farm Mut. Auto. Ins. Co. v. Graftman*,
968 F. Supp. 2d 480 (E.D.N.Y. 2013) ...................................................... 116

*Starns v. Jones*, 500 F.2d 1233 (8th Cir. 1974) .......................................139

*Tapp v. Blackmore Ranch, Inc.*, 254  Neb. 40 (1998)..............................93

*The Atlas*, 93 U.S. 302 (1876) ....................................................... 118, 119

*The Village of Hallam v. L.G. Barcus & Sons, Inc.*,
281 Neb. 516 (2011) ............................................................................... 133

*Thomas v. O'Brien*,
2010 WL 785999 (E.D.N.Y. Feb. 26, 2010) .............................................140

*Thurston v. Ballou*, 23 Mass. App. Ct. 737 (1987).................................111

*Tortu v. A-1 Quality Limousine Service*,
2008 WL 3887612 (D.N.J. Aug. 18, 2008).....................................84, 91, 92

*United States v. Reliable Transfer Co.*, 421 U.S. 397 (1975) ................... 130

*Vowers & Sons, Inc. v. Strasheim*, 254 Neb. 506 (1998) ......................... 131

*Wheeler v. Estes Express Lines*,
53 F. Supp. 3d 1032 (N.D. Ohio 2014).....................................................136

*Winn Dixie Stores, Inc. v. Aspen Transp., LLC*,
2013 WL 4780125 (M.D. Fla. Sept. 5, 2013)............................................123

**International Cases**

*Docherty (Litigation Guardian) v. Lauzon,*
[2010] O.J. No. 5017 (Ontario Superior Court).................................................................37

*Elliott v. Hill Bros. Expressways,* [1998] A.J. No. 523 (Q.B. Alberta) ......................................36

*Featherstone v. Doe,* [2013] ONSC 3175 ..................................................................35

*Garant v. Impens*, [1986] O.J. No. 1190 (Superior Court Ontario ...............................................35

*Stroud v. Nicholson,* [2005] O.J. No. 367 (Ontario Superior Court) ..........................................36

**Other Authorities**

McCormick on Evidence § 258 ....................................................................135

*Forensic Aspects of Driver Perception and Response*
(Paul L. Olson; Lawyers and Judges Publishing Co., 2015).......................................38

Restatement (Second) Conflict of Laws § 145 (1971) ........................................ 74, 114

Restatement (Second) Conflict of Laws § 146 (1971) ........................................ 114

Restatement (Second) of Torts § 885(3) (1979) ........................................ 116

Plaintiffs Certain Underwriters at Lloyds and Those Companies Severally Subscribing to Boeing Policy Number MARCW150053 and Related Policies Governing the Cargo, (collectively "Plaintiffs"), by their attorneys, Fraser Stryker, PC, and Maloof Browne & Eagan LLC, hereby submit this Amended Memorandum in Opposition to Motions for Summary Judgment of Defendants Road Star Carrier, Inc. ("Road Star") and Bauer Built, Inc. ("Bauer Built").

There is substantial overlap factually and legally between the two summary judgment motions (D.E. 116 and D.E. 122). Plaintiffs submit this one amended brief in opposition to both motions, including addressing the combined 149 statements of fact.

## SUMMARY OF THE FACTS OF THE CASE

This is a case about a brand new $18 million jet engine being delivered from General Electric in Ohio to Boeing in Seattle, to be put on a new 787 airplane. It had its first – and sole – airborne flight a tad early, being catapulted approximately 300 feet off of the flatbed of its delivering tractor trailer on I-80 near Wood River, Nebraska.[1] It was then declared a total loss, and never made it onto a plane.[2]

---

[1] All of the facts cited in this summary are documented either herein, or, if undisputed, in the Plaintiffs' Statement of Additional Undisputed Material Facts.

[2] By way of summarizing the status of this civil matter: (a) virtually all liability discovery has been taken (including depositions of all eyewitnesses); (b) Plaintiffs submit that only limited damages discovery remains (as it is obvious that the jet engine, after tumbling some 300 plus feet down I-80, could not safely be reliably repaired and put under the wing of an aircraft); (c) a total of ten depositions have been taken; (d) at least eleven expert witnesses have been retained by the parties; (e) the damaged engine has been inspected; (f) six conferences have been held with Magistrate Judge Zwart; (g) numerous discovery disputes have been submitted to Judge Zwart (and either resolved or held in abeyance); (g) extensive settlement submissions as part of a first mediation effort were presented to Judge Zwart by the parties following which she identified six issues which needed summary judgment resolution for the parties to best evaluate the case for settling the dispute (D.E. 94); and (h) the parties have now scheduled a second mediation on February 8, 2018 before Michael G. Mullin in anticipation of the Court's rulings on the various

Boeing and its trucker's independent contractor, Thunder Rolls Express, Inc. ("Thunder Rolls"), deliver these jet engines on the same route dozens of times per year to supply the jet maker's customers; they have the securing and movement process down to a science, and have a stellar safety track record. Similarly, the actual driver of the truck delivering the jet engine, Mr. Joseph Womack, had a truly exemplary safety record, as he was coming up on four million accident-free miles.  The level of care which Boeing and its trucker exhibited was not, however, matched by the two Defendants who are now moving for Summary Judgment, Road Star and Bauer Built. Coming around a curve (D.E. 130-25, Report of Professor William Fogarty dated February 20, 2017, pp. 5-6 of 184; Appendix J, pp. 94-105 of 184)[3], which limited visibility for oncoming traffic, Road Star, a Canadian trucker, blew a flat tire, parked its truck hugging the fog or lane line, and put out only two of three required emergency warning triangles, and those only at most 40 feet, where they were so visually cluttered as to be nearly invisible (*id.*, p. 11 of 184; Appendix J, p. 100 of 184), rather than the required legal range for the furthest triangle of 200-500 feet. (*Id.,* pp. 4-5 of 184; Appendix E1 thereto, pp. 64-66 of 184). In fact, even though Road Star was running up to 80 trucks on any given day in the United States, its truckers were never (a) taught U.S. safety procedures nor (b) even outfitted with three warning triangles as required by U.S. law. Yet somehow Bauer Built managed to be just as sloppy if not worse – despite being taught industry standard safety procedures to park at least 30 feet behind any vehicle they were servicing to maximize visibility, and to turn on their stronger hazard lights, their driver did neither. Road Star had the most basic type of flashing hazard lights,

---

motions. Plaintiffs apologize for the length of this brief, made necessary as we are responding to combined briefs of over 220 pages.
[3] For ease of reference, each page of Plaintiffs' expert declarations and reports/attachments is Bate Stamped in the lower right hand corner.

similar to a car's, but they were weak and visible only 400-500 feet (D.E. 130-26, Report of Professor Ronald Gibbons dated January 17, 2017, p. 10 of 31), while Bauer Built turned on only a weak set of beacon lights barely visible at 700 feet, and to make things worse, parked on a diagonal in front of the disabled truck, screening those lights from oncoming traffic and rendering them nearly useless. (*Id.*, pp. 7-8 of 31). Thus, in contrast to Boeing and Thunder Rolls, it is not an exaggeration to say that Road Star and Bauer Built shredded the applicable federal safety regulations, and ignored nearly all of their important industry safety standards.

To make a long story short, the record, *infra*, will show that under applicable industry standards and federal safety standards, Road Star was required to put out three triangles on the highway as far as 500 feet, which would have made it visible at 1,160 feet, or roughly 11 seconds of highway travel time away from its disabled truck (D.E. 130-25, Professor Fogarty Report, Appendix J, pp. 103-104 of 184), given that the Thunder Rolls truck was traveling at 72 mph (106 feet per second). Bauer Built should have parked behind the disabled truck and put on its much stronger special flashing hazard lights, which would have been visible at over 1,500 feet, or roughly 15 seconds away from the disabled truck. (*Id.*, Appendix J, p. 101 of 184). In addition, the Road Star truck was parked nearly flush with the lane line, with its closest point just 5-6 inches from the highway lane. (D.E. 130-24, Fay Engineering Report, p. 15 of 48, ¶ 2). In choosing this location, Road Star left wide open an additional foot of paved shoulder and three feet of hard grassy shoulder (*id.*, p. 15 of 48, ¶ 3), which if it had simply been utilized, there would have been no accident here at all. (D.E. 130-25, Professor Fogarty Report, Appendix U, p. 184 of 184).

These warning devices are required by federal law and safe industry practice for a reason – without them oncoming traffic cannot discern the position of a disabled tractor trailer

more than 625 feet away (D.E. 130-25, Professor Fogarty Report; Appendix J, p. 100 of 184; Appendix N, pp. 114-116 of 184). As luck would have it – in this case bad luck – at the very moment that Mr. Womack was approaching the disabled vehicle, he had a pickup truck just behind him in the lane to his left, (*id.*, Appendix K, p. 109 of 184), and another tractor trailer just over 200 feet in front of him, (*id.*, Appendix J, p. 98 of 184), which he was in the process of passing. The truck in front of him partially shielded his view of the disabled truck – most notably between the distances at least 625 feet and 300 feet before the point of impact, (*id.,* Appendix J, pp. 100 of 184, 102 of 184) – which resulted in him first discerning the disabled truck and its dangerous location hugging the lane line with only 300 feet, or **2.8 seconds, of warning**. (*Id.*, Appendix J, p. 100 of 184). Given the Road Star vehicle's location hugging the lane line, the 12 foot width of the lane, and the 11 foot 10 inch width of the jet engine, Mr. Womack could not simply remain in his lane, as trucks cannot be driven on a perfect straight line at high speeds. (*Id.*, Appendix U, pp. 183-184 of 184). Mr. Womack in the final 2.8 seconds, (*id.*, Report, p. 10 of 184), made a valiant emergency effort to change lanes into the left lane, only to discover that this had the potential to cause an accident with the pickup truck which was gaining on him in that lane. He then immediately returned to his lane and slightly overcorrected, clipping the far left corner of the disabled trailer, and jettisoning his engine. His driving was alert and safe at all times. (*Id.*, Professor Fogarty Report, p. 10 of 184). It was Road Star and Bauer Built's utter lack of care that trapped him, and ruined his driving record. Luckily, there were no serious personal injuries.

   The bottom line is that under standard industry practice and **federal regulations**, Mr. Womack should have been given **11 to 15 seconds of warning** to ensure that he had time to safely avoid the disabled tractor trailer on the shoulder, but through Road Star and Bauer Built's

utter failure to follow any of the numerous applicable federal regulations and standards, he was instead given **only 2.8 seconds**, a time frame within which it was impossible for him, or even the world's greatest truck driver, to avoid the accident, with predictable results.

### SUMMARY OF WHY THE ACCIDENT OCCURRED, INCLUDING ADDITIONAL EXPOSITION OF THE FACTS IN LIGHT OF THE COURT'S SEPTEMBER 27, 2017 DECISION

This Court, in its Memorandum and Order dated September 27, 2017 (D.E. 159) suggested that the trucker, fully alert after eight to eight-and-a-half hours of sleep, and checking the road to the side (D.E. 118-2, Deposition of Joseph Womack Tr. 128:4-7; 189:17-23), as needed, was "approximately 100 feet away" when he first saw the Road Star truck (citing Filing 118-2 at 17).

Respectfully, such a finding is not supported by the record. First of all, the ambiguously phrased (and duly objected to) question which leads Mr. Womack to the 100-foot estimate (actually, he estimates 100-125 feet) did not in fact ask him when he could first see any of the disabled truck for the first time, but rather, when the truck in front of him "cleared" so that he could see the truck. (D.E. 118-2, Womack Tr. 62:22-63:19). Mr. Womack was never in fact asked for how long the truck in front of him blocked his view of the disabled truck, **or if he had seen the disabled truck, in whole or in part, before the truck that he was following had cleared it**.

Second, completely contrary to the 100-foot estimate, elsewhere in his deposition, Mr. Womack estimates roughly two seconds as just comprising the time his truck was moving after he "attempted to change lanes." And those two seconds leave out his reaction time before he tried to change lanes once he saw the disabled truck. (D.E. 118-2, Womack Tr. 39:17-21). As explained below, two to three seconds is over 200 to 300 feet of truck movement here.

5

This is explained in detail in the Final Accident Reconstruction by Plaintiffs' expert, Professor William Fogarty, a forty-year Professor Emeritus of Accident Reconstruction at the University of Miami, who has supervised the reconstruction of over three thousand similar accidents for the government (D.E. 130-25, Professor Fogarty Report, Appendix B, p. 28 of 184), in his Report (D.E. 130-25, Appendix J, "Accident Event Opinion"). Per Professor Fogarty's opinion, the 100-foot estimate here is **scientifically impossible** given the testimony that Mr. Womack's cruise control was set at 72 miles per hour, which corresponds with moving 105.6 feet per second. (D.E. 118-2, Womack Tr. 33:15-18; D.E. 130-25, Professor Fogarty Report, Appendix J, p. 95 of 184). This is because Mr. Womack expressly testified that he undertook the following tasks before the collision:

- Perceiving the disabled vehicle and the danger (D.E. 118-2, Womack Tr. 63:10-14);
- Steering to his left to begin changing lanes (D.E. 118-2, Womack Tr. 156:10-25);
- Perceiving the pickup truck blocking that maneuver and returning back to his own lane (D.E. 118-2, Womack Tr. 157:3-14); and
- Braking (D.E. 118-2, Womack Tr. 129:5-9).

Those tasks, Professor Fogarty opines, at a minimum would take approximately the following time:

- An initial perception of the disabled truck @ 0.25 sec. @ 26 feet.
- A 1.25 to 1.5 second accumulation of discrete responses defined above for steering left, looking in mirror, steering right, all total to 1.5 to 1.75 sec. @ 75 mph yields 158 to 185 feet.
- Braking at 0.4 to 0.54 sec @ 41.5 to 55 feet to impact.

(D.E. 130-25, Professor Fogarty Report, Appendix J, p. 98 of 184). Thus, Professor Fogarty opines that the minimum time from when Mr. Womack saw the disabled vehicle until the

collision would be closer to **260-300 feet**,[4] (*id.*, pp. 95 and 99 of 184), which, unfortunately, even if he was fully alert was also the approximate time of his first opportunity to see it and/or to discern its location and that it was not moving (without its triangles being placed at proper distances as required by federal regulations or the industry standard conspicuous flashing yellow lights being in place on the service vehicle). (*Id.*, p. 100 of 184).

Equally important on this record is the fact that Professor Fogarty's report cites to field research that the ability of witnesses "to estimate distances is extremely weak." (*Id.*, Appendix K, p. 109 of 184). Similarly, Plaintiffs' new additional expert, accident conspicuity expert Professor Marc Green of the University of West Virginia Medical School, a leading researcher on the actions of drivers in accidents, explains in his Report that the time for Mr. Womack to merely check his mirror and see the accelerating pickup truck would alone have "eaten up most of the 2.5-2.8 seconds that he had available for avoidance." (Additional Pl. Exh. 30, Report of Professor Marc Green dated October 122, 2017, p. 4). Thus, Professor Green both (a) accepts Professor Fogarty's estimates and further (b) opines from his research that the time for Mr. Womack to check his mirror alone would far exceed the time to travel 100 feet (about one second).

Further, consistent with these other expert findings, Defendant Road Star's own expert, David Krauss,[5] in his book *Forensic Aspects of Driver Perception and Response* (Lawyer and Judges, 4th ed. 2015), additional Pl. Exh. 31 hereto at pp. 83 and 90, agrees that any

---

[4] This is based upon his further opinion from the specific testimony provided of a separation distance between the two moving trucks of 200-240 feet. (*Id.*, Appendix J, pp. 95 and 98-99 of 184).

[5] It is also worth noting that Road Star's expert Krauss repeatedly cites to the work of our own expert, Professor Green, and even appends to his report one of Professor Green's research papers on driver reaction time, thus implicitly recognizing him as a leading expert in the field. (D.E. 145-7, p. 3 of 209 and pp. 59-106 of 209).

competent finder of fact must discard a witness distance estimate, made during participating in an accident, such as Mr. Womack's here, writing:

> In fact, witnesses' judgments of distance in the usual measuring units are likely to be unreliable, sometimes spectacularly so.
>
> ****
>
> Drivers are generally poor at estimating distance in units such as feet, meters, car lengths, football fields, etc. Reliance should be placed on other distance indicators whenever possible.

(Pl. Exh. 31, Forensic Aspects of Driver Perception and Response, p. 3 of 12 and p. 10 of 12). Thus, in short, all of the scientific research, and all three of the experts in this case, **on both sides**, agree that estimates like the 100-foot witness distance estimate that Mr. Womack gave here, mentally recorded under exigent circumstances, is "likely to be unreliable, sometimes spectacularly so."

Lastly, the evidence is that the Road Star truck was parked "practically right on the white line," and parked as close as "three to four inches" away.[6] (D.E. 118-2, Womack Tr. 62:22-63:9). And both Professor Fogarty and Professor Green agree that at this location, given the nature of the long curve where the truck was parked, it was impossible before the last few hundred feet for Mr. Womack to discern the disabled truck and that it was not moving in the absence of properly placed warning triangles or proper conspicuous flashing truck lights. (D.E. 130-25, Professor Fogarty Report, Appendix J, p. 100 of 184; Pl. Exh. 30, Professor Green Report, p. 6).

---

[6] Accident Reconstructionist Ric Robinette's on-scene measurements as attached to his Expert Report show that the Road Star truck's mirrors would have been only 5 ¾ inches from the fog line. (D.E. 130-24, Fay Engineering Report, p. 23 of 48).

This was through no fault of Mr. Womack, whose actions were determined by our Professor of accident reconstruction **as being consistent with being an alert driver whose driving was at a normal and normally safe following distance (200-240 feet) to the truck in front of him**. ([D.E. 130-25](), Professor Fogarty Report, pp. 10 of 184; Appendix J, p. 98 of 184; and Appendix T, p. 172 of 184).

As Professor Green concludes, in the absence of such properly placed triangles or industry standard of conspicuous flashing yellow lights on the service vehicle:

> 1. A normal driver would not see the Road Star or service vehicle or triangles with sufficient advance warning for avoidance due to the normal allocation of attention required to perform his driving tasks . . .

(Pl. Exh. 30, Professor Green Report, p. 6). Moreover, instead of a few hundred feet of warning, these safety devices would have given Mr. Womack at least 12-15 seconds (based upon 1,200-1,500 feet) of warning, not 2-3 seconds of warning. ([D.E. 130-25](), Professor Fogarty Report, Appendix J, pp. 99-101 and 103 of 184).

Professor Fogarty in his Expert Report explains the distinction recorded in the retina and registered in the brain between vehicles that are purely *visible* and vehicles that are *discernible*. "While a driver may have an opportunity (clear line of sight to an object), the image transmitted to the brain by the eye may not be discernible, it may be too small to be identified . . . too irrelevant to be identified." ([D.E. 130-25](), Professor Fogarty Report, p. 6 of 184).

The gap between visibility and discernment is evidenced in a driver's response to his retinal image dilation of approaching objects, a phenomenon called "looming." Until that recognition occurs (here, Professor Fogarty estimates at less than 625 feet, as noted below), a driver has little ability to gauge his time-to-collision (TTC) when a vehicle ahead of him is not moving. Professor Fogarty in fact cites to a study written by Professor Green on this subject:

Drivers see many vehicles on the roadway ahead, so the mere presence of a lead vehicle does not necessarily imply the need to respond. . . . However, they cannot tell anything about the rate of closing or the imminence of collision.

\*\*\*\*

The analysis of driver looming/motion perception and behavior consists of two sets of factors, sensory and cognitive. The sensory, "psychophysical" factors are the eye's ability to sense object, contrast, motion, etc. . . . That is obviously a good place to start a collision analysis. The sensory information by itself, however, has little significance. To behave intelligently, drivers must interpret the sensory information, and assess the situation. This requires cognitive processing that is largely based on experience and expectation.

\*\*\*\*

**But it is certain that until looming is perceptible, the driver has no accurate information about TTC** [Time To Collision]**.**

(D.E. 130-25, Professor Fogarty Report, Appendix N, pp. 136 and 139 of 184 (emphasis supplied)).

Note that in the photo below the truck parked on the shoulder can be seen but cannot yet be "discerned" at 1,500 feet to be stationary or parked on the shoulder. Consistent with Professor Fogarty's opinion, this would not occur on this roadway until 625 feet away or closer (D.E. 130-25, Professor Fogarty Report, p. 10 of 184 and Appendix N thereto, p. 147 of 184, opining from his research that, on this road, due to the eye's limited ability to discern vehicle positions, "all distances to impact of 625 feet or more are irrelevant, scientifically, to the issue of Womack being provided 'visibility' sufficient to cause reaction."), and that from 625 to 300 feet the truck in front of Mr. Womack partially obscured his line of sight to the Road Star vehicle. (Id., p 10 of 184; Appendix N, p. 147 of 184). Even 625 feet gives a very short time to react, and thus, Professor Fogarty's expert opinion is that Mr. Womack here was not given "a

10

reasonable opportunity to react and avoid the Road Star trailer" and that "his capability to avoid impact became nonexistent" and further that "[h]e was not given a reasonable warning opportunity to avoid a hazard." (D.E. 130-25, Professor Fogarty Report, pp. 9-10 of 184, and Appendix U thereto, p. 184 of 184; *see also id.* at p. 7 of 184 (opining based upon industry standards that "6.7 to 10 seconds of time is established for a design driver's detection (perception), recognition (identification), decision (judgment) response prior to a lane change maneuver. . . ." and citing a 2010 research paper that a lane change for a tractor trailer normally takes 6.8 to 8.4 seconds.)).

That the industry standard is for highway service vehicles to have flashing yellow lights with an LED intensity of 4,000 cd, which translates to be visible to roughly 1,500 feet (or roughly 15 seconds away), is detailed in the expert report of Professor Ronald Gibbons of Virginia Polytechnic University and State University. (D.E. 130-26, Professor Gibbons Report, p. 5 of 31, Table 1, and p. 6 of 31, Figure 2). Professor Gibbons even conducted his own accident reconstruction at the scene, which established that the proper industry standard red and amber lights would have been visible at 1,500 feet. (*See* Figure 6 below from his accident recreation, a photo taken at 1,500 feet from an identically sized exemplar truck parked on the shoulder on I-80 at the exact location where the Road Star truck was parked).



(*Id.*, p. 10 of 31). And as you can see from the above photo, given the curve in question's location, 1,500 feet (or roughly 15 seconds away) from the accident location was also long before Mr. Womack's line of sight could be impacted even partially by a truck that he was following. (*See generally* D.E. 130-25, Professor Fogarty Report, Appendix J, p. 99 of 184).

In closing, with 10 to 15 seconds of warning, it would have been virtually impossible for this accident to happen. (*See* Report of Professor Philip Garvey of Pennsylvania State University dated January 19, 2017, with appended research study, D.E. 130-27, pp. 3 and 24-25 of 53, noting that 98% of all truckers comply with state move-over laws and change lanes once they see flashing emergency lights and flares on the shoulder of the highway). Professor Garvey further opines that properly placed triangles have similar effectiveness to flares. (*Id.*, p. 3 of 53). And, again, Professor Fogarty specifically opines that given the design of the highway section and curve in question flashing lights would have been seen by Mr. Womack at 1,500 feet

12

away from the collision location. (D.E. 130-25, Professor Fogarty Report, Appendix J, p. 100 of 184).

To further summarize, given that (a) Mr. Womack testified that he always changes lanes when he sees flashing lights up ahead, in compliance with state move-over laws, and during his 36-years and approximately four million accident-free miles of driving he has never been cited for not doing so, (D.E. 118-2, Womack Tr. 36:21-37:14; 42:15-43:3); given that (b) research studies have shown that 98% of truckers change to the left lane promptly when confronted with emergency lights and other appropriate warnings, per the Garvey studies above; and given that (c) on the roadway in question during our own reconstruction proper industry standard flashing lights were easily visible at 1,500 feet, with industry standard flashing lights (or properly placed triangles), there is simply no question that this accident would not have had even a **remote** chance of occurring.

Finally, Professor Marc Green, the leading "conspicuity" accident reconstructionist in the country (whose work is expressly relied upon, again, **by Road Star's expert**), expressly opines that, given the location of the Road Star truck on the curve in question, how close it was hugging the fog line, its not being properly marked or lighted, and the brain's difficulty in the accurate discerning of the non-moving nature of a parked truck, here:

1. **A normal driver would not see the Road Star or service vehicle or triangles with sufficient advance warning for avoidance due to the normal allocation of attention required to perform his driving tasks;**
2. **The service vehicle's position and inadequate lighting lowered its conspicuity;**
3. **A normal driver would not see a reflective triangle in prevailing conditions until he was relatively close to it; and**
4. **Given the high roadway speed, a reflective triangle would have to be placed far in advance of a stopped vehicle in order to provide an approaching driver sufficient time to respond.**

13

(Pl. Exh. 30, Professor Green Report, p. 6 (emphasis supplied)).

Contrary to initial appearances, if they drill down on the facts, an intelligent jury will find that Mr. Womack's fault in causing this accident was actually *de minimis*.[7]

## INTRODUCTION TO THE LEGAL ISSUES

At issue here is the loss of an $18,000,000 Boeing GEnx-1B engine that was damaged in Nebraska during interstate transport by Defendants Southern Pride Trucking, Inc. ("Southern Pride") and Thunder Rolls from Peebles, Ohio, to Everett, Washington when the engine struck Road Star's tractor-trailer, which was inexplicably stopped on the rumble strip of the shoulder on a curve on the highway, right up against the fog line, to change a tire, despite the existence of at least four feet of additional available shoulder, and without putting out the proper warning triangles. This accident could have been avoided if Road Star and Bauer Built, the emergency roadside assistance service handling the tire change, had exercised due care by doing any one of the numerous safety precautions all of which the law requires – (i) stopping far enough off the right hand side of the road instead of on the rumble strip to allow adequate traffic clearance, or (ii) placing three reflective triangles at the appropriate distance to warn oncoming traffic, or (iii) in the case of Bauer Built, turning on its hazard lights or having emergency lights with adequate visibility, or (iv) positioning its truck behind the disabled tractor-trailer so as to give additional notice of an emergency situation to oncoming traffic.  Plaintiffs are prepared to meet their burden at trial that the Defendants' failure to perform, *inter alia*, even one of these

---

[7] It is worth noting, on the subject of the reconstruction of how this accident actually occurred, that in response to the opinions of Plaintiffs' four distinguished professors, Road Star was only able to submit an opinion from a long discredited expert, *see* discussion *infra*, and Bauer Built was not able to procure the opinion of any expert at all.

four minimal, legally required, normal safety warning functions, was at least one percent of the proximate cause of this catastrophic accident.

Plaintiffs have already moved for partial summary judgment against Defendant Road Star on the issue of negligence *per se*. (D.E. 111). As addressed in that motion, Road Star, as an operator of commercial motor vehicles, is subject to federal safety regulations, which include the obligation to set out three reflective triangles at specified distances to warn oncoming traffic of a disabled vehicle pursuant to 49 C.F.R. § 392.22 *et seq*. That they admittedly and indisputably failed to comply with these federal requirements – which are designed to prevent highway accidents such as the one at issue – renders Road Star negligent *per se*, leaving the only issue for trial one of causation.

Defendants Road Star and Bauer Built now for their part undertake the rare (and Herculean) task of convincing this Honorable Court to prematurely dismiss this $18 million negligence case (a) before discovery has been completed, (b) before all of the experts have been retained and (c) their reports prepared, and (d) before expert depositions, on the single basis that no jury could ever find either of them to be even 1% negligent under either federal common law or Nebraska law, both of which apply joint and several liability.[8]

---

[8] With their summary judgment brief, Defendant Road Star relies upon the Report of the Canadian engineering firm HRYCAY. (D.E. 118-3). However, as discussed further *infra*, Defendant Road Star fails to comply with Rule 26(a)(2)(B)(iii)-(vi) by failing to file with HRYCAY's Report its exhibits (they came late), the expert's qualifications, including publications, his prior testimony, or his compensation, so the report should be stricken. The qualifications of the HRYCAY expert are thus completely unknown given this failure to comply with Rule 26(a)(2)(B) and Plaintiffs have not yet had the opportunity to depose him. Moreover, although the deadline for identifying experts has not even occurred, even Plaintiffs' experts identified to date will dispute many of HRYCAY's facts and most of their conclusions, and are prepared to testify that Defendants' negligence caused the accident. **Finally, the HRYCAY Report itself does not even include the conclusion that Mr. Womack's overcorrection was the only cause of the accident.** *See* D.E. 118-3**, p. 14.** In fact, HRYCAY's conclusions

They further ask this Honorable Court to make that ruling not withstanding their (a) having failed to comply with the pertinent federal highway warning device (triangle) placement regulations, and (b) the identical standards contained in the Nebraska State Commercial Motor Vehicle Driving Manual or (c) admitted industry standards, all designed specifically to prevent precisely this type of accident, and despite the fact that both companies (d) have a long history of engaging in such grossly negligent conduct.

They further ask this Honorable Court to rule, as a matter of law, that 100% of the cause for this accident falls squarely upon the driver carrying the GE jet engine, even though his (candid) testimony is that he was fully alert and aware at the time of the accident, doing his best to drive safely, and, in contrast to the Defendants, has no history of negligence whatsoever, and in fact had a stellar 36 year driving career which included, up to the point of the accident, nearly 4 million accident free miles (the equivalent of over 1,000 road trips from New York to California) and further given that he had carried the very same oversized jet engines on the same Peebles, Ohio to Everett, Washington route some 180 times without incident.

Defendants' Herculean task is perhaps more accurately described as Sisyphean, since virtually every legal argument that they make ultimately relies upon a misreading of the established case law, resulting in their making no headway at all on each of their legal points, and they then have to start over again. Specifically:

---

regarding the reflective triangles are that he identifies only the placement of two, (*id.*, p. 13), and does not even address the absence of the third one that 49 C.F.R. § 392.22 requires; and could not "determine with certainty" where the triangles had been placed, (*id.*, p. 14 at ¶ 3), **much less the effect of their absence at proper distances.**

(1)    Defendant Road Star argues that, as a matter of law, Mr. Womack's negligence can be declared now, pre-discovery's closure and pre-trial, to have been the sole cause of this loss.

(2)    Defendant Road Star argues, quite desperately and preposterously, that the federal regulations governing the placement of warning devices on all highway "curves" does not apply in this case because in their opinion this curve was not "sudden enough" or "short enough," <u>ignoring the true AASHTO[9] tables on curve sizes and the regulations' own plain wording that it applies to all curves</u>.

(3)    Defendant Road Star argues that Nebraska law supersedes federal law, concerning the application of negligence *per se* principles, <u>ignoring all of the established case law</u> that federal law supersedes state law in this area whenever it is more stringent.

(4)    Defendant Road Star further argues, erroneously, that their liability is "several" and not "joint and several," <u>ignoring all of the established case law</u>. Although not necessary for the resolution of this motion, Plaintiff will address this as well.

(5)    Defendant Bauer Built argues that the driver of the GE jet engine's (Joseph Womack's) statement constitutes "judicial admissions" against the Plaintiff cargo insurers, <u>ignoring all of the established case law</u> holding that third-parties to a statement can <u>never</u> be held bound by it.

(6)    Defendant Bauer Built argues that Mr. Womack's conduct constitutes "intervening acts" which exonerates it, <u>ignoring all of the established case law</u> that an act which comes together with a preceding act at the very same moment to cause injury are never to be treated as an intervening act.

---

[9] Association of State Highway and Transportation Officials ("AASHTO").

17

(7)    Defendant Bauer Built further argues that negligent defendants cannot share tort liability with "Carmack defendants," nor with "strict liability defendants," despite, yet again, all of the established case law being directly to the contrary.

We support this now with the following.

# I.

## PLAINTIFFS' STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS ("SOUMF") REQUIRING DENIAL OF DEFENDANTS' MOTIONS

1.    Joseph Womack was 56 years old on August 10, 2015, the date of the accident.  (D.E. 118-2, Womack Tr. 8:8-9).

2.    Mr. Womack had been professionally and safely driving a truck since he was age 20 – for 36 years – since 1979. (D.E. 118-2, Womack Tr. 8:13-15).

3.    Mr. Womack had been specializing in moving aircraft parts on his truck for 9 years, since 2006.  (D.E. 118-2, Womack Tr. 8:16-22).

4.    The GE jet engine that Mr. Womack carried was picked up at General Electric's plant in Peebles, Ohio on August 9, 2015 for delivery to Boeing in Everett, Washington.  (D.E. 118-2, Womack Tr. 21:12-17).

5.    The GE jet engine was properly secured onto Mr. Womack's truck. (D.E. 118-2, Womack Tr. 20:1-2).

6.    In fact, Mr. Womack checked the strength of the jet engine's securing himself and found no problems.  (D.E. 118-2, Womack Tr. 19:20-25).

7.    The GE personnel present during the securing of the GE jet engine also did not indicate any issues with it at all.  (D.E. 118-2, Womack Tr. 20:3-8).

8.      Mr. Womack had a driving record that included safely driving 81 similarly "oversized" jet engines on this exact same route from Ohio through Route I-80 in Nebraska to the State of Washington without any incidents whatsoever. (D.E. 118-2, Womack Tr. 10:12-16).

9.      None of those 81 engines, carried by this same driver, on this same route, were delivered with any damage whatsoever. (D.E. 118-2, Womack Tr. 11:18-22).

10.     Overall, between September 9, 2007 and July 29, 2015, Mr. Womack in this same truck moved roughly 172 jet engines and delivered them safely to Boeing. (D.E. 118-2, Womack Tr. 11:6-11:22).

11.     Prior to the accident, Mr. Womack had driven nearly 4 million cumulative miles without an accident – roughly the equivalent of driving from New York City to Los Angeles nearly 1,500 times. (D.E. 118-2, Womack Tr. 42:21-43:3).

12.     Mr. Womack was contracted by Southern Pride to move those jet engines. (D.E. 118-2, Womack Tr. 12:8-15; 13:18-22).

13.     Southern Pride specializes nationwide in moving jet engines, safely moving an estimated 50 jet engines each day around the United States. (D.E. 118-2, Womack Tr. 11:23-12:3).

14.     Between the location where he picked up the GE jet engine in Peebles, Ohio, and the accident site on I-80 near Wood River, Nebraska, Mr. Womack had already carried the GE jet engine an estimated 1,000 miles without incident. (D.E. 118-2, Womack Tr. 23:9-15).

15.     Mr. Womack also filled out a bill of lading for the GE jet engine indicating that it had no damage when he received it. (D.E. 118-2, Womack Tr. 25:14-17).

16.     In fact, the GE jet engine which Mr. Womack was carrying was brand new. (D.E. 118-2, Womack Tr. 25:18-19).

19

17.     During those approximately 1,000 miles, Mr. Womack had no problem at all with the GE jet engine.  (D.E. 118-2, Womack Tr. 17:24-23:20).

18.     On August 10, 2015, after a night's sleep, Mr. Womack began driving at 7:30 A.M. EST at Morton, Illinois.  (D.E. 118-2, Womack Tr. 29:12-15).

19.     Mr. Womack typically drove 2,500 miles per week in 2015. (D.E. 118-2, Womack Tr. 29:22-30:1).

20.     After leaving Morton, Illinois, and before the accident, Mr. Womack stopped in Clive, Iowa for fuel. (D.E. 118-2, Womack Tr. 30:8-10).

21.     While on I-80, Mr. Womack had his cruise control set at 72 mph, which was within the 75 mph speed limit. (D.E. 118-2, Womack Tr. at 33:15-18).

22.     While driving, Mr. Womack's standard practice is to "always keep [his] eyes moving" and to "keep a proper lookout" when he is driving, and he never testified that he altered that practice here.  (D.E. 118-2, Womack Tr. 54:6-10).

23.     Mr. Womack had a set practice of changing lanes whenever he saw triangles put out behind a tractor trailer.  (D.E. 118-2, Womack Tr. 36:12-16).

24.     Mr. Womack had a set practice of changing lanes whenever he saw hazard lights on an emergency vehicle on the side of the road.  (D.E. 118-2, Womack Tr. 36:17-20).

25.     Mr. Womack had a set practice of moving over whenever he saw any emergency service vehicle with its emergency lights activated on the side of the road. (D.E. 118-2, Womack Tr. 37:5-11).

26.     Mr. Womack knew that it was the law in all 50 states that he had to "move over" away from the shoulder at least one lane whenever he saw an emergency service vehicle on the side of the road. (D.E. 118-2, Womack Tr. 37:15-17).

27.     Mr. Womack knew that the nationwide "move over" law was in effect in Nebraska.  (D.E. 118-2, Womack Tr. 37:15-17).

28.     Based upon his 36 years of driving, Mr. Womack rightly expected that if a truck was broken down on the side of a divided highway it would absolutely follow the law and put out triangles between 200 and 500 feet as a fair warning. (D.E. 118-2, Womack Tr. 38:3-10).

29.     Mr. Womack confirmed that it helped him as a truck driver to know what's up ahead when such triangles were put out on the highway indicating the presence of a disabled truck on the shoulder.  (D.E. 118-2, Womack Tr. 38:13).

30.     Mr. Womack had never been cited once in his 36 years of driving for failing to move over when passing an emergency vehicle with its emergency lights activated on the side of the road. (D.E. 118-2, Womack Tr. 109:12; 110:2-12).

31.     Defendants have elicited no evidence which even suggests that Mr. Womack would, in this single instance, have made an exception to what was his **consistent** 36 years practice of timely changing over to the left lane every time he was provided with adequate notice via the placement of triangles that a tractor trailer was broken down on the shoulder of a highway. (D.E. 118-2, Womack Tr. 36:17-20).

32.     Defendants have elicited no evidence which even suggests that Mr. Womack would, in this single instance, have made an exception to what was his **consistent** 36 years practice of timely changing over to the left lane every time he was provided with adequate notice via the turning on of hazard lights that an emergency vehicle was located on the shoulder of a highway.  (D.E. 118-2, Womack Tr. 37:5-11).

33.     Defendants have elicited no testimony in his entire deposition which established that Mr. Womack was in need of a rest, or was drowsy or fatigued. (D.E. 118-2, Womack Tr., entire).

34.     Defendants have elicited no testimony in his entire deposition which establishes Mr. Womack was listening to the radio, talking on a cell phone, or otherwise distracted. (D.E. 118-2, Womack Tr., entire).

35.     On August 10, 2015, at approximately 1,584 feet east of mile marker 297 on Interstate 80 near Wood River, Nebraska, a tractor trailer owned and operated by Defendant Road Star had parked on the shoulder of the right travel lane to service a flat tire.  (D.E. 118-1, Investigator's Motor Vehicle Accident Report, Sheets 1-2; D.E. 118-4, Deposition of Muhammad Saqib, Tr. 23:24-24:6; D.E. 130-24, Fay Engineering Report, Attachments 1 and 2, pp. 16-19 of 48).



(D.E. 130-24, Fay Engineering Report, Attachment 1, p. 17 of 48).



(D.E. 130-24, Fay Engineering Report, Attachment 2, p. 19 of 48).

36.     The driver of the disabled truck did not move fully away from the travel lanes. Instead he **parked directly on the rumble strip** and within roughly a foot or so of the white lane (fog) line. (D.E. 130-24, Fay Engineering Report, at p. 15 of 48, ¶ 2; D.E. 118-2, Womack Tr. 207:2-9: "it [the truck] was even closer than one foot off the fog line").

37.     The Road Star driver parked on the rumble strip even though there was another 1 foot and 3 inches of empty asphalt to the right of the shoulder, and at least another 3 feet of flat grass off the road beyond the shoulder. (D.E. 130-24, Fay Engineering Report, p. 15 of 48, ¶ 3, and Attachments 3 and 4, pp. 20-23 of 48; and D.E. 124-8, Saleem, Tr. 18:2-6).

38.     The Bauer Built truck, weighing at least 26,000 pounds, had no problem parking on the open grass shoulder area, stretching possibly ten feet. (D.E. 118-1, State of Nebraska Investigator's Motor Vehicle Accident Report, at Sheet 6; D.E. 118-5, Salisbury Tr. 45:1-13 and 46:11-19).



([D.E. 130-24](), Fay Engineering Report, Attachment 3, p. 21 of 48).

        39.    In fact, as shown in the diagram below, the evidence establishes via measurements of the tire marks that the disabled tractor-trailer left side rear view mirror was just 5 ¾ inches from the highway white lane (fog) line. The truck was partly covering the rumble strip, which should have been left clear to provide an emergency warning sound for any vehicle traversing it. ([D.E. 130-24](), Fay Engineering Report, p. 15 of 48, ¶ 2, Attachment 4, p. 23 of 48; [D.E. 130-1](), Photograph of Road Star truck against lane line and on rumble strip; confirmed to correspond to placement vis-à-vis the lane pre-accident at [D.E. 118-5](), Salisbury Tr. 90:20-24).



(D.E. 130-24, Fay Engineering Report, Attachment 4, p. 23 of 48).



(D.E. 130-1, Larson Photo of Road Star truck up against lane line and on the rumble strip; confirmed to correspond to its placement vis-à-vis the lane line pre-accident at D.E. 118-5, Salisbury Tr. 90:20-24).

40.     Defendant Bauer Built, which provides roadside assistance to the trucking industry, provided the tire change service to Road Star.  Although there was plenty of room behind the Road Star truck, Brandon Salisbury, the Bauer Built tire change technician, parked his vehicle in front and to the side of the disabled Road Star truck. (D.E. 130-24, Fay Engineering, p. 11 of 48; D.E. 130-2, Larson Photograph; *see also* D.E. 118-5, Salisbury Tr. 90:20-24 and Tr. 137:7-9, confirming that his truck did not move as a result of the accident).

41.    The location where the Bauer Built vehicle was parked made it "not all that visible" to oncoming traffic. (D.E. 118-5, Salisbury Tr. 142:25-143:6).



(D.E. 130-2).

42.     The Road Star truck was only carrying two reflective triangles. (D.E. 124-8, Saleem Tr. 13:10-15).

43.     The driver of the vehicle, Muhammad Saqib, placed these two reflective triangles out only a maximum of just forty feet behind the disabled tractor-trailer unit. (D.E. 118-5, Salisbury Tr. 84:15-18, 99:3-100:9, 102:2-6; D.E. 118-4, Saqib Tr. 27:4-6, 28:4-7; D.E. 124-8, Saleem Tr. 13:10-15; D.E. 130-3, Photograph marked by Salisbury).



(D.E. 130-3, Photograph showing location of triangle placement; square and circled area accurately shows triangle placement except forward triangle was a "little further" toward front of the police car shown in corner of photo. (D.E. 118-5, Salisbury Tr. 99:3-100:9; 102:2-6)).

44.     The Road Star drivers Mr. Saqib and Mr. Saleem received no training as to how many emergency warning devices to carry or at what distances such devices should be placed. (D.E. 118-4, Saqib Tr. 20:14-23; D.E. 124-8, Saleem Tr. 9:16-23).

45.     The Road Star employee in charge of Recruiting, Licensing and Safety (including driver training), was not aware of the U.S. requirements regarding a minimum of 3 warning devices or the distances at which they should be placed. (D.E. 130-4, Deposition of Stacey Ullman, Tr. 16:15-17:15; 36:10-18).

46.     The Bauer Built service technician failed to put out a single warning triangle. (D.E. 118-5, Salisbury Tr. 89:6-10; 164:11-13).

47.     The Bauer Built service technician's conduct directly violated his training at Bauer Built, which was to put out triangles at 10, 100 and 200 feet when performing service on the highway. (D.E. 118-5, Salisbury Tr. 49:22-50:4).

48.     Between the time the tractor trailer pulled to the side of the road with the flat tire and the time the accident occurred, approximately 70-80 minutes had elapsed. (D.E. 130-5, Statement of Accident (authenticated at D.E. 118-4, Saqib Tr. 37:4-38:21) which states that the Road Star drivers were at the scene 40-50 minutes before the Bauer Built service truck arrived; and D.E. 118-5, Salisbury Tr. 69:2, who estimates 30 minutes elapsed between the time the service truck arrived until the accident occurred).

49.     It was common knowledge that oversized loads pass by the accident location numerous times per day on Interstate 80. (D.E. 118-5, Salisbury Tr. 72:24-73:5).

50.     A collision ensued between the oncoming Southern Pride/Thunder Rolls truck carrying the jet engine and the parked Road Star truck. (D.E. 118-1, Investigator's Motor Vehicle Accident Report, Sheets 1-2).

51.     The Road Star truck had a commerce classification of "Interstate Commerce" and had a Gross Vehicle Weight Rating of more than 26,000 lbs. (D.E. 118-1, State of Nebraska Investigator's Supplemental Truck and Bus Accident Report, Sheet 5).

52.     The Bauer Built truck performs interstate emergency roadside assistance, and weighs more than 26,000 pounds. (D.E. 118-1, State of Nebraska Investigator's Supplemental Truck and Bus Accident Report, Sheet 6; D.E. 118-5, Salisbury Tr. 170:2-16).

53.     Such truck was registered with the Safety Measurement System ("SMS") of the U.S. Federal Motor Carrier Safety Administration as one of the trucks owned by Bauer Built to conduct its work as an "interstate" carrier (with DOT # 83629) and transporter of tires and batteries.  (D.E. 130-6, SMS Report; D.E. 130-7, SMS Carrier Registration Information; D.E. 118-5, Salisbury Tr. 168:8-169:20).

54.     Road Star is based in Ontario, Canada, and at any given time runs about 80 trucks in the United States. (D.E. 130-8, FMCSA Road Star "Company Snapshot"; D.E. 130-9, Deposition of Robert Grimson, Road Star Safety and Compliance Director, Tr. 24:16-22).

55.     Road Star has been registered with the U.S. Federal Motor Carrier Safety Administration ("FMCSA") as an interstate motor carrier (DOT # 1094105) since 2004. (D.E. 130-8, FMCSA Road Star "Company Snapshot"; D.E. 130-10, Screen Capture from FMCSA website re: Road Star licensing history, at p. 4 (showing authority granted in 2004 without interruption)).

56.     At the time of the incident the Road Star truck was en route from Ontario, Canada to Utah carrying office furniture. (D.E. 118-4, Saqib Tr. 15:1-8; D.E. 118-11, Road Star Bill of Lading; D.E. 130-11, Road Star Manifest).

57.     Standards of the Tire Industry Association require a service vehicle to park in the rear of a disabled tractor trailer as a warning to oncoming traffic. (D.E. 130-21, Transcript of Bauer Built Training Video; D.E. 130-28, Report of Michael Martina dated January 11, 2017, p. 3 of 27).

58.   Industry standards require a service vehicle to park on a diagonal to a disabled truck to warn oncoming traffic. (D.E. 130-28, Martina Report, p. 3 of 27).

59.   Industry standards require a service truck to activate its hazard lights and overhead beacons when servicing a disabled vehicle. (D.E. 130-21, Transcript of Training Video; D.E. 130-28, Martina Report, p. 3 of 27).

60.   The Bauer Built driver did not park to the rear of the Road Star Truck; did not park at a diagonal; and did not activate his hazard lights. (D.E. 130-2, Accident Scene Photo; D.E. 130-29, still excerpt of Video of accident scene taken by Road Star Driver Rizwan Saleem (showing the 4 way beacon light on but not red hazard lights). On request, a copy of the video will be available to the Court).

61.   Industry standards required the emergency lights on Road Star's vehicle (LED lights) to have a minimum 4,000 cd (intensity) for the daytime. (D.E. 130-26, Professor Gibbons Report, p. 5 of 31).

62.   The Bauer Built roof top strobe had an intensity of only 1,000 cd, and amber side flashers had an intensity of only 250 cd. (D.E. 130-26, Professor Gibbons Report, p. 2 of 31).

63.   The visibility distance of the service truck was below 900 feet base on the static assessment and the crash site assessment; keeping the service truck behind the stopped truck and using the red flashing tail lights would have increased visibility beyond 1,500 feet; the taillights on the tractor trailer were not visible beyond 500 feet. (D.E. 130-26, Professor Gibbons Report, p. 11 of 31).

64.     Three triangles deployed at proper distances normally can be seen up to 700 feet upstream of their placement. (D.E. 130-27, Professor Garvey Report, p. 3 of 52, Exh. A, pp. 4-6 of 53).

65.     Eighty-nine percent of vehicles change lanes when warning devices were placed at proper distances. (D.E. 130-27, Professor Garvey Report, Exh. B, p. 23 of 53).

66.     The combination of properly placed triangles (or flares) and emergency lights warn over 95 percent of traffic to move over one lane. (D.E. 130-27, Professor Garvey Report, p. 3 of 53, ¶¶ 2-3 and Exh. B, p. 24 of 53).

67.     Triangles placed at 500 feet are typically visible at an additional 700 feet or 1,200 feet in total (nearly 12 seconds of warning). (D.E. 130-27, Professor Garvey Report, p. 3 of 53, ¶ 1).

68.     Had the Bauer Built driver appropriately activated the hazard flashing lights at the site of the disabled vehicle, the driver carrying the jet engine would have had an opportunity to see those lights when he was **more** than 1,500 feet (or roughly 15 seconds) away from the disabled truck. (D.E. 130-25, Professor Fogarty Report, Appendix J, pp. 101-103 of 184).

69.     Had warning triangles been placed at the appropriate intervals (up to 500 feet), the driver could have had an opportunity to see them when he was up to 500 feet away or 1,000 feet (or roughly 10 seconds) away from the disabled vehicle. (D.E. 130-25, Professor Fogarty Report, Appendix J, p. 99 of 184).

70.     Had this professional driver received the foregoing warning, he would have had a reasonable opportunity to and would almost certainly have avoided the accident by either partially changing lanes or decelerating and then changing lanes, either of which could

entirely have been accomplished by a professional driver in well under 10 seconds. (D.E. 130-25,

Professor Fogarty Report, pp. 7-8 of 184).

**II.**

**ROAD STAR'S STATEMENT OF FACTS**
**AND EXPERT REPORT SHOULD BE STRICKEN**

A.   **Road Star's Entire Motion Including Much of Its Statement of Facts Relies Largely Upon the Report of the HRYCAY Canadian Engineering Firm which (i) Has Repeatedly Been Found in the Past by Both Canadian and American Courts to Issue Biased Reports, (ii) In this Instance Relies Upon a 20-Year Old Study Later Found By Its Own Author to Be Based On Erroneous Data, and (iii) Fails to Comply With F.R.C.P. 26(a)(2)(B)**

1.   **HRYCAY's Reports Have Been Judicially Found By Courts in Two Countries to Lack Objectivity**

The expert report which Road Star relies almost exclusively upon to support its

Summary Judgment Motion was issued by HRYCAY Consulting Engineers, Inc. ("HRYCAY").

(D.E. 118-3, p. 15). What Road Star fails to reveal in its motion is that HRYCAY,[10] based out of

Ontario, Canada, and their engineering reports, have a long history of being thrown out as

intentionally biased by Courts in **both** Canada and the United States.

In an Ontario Superior Court of Justice opinion denying defendant's motion for

summary judgement, *Featherstone v. Doe,* [2013] ONSC 3175 at para. 12*,* the Judge warned of

this expert firm's utter lack of credibility:

> The independence and objectivity of Mr. [James] Hrycay will be
> an issue if this matter reaches trial. The plaintiff's factum indicates
> that **his evidence was rejected for lack of objectivity and**

---

[10] As far back as 1986, the company's founder, Mr. James Hrycay, was found by yet another Court to be intentionally trying to "obscure answers in technical data," refusing to "answer direct questions" and proffering "evidence [found] to be unacceptable." *Garant v. Impens*, [1986] O.J. No. 1190 (Superior Court Ontario) at pp. 4-5. (D.E. 130-16).

> **independence** in the following reported decisions: *Docherty (Litigation Guardian) v. Lauzon,* [2010] O.J. No. 5017 (S.C.J.) at paras 102-3; *Elliott v. Hill Bros. Expressways Ltd.,* [1998] A.J. No. 523 (Q.B.) at paras. 42-3; *Garant v. Impens,* [1986] O.J. No. 1190 (H.C.J.) at p. 4; and *Stroud v. Nicholson,* [2005] O.J. NO. 3671 (S.C.J.) at paras. 56-60.

(D.E. 130-12; emphasis supplied).

A detailed look into these above-referenced cases reveals an unscrupulous pattern of bias by the firm that, sadly, still appears to carry over into this case:

(1) In the 1998 case *Elliott v. Hill Bros. Expressways,* [1998] A.J. No. 523 (Q.B. Alberta) at paras 42-3, HRYCAY was hired by the defendant to be an accident reconstruction expert in a case involving a tractor-trailer. After giving a series of convoluted non-answers, the Judge found its testimony "resulted in obfuscation rather than clarification" and the Judge ultimately declared:

> I am not prepared to rely upon the reports or the evidence of [second defense expert] or Mr. Hrycay. Counsel for the Plaintiffs have suggested **they are proponents and advocates of the Defendants**. I believe that characterization to be accurate.

(D.E. 130-13, ¶¶ 42-43; emphasis supplied).

(2) In the 2005 case *Stroud v. Nicholson,* [2005] O.J. No. 367 (Ontario Superior Court) at paras 56-60, a personal injury lawsuit against the City of London, Ontario, HRYCAY testified on behalf of the City and was found to lack objectivity:

> The fact that other courts in other cases may have rejected Mr. Hrycay's testimony on the basis of bias or for any other reason has not affected my view of his testimony or my decision in this case. In my opinion, his credibility in *this* case suffered as a result of [Plaintiff's attorney's] cross-examination. I believe that he favoured the City and **was not completely independent**. As a result, I have disregarded his opinion...

(D.E. 130-14, ¶ 60; emphasis supplied).

36

(3) In the 2010 case *Docherty (Litigation Guardian) v. Lauzon,* [2010] O.J. No. 5017 (Ontario Superior Court) at paras 102-3, HRYCAY again was an expert in accident reconstruction for a personal injury lawsuit. The Judge was far from impressed with HRYCAY's tenuous grasp on impartiality:

> Experts come to court to assist the trier in the pursuit of the truth. They are not advocates. And therein for me lies the problem with Mr. Hrycay's testimony...I regard Mr. **Hrycay's evidence as slanted and, to that extent, untrustworthy.**

(D.E. 130-15, ¶¶ 102-103; emphasis supplied).

(4) Similarly, even in the United States, HRYCAY had been precluded from testifying as expert witnesses in *Citizens Insurance Company of America v. Polony*, 2008 WL 2813337, at *6 (Mich. Ct. App. July 22, 2008) after attempting to give testimony on a subject that it was found "not qualified to give" and that even worse was "not rationally derived from a sound foundation":

> Hrycay was neither a psychiatrist nor a psychologist, and as noted by the trial court, Hrycay's ultimate conclusion was based on "what a reasonable person" would have done under the circumstances. In fact, by Hrycay's own admission, he was not qualified to testify regarding what the deceased's subjective intent was at the time of the questioned incident. Hrycay's ultimate conclusion that the deceased "intended to run into [Daily's] vehicle" was therefore not "rationally derived from a sound foundation," **nor was Hrycay "qualified as an expert** by knowledge, skill, experience, training, or education" to give the conclusion. Accordingly, the trial court did not abuse its discretion when it found that Hrycay was "not qualified to give subjective intent testimony as to what was going through [the deceased's] mind."

(*Id.*; emphasis supplied).

Given HRYCAY's horrendous track record, the fact that the report here was authored under the banner of this eponymous company places the objectivity of that report in serious doubt.

37

## 2. **Outdated and Misleading Findings**

Even more egregiously, in order to provide supporting evidence for Road Star's argument that the Thunder Rolls driver had sufficient time to safely react upon first noticing the disabled vehicle, HRYCAY in their report in this case (D.E. 118-3) relies upon now rejected scientific data from a 20 year old book, *Forensic Aspects of Driver Perception and Response* (Paul L. Olson; Lawyers and Judges Publishing Co., 1996). The author Olson there suggests "there are good data indicating that most drivers (*i.e.*, about 85 to 95%) will respond by about 1.5 seconds after the first appearance of the object or condition of concern." What HRYCAY fails to mention is that Olson updated this book in 2015 with new data and now indicates that his old 1.5 second figure was erroneous; he has now expanded it to **at least** 2.5 seconds to account for a one-second perception delay. (D.E. 130-17, pp. 243-244). Another study cited within this same edition by Olson suggests a reaction time of **3-4 seconds** actually is more appropriate. (*Id.*, p. 244). Thus, HRYCAY's entire opinion relies upon a 1.5 second driver response time found in a scholarly work that is **21 years out of date** – that has been updated three times since the first edition was published and which figures has since been rejected by its own author – to support one of the Defendant's most critical arguments. Apart from *Forensic Aspects of Driver Perception and Response*, HRYCAY only elects to cite to one other study in its entire 37-page report.

Unfortunately, the HRYCAY Report's misleading statements do not end here. Defendant also relies on HRYCAY's false implication that curves with radii greater than 14,000 feet are not curves at all, because they do not have indicated design criteria with AASHTO. This is a gross misrepresentation of the quantitative facts, since the AASHTO actually does have indicated design criteria, both in tables and in design equations offered, where the radius

38

curvature can be entered to gain a numeric result. (D.E. 130-25, Professor Fogarty Report, Appendix T, p. 173 of 184). HRYCAY also fails to mention that AASHTO does in fact provide non-table discussion on how one would approach a specific design speed of 75 mph on a horizontal curvature: Tables III-9, III-10, and III-11 each deal with a design speed of 70 mph and a curve radius of 22,918 for curves – far larger and more gradual than the curve in this case – within 15 minutes of curvature degree angle. (D.E. 130-25, Professor Fogarty Report, Appendix T, pp. 173-184 of 184). That AASHTO does not provide any criteria **specifically** for 75 mph design speeds (or, for that matter, 35, 45 or 55 mph design speeds) does not mean there are no design criteria. HRYCAY's argument to the contrary is downright dishonest.

### 3. HRYCAY's Failure to Comply with Federal Rules of Civil Procedure

Finally, HRYCAY's report should also be stricken for failing to comply with Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure because Defendant failed to timely include with HRYCAY's reports the writer's exhibits (they were received late) and never produced the writer's qualifications, including all publications within the past ten years, prior testimony within the last four years, or a statement of his compensation. Nor has the HRYCAY expert ever been made available for cross-examination before use of his report as required by F.R.C.P. 26(b)(4)(A)[11]. Given HRYCAY's long history of lacking objectivity in their reports, as found by Courts in two countries, and without seeing their expert's *Curriculum Vitae*, and further without the opportunity to depose HRYCAY, nothing in its report should be utilized by the Court on this matter.

---

[11] While Plaintiffs' experts have not been made available for depositions either, their Reports are properly provided at this stage here primarily to simply demonstrate issues of fact that may exist.

**B.   Road Star's Statement of Facts Should Be Stricken Because They Contain Irrelevant and Immaterial Facts, Legal Conclusions and Mischaracterizations of the Record in Violation of Local Rule 56.1**

Pursuant to Local Rule 56.1, the Statement of Facts is to include only material facts.  Nebraska Civil Rule 56.1(a)(1).  The material facts relevant to a resolution of this dispute clearly all involve at what point Joseph Womack, the Thunder Rolls driver transporting the jet engine, could discern that the Road Star truck was (1) not moving, and (2) too close to the fog line such that his oversized load could not pass without changing lanes.  Road Star's myriad list of irrelevant "facts" – actually consisting of conjecture, mostly about truck visibility rather than truck lack of movement and location on the rumble strip discernibility, with legal conclusions woven throughout – should be stricken in its entirety as manifestly failing to comply with this rule.  *Rohren v. Centennial Public School Dist. 67-R*, 2008 WL 486602, at \*2 (D. Neb. Feb. 19, 2008) (finding that the court would not consider defendant's improperly submitted evidentiary materials in support of its motion for summary judgment).  *See Anderson v. Durham D & M, LLC*, 2009 WL 585653, at \*2 (W.D. Mo. Mar. 4, 2009) (noting that irrelevant facts and disputes over them should be avoided); *Northwest Bank and Trust Co. v. First Illinois Nat'l Bank*, 354 F.3d 721, 725 (8th Cir. 2003) (finding District Court did not abuse its discretion in deeming movant's facts admitted where respondent's voluminous filings of purported material facts were "replete with conclusory allegations and legal argument").

40

## III.

## PLAINTIFFS' RESPONSE TO ROAD STAR'S
## STATEMENT OF UNDISPUTED FACTS[12]

Plaintiffs object to Road Star's attempt at pp. 12-13 of its Amended Memorandum (D.E. 191-1) to limit the Court's consideration to five discrete facts; ignoring the numerous facts set forth in great detail herein in Plaintiffs' Statement of Additional Material Facts ¶¶ 1-70 and its Response to Road Star's Statement of Facts ¶¶ 1-87. Such facts concern the various failures of Road Star and Bauer Built (including failure to properly warn the Thunder Rolls driver of the stopped Road Star truck on the edge of the rumble strip).

Subject to Point II, *supra*, Plaintiffs respond as follows:

1.      Not disputed.

2.      Not disputed.

3.      Disputed.  Plaintiffs do not dispute that, in response to counsel's question "you could see a mile out there under those conditions in flat territory, right?" Joseph Womack testified, "Yes." (D.E. 118-2, Womack Tr. 66:18-23).  However, he also testified that he "may have had" an obstructed view of the disabled vehicle when he was a quarter of a mile away. (*Id*., Womack Tr. 89:24-90:1). He also had a curve on his route. (D.E. 130-24, Fay Engineering Report, Attachment 1, p. 17 of 48; D.E. 130-25, Professor Fogarty Report, p. 6 of 184).

---

[12] Plaintiffs' disputed in detail approximately fifty-five of Road Star's Statements of Fact, in whole or in part. In Road Star's Amended Memorandum (D.E. 191-1), at pp. 13-70, in a mind numbing effort to have the last word, and without any legal basis permitting such a filing, Road Star inserts a "Reply" to each of these responses. Such "Reply" is improper and not provided for in either the Local Rules or the F.R.C.P. Rather than continuing with a ping pong match on the facts, Plaintiffs simply ask the Court to ignore (or to strike) Road Star's so-called "Reply" to these facts, which cause their brief to reach to 169 pages even though it covers only the claims against one Defendant. In any event, such Replies only serve to emphasize the numerous issues of fact which compel denial of Road Star's motion.

Obviously, then, depending on where he was on the road, his visibility distances changed. Further, disputed on the basis that the only limited source for this fact – the HRYCAY report – is unusable as it is deficient in form under F.R.C.P. 26(a)(2)(B), deficient by being incomplete, deficient in relying upon out of date science, and deficient for manifestly lacking in objectivity, and unusable as the expert has never been made available for deposition. (*See* Point II *supra*). Moreover, visibility is not the same as noticeability or discernibility, *i.e.* at what distance an object can be discerned for what it actually is. As Plaintiffs' expert, Professor Fogarty, is prepared to explain, the view of competent accident reconstructionists is that to discuss "visibility" rather than "discernibility" in assessing cause or opportunity for avoidance is outside of recognized forensic engineering standards. (D.E. 130-25, Professor Fogarty Report, Appendix T, pp. 166-170 of 184; also Appendix U, pp. 182-183 of 184).

4.      Not disputed except that there was no "shallow grassy ditch" bordering the paved right shoulder where the Road Star truck parked, or in the vicinity. Rather, there was at least 3 feet of flat grass off the road beyond the shoulder, (D.E. 130-24, Report of Fay Engineering Report, p. 15 of 148 at ¶ 3, and Attachments 3 and 4, pp. 20-23 of 48; D.E. 124-8, Saleem Tr. 18:2-6), upon which Bauer Built's 26,000 pound truck had no problem parking. (D.E. 118-1, Nebraska "Investigator's Motor Vehicle Accident report," at Sheet 6; D.E. 118-5, Salisbury Dep. Tr. 45:6-13).

5.      Not disputed.

6.      Disputed. The citations noted by Defendant to support this alleged fact are mischaracterizations of the testimony.[13] Furthermore, Plaintiffs are prepared to prove at trial that

---

[13] Defendants cite to page 36 lines 8-9 of Trooper Allen's deposition. Those lines are Trooper Allen saying, "Colorado, and a nice guy. I know that's not helpful to you in any way, but it just

the curvature in the highway fell within Tables III-9, III-10 and III-11 of the AASHTO Policy on Geometric Design for Highways and Streets and that the topography at the site of the accident was, in fact, a curve.  (D.E. 130-25, Professor Fogarty Report, Appendix T, pp. 173-179 of 184).

   7. Not disputed.

   8. Disputed. Further, disputed on the basis that the only listed source for this fact – the HRYCAY report – is unusable as it is deficient in form under F.R.C.P. 26(a)(2)(B), deficient by being incomplete, deficient in relying upon out of date science, and deficient for manifestly lacking in objectivity, and unusable as the expert has never been made available for deposition. (*See* Point II *supra*). Moreover, the AASHTO does provide non-table discussion on how one would approach a specific design speed of 75 mph on a horizontal curvature. Moreover, tables III-9, III-10 and III-11 each deal with a design speed of 70 mph and a curve radius of 22,918 for curves within 15 minutes of curvature degree angle. That AASHTO does not provide any design criteria specifically for 75 mph design speeds (or, for that matter, 35, 45 or 55 mph design speeds) does not mean there are no design criteria. While Defendant relies on false implication that curves with radii greater than 14,000 feet do not have indicated design criteria with AASHTO, which is a gross misrepresentation of the quantitative facts, the organization actually has both in the above-listed tables and in the design equations offered data where this radius curvature can be entered to gain a numeric result. Sadly, both Defendant and HRYCAY

---

seemed like –".  Later, Trooper Allen answers "it's like a nice . . . like a fade.  It's not a curve. . . . But this one [aerial photograph] does have a bend in the road, but you can see everything ahead. There is [sic] no hills or blind spots in there." (D.E. 118-7, Allen Tr. 37:2-7). Similarly, the citation to Mr. Womack's Deposition is misleading. On page 69, he is shown a photograph of the accident site, and is told to "assume for purposes of my questions that this, in fact, is a depiction of the accident scene," (D.E. 118-2, Womack Tr. 70:18-19), and the witness responds that "sitting on the ground, it doesn't look like it has that curve in it," (*id.*, Tr. 69:7-8), even though counsel reiterates that "assume that this is, in fact, a picture of the roadway from above." (*Id.*, Tr. 69:10-11).

are thus attempting here to <u>deceive</u> the Court. (<u>D.E. 130-25</u>, Professor Fogarty Report, Appendix T, pp. 173-179 of 184).

9.      Disputed.  Professor Fogarty has determined that the road is "curved" and has "curvature." (<u>D.E. 130-25</u>, Professor Fogarty Report, Appendix T, p. 180 of 184).

10.      Disputed.  *See* Response to ¶ 8, *supra*.

11.      This statement of fact – that "there is nothing that can obstruct a driver's line of sight" – is overly general and not tied to any evidence, as noted by the Defendant, who references nothing in the record in support. (<u>D.E. 117</u> at 9, ¶ 11).  This paragraph, then, violates <u>Nebraska Civil Rule 56.1(a)(2)</u> (requiring citation to the record in support of each statement of fact and clarifying that "failure to provide citations to the exact locations in the record supporting the factual allegations may be grounds to deny the motion") and should be stricken.  However, if this Court does not strike paragraph 11, Plaintiffs dispute it. In fact, the driver Mr. Womack testified that he "may have had" an "obstructed view of the disabled vehicle when [he] was a quarter of a mile away." (<u>D.E. 118-2</u>, Womack Tr. 89:24-90:1). Furthermore, Professor Fogarty has concluded that the curve does affect the driver's line of sight to the disabled vehicle and absolutely diminishes discernibility. (<u>D.E. 130-25</u>, Professor Fogarty Report, p. 6 of 184 at bullet point six, and p. 14 of 184 at bullet point one).

12.      Defendant Road Star provides no reference to where in HRYCAY's thirty-seven page report this alleged fact comes from in violation of <u>Nebraska Civil Rule 56.1(a)(2)</u>. *See <u>McClure v. Burlington Northern Santa Fe Ry. Co.</u>*, 2005 WL 174877, at *1, n.1 (D. Neb. Jan. 26, 2005) (finding that citation to an entire, multi-page exhibit without identifying the relevant portion violates 56.1). As such, it should be stricken. *<u>Rohren</u>*, 2008 WL 486602, at *2 (finding that the court would not consider defendant's improperly submitted evidentiary

materials in support of its motion for summary judgment). If this Court does not strike paragraph 12, Plaintiffs dispute it. As set forth in Professor Fogarty's Report, "[w]hen an emergency warning device is located close to and near the base level of a tractor-trailer vehicle, from a distant observation position of several hundred feet both objects appear to blend at the same location." (D.E. 130-25, Professor Fogarty Report, p. 8 of 184). Further, disputed on the basis that the only listed source for this fact – the HRYCAY report – is unusable as it is deficient in form under F.R.C.P. 26(a)(2)(B), deficient by being incomplete, deficient in relying upon out of date science, and deficient for manifestly lacking in objectivity, and unusable as the expert has never been made available for deposition. (*See* Point II *supra*).

13.     Not disputed.

14.     Not disputed.

15.     Disputed. Once again, Defendant distorts the testimony of the witnesses. Road Star's driver, Mr. Saqib, does not testify that he parked "completely" off the rumble strip. Rather, quite the opposite. He says that he "parked on the right side of the rumble strip," (D.E. 118-4, Saqib Tr. 30:15-16), "parked towards the right side of the . . . more towards the right side of the rumble strip," (*id.*, Tr. 30:20-22) (ellipses in original), and that his "tire was on the right side of the tumble strip" but that he didn't "know exactly" by how much. (*Id.*, Tr. 35:25-36:2). Furthermore, Plaintiffs' expert accident reconstructionist determined that the truck was parked directly on and blocked part of the rumble strip.  (D.E. 130-24, Fay Engineering Report, p. 15 of 48 at ¶ 2; *see also* D.E. 118-2, Womack Tr. 207:7-9 (noting that the truck "was even closer than one foot off the fog line")).

16.     Not disputed.

17.     Not disputed.

18.     Not disputed that Road Star's driver placed **a total of two** triangles behind the trailer – one was 10-12 feet behind and one was 30-40 feet behind the trailer.  (D.E. 118-4, Saqib Tr.  27:4-6, 28:4-7; s*ee also* D.E. 118-5, Salisbury Tr. 84:15-24, 111:3-4).

19.     Disputed. Stacey Ullman of Road Star testified that she cannot recall instructing Mr. Saqib at all on how to handle a breakdown on a curve and he was given no written materials on the subject of how to handle a breakdown on a curve. (D.E. 130-4, Ullman Tr. 23:9-24:3). Moreover, any such training would have been futile as Mr. Saqib was not even given a third triangle for use on curves. (D.E. 124-8, Saleem Tr. 13:10-13). Finally, Saqib's testimony that he was taught that only where there was an "obstruction" on a curve did he need a third triangle at up to 500 feet violates 49 C.F.R. § 392.22(b) , which directly to the contrary says they are needed on curves "or" where there is an obstruction.

20.     Disputed. Again, Defendant has mischaracterized the witness testimony in the cited portion, which nowhere mentions a curve or the lack thereof.  (D.E. 118-4, Saqib Tr. 45:19-24).  And, as set forth, *supra*, *see* Response 9, at best, there is a disputed fact as to whether this accident occurred along a curve as that term is defined for purposes of the application of 49 C.F.R. § 392.22, and AASHTO itself treats this type of road design as having a curve. (D.E. 130-25, Professor Fogarty Report, Appendix T, pp. 173-179 of 184).

21.     Disputed. *See* Response 15, incorporated by reference. Moreover, while Plaintiffs do not dispute that Defendant placed two reflective triangles at a distance of 10-12 feet for the first one and 30-40 feet for the second*, see* Response 18*, supra*, Plaintiffs dispute "with reflective triangles behind it" to the extent that such a statement implies adequacy of placement, adequacy of the number of triangles, and/or compliance with 49 C.F.R. § 392.22.

22.     Not disputed.

23.     Not disputed.

24.     Not disputed.

25.     Not disputed that Bauer Built's truck was to the right of the rumble strip. Disputed as to the assertion of "as well." Plaintiffs dispute that the Road Star truck was not touching the rumble strip. It was on top of it. *See* Response 15, incorporated by reference.

26.     Disputed. Salisbury's testimony was that "[t]hey had them back what I felt was far enough to be seen from oncoming traffic." (D.E. 118-5, Salisbury Tr. 34:1-2). However, Plaintiffs note that Salisbury's "belief" – or more accurately feeling or opinion – is not a material fact. He is not qualified as an expert.

27.     Disputed. Defendant Road Star provides no reference to where in the six page Investigator's Motor Vehicle Accident Report it states any of the alleged facts contained within this numbered paragraph. Paragraph 27 thus violates of Nebraska Civil Rule 56.1(a)(2). *See McClure*, 2005 WL 174877, at *1, n.1. The only description of the accident contained in that report, (D.E. 118-1, p. 2), is as follows:

> Vehicle # 2 [Road Star's tractor trailer] and Vehicle # 3 [Bauer Built] were parked on the shoulder of Interstate 80.  # 3 is a service truck fixing # 2's flat front steer tire.  Vehicle # 1 [the Southern Pride truck] a oversized vehicle failed to get over far enough to clear the parked # 2.  Driver of # 1 stated he was going approximately 75 mph and witness stated # 1 was not speeding. Driver of # 1 stated there was a gray pickup beside him in the passing lane causing him to not get over enough to clear # 2.  The collision caused # 2 to hit # 3.

Moreover, the Bauer Built vehicle had certainly not fully "crossed" into the shoulder. (D.E. 130-24, Fay Engineering Report, Attachment 4, pp. 22-23 of 48).

28.     Not disputed.

29.     Not disputed.

47

30.     Disputed.  Again,  Defendant  mischaracterizes  the  testimony.  Driver Womack testified that the travel lane was a standard 12-foot lane, and erroneously testified that the width of his cargo was 11 feet, 2 inches. (D.E. 118-2, Womack Tr. 143:14-18). He was not asked the question whether he "still fit entirely in the lane." The jet engine in fact was 11 feet, 10 inches wide. (D.E. 124-6, GE Shipping document). It would have been highly improbable for truck driver Womack to insure while driving an 11 foot, 10 inch wide load in a 12 foot wide lane that he would not strike a vehicle close alongside him on the rumble strip of the shoulder (D.E. 130-25, Professor Fogarty Report, Appendix U, pp. 183-184 of 184), thus his decision to change lanes was necessary.

31.     Not disputed.

32.     Not disputed.

33.     Not disputed.

34.     Disputed.  His  distance  estimate  was  never  precise  as  to  location,  nor ultimately very accurate. Actually, calculations of his truck speed and the other truck's speed show a range of separation distances from 200-300 feet. (D.E. 130-25, Professor Fogarty Report, Appendix J, pp. 98-99 of 184).

35.     Not disputed.

36.     Disputed.  Again,  Defendant  mischaracterizes  the  witness'  testimony. There was no discussion of how close driver Womack was to the tractor trailer in front of him when he testified that he was sitting in the left side of his vehicle and the "tractor trailer ahead of [him] is 102 inches wide, so he's eight feet, eight-and-a-half feet wide.  And it's just a . . . it's a big moving billboard going down the road." (D.E. 118-2, Womack Tr. 42:2-6).  Mr. Womack testified only that the tractor trailer in front of him at one point in time "prevented him from

seeing the disabled truck on the side of the road." (*Id.*, Womack Tr. 83:18-22). In fact, directly to the contrary, he disputed that the visual blockage was for a large length of time. (*Id.*, Womack Tr. 85:18-86:5).

37.    Not disputed that Mr. Womack's testimony was that the trailer's right tires were three to four inches away from the fog line but he only so testified at the single point where it passed the disabled truck. (D.E. 118-2, Womack Tr. 62:22-63:4).

38.    Not disputed except "evasive action" is an unclear, and possibly mischaracterizing, term.  The witness testified that the tractor trailer ahead of him, in passing the disabled truck, "made no swerve, not turn signal, no nothing to indicate that there was a disabled vehicle on the shoulder." (D.E. 118-2, Womack Tr. 32:4-6).

39.    Disputed.  The witness nowhere says he had an unobstructed view of the disabled Road Star truck, and, in fact, does not mention the disabled truck in his answers to the pertinent questions. Moreover, the disabled truck, its lack of movement and location on the rumble strip were not even reasonably discernible on a curve at a half mile away, but only would begin at 625 feet away, or less than 1/8 of a mile. (D.E. 130-25, Professor Fogarty Report, at p. 10 of 184).

40.    Disputed.  Clete Larson's testimony is internally inconsistent and scientifically absurd. (D.E. 130-25, Professor Fogarty Report, Appendix K, pp. 106-110 of 184).[14]

---

[14] The evidence at trial will be that Clete Larson, a former police officer (a) gave internally inconsistent distances and truck movement testimony (D.E. 130-25, Professor Fogarty Report, Appendix K, pp. 107-109 of 184), and (b) even allowed his wife, who was on her computer playing a game and saw nothing of the events in question, to rewrite and to materially alter his witness statement! (*See* Statement with his and his wife's subsequent handwritten edits, D.E. 130-18, and D.E. 130-19, Gloria Larson Tr. 6:12, 11:20, 13:4-7). His primary objective here

41.    Disputed. Again, Defendant grossly mischaracterizes the testimony. Mr. Womack was paying attention at all times. (D.E. 118-2, Womack Tr. 53:17-54:10). And the cited testimony relates only to his being a greater distance away. (*Id.*, Tr. 89:24-90:5). There is absolutely no mention by the witness that he was not paying attention.  In fact, there is no evidence that he was not fully paying attention, was tired or was distracted. (SOUMF, *supra*, at ¶¶ 22, 33, and 34). He had plenty of rest.  (*Id.* at ¶ 18).  Additionally, facts of his safe, attentive driving, include:

- He "always keeps [his] eyes moving" to "keep a proper lookout" when he is driving.  (D.E. 118-2, Womack Tr. 54:6-10);

- He has a practice of changing lanes when he sees triangles out at 200 or 500 feet.  (D.E. 118-2, Womack Tr. 36:12-16);

- He has a practice of changing lanes promptly when he sees hazards lights on an emergency vehicle on the side of the road. (D.E. 118-2, Womack Tr. 36:17-20);

- He is familiar with "Move Over Laws," (D.E. 118-2, Womack Tr. 36:21-23), and has a practice of complying with them.  (*Id.*, Tr. 37:9-11);

- He has been a truck driver for 36 years and has driven nearly four million miles without ever before hitting a truck on the side of the road.  (*Id.*, Tr. 42:22-43:3);

- He had safely moved 172 engines for Boeing between September 11, 2007, and July 29, 2015.  (*Id.*, Tr. 11:6-17).

---

seems to have been to exonerate himself from possible liability. All of his testimony is therefore unreliable.

42. Defendant Road Star provides no reference to where in HRYCAY's thirty-seven page report this alleged fact comes from in violation of Nebraska Civil Rule 56.1(a)(2) and should be stricken. *See McClure*, 2005 WL 174877, at *1, n.1.  If the Court does not strike paragraph 42, Plaintiffs dispute it on the basis that the only listed source for this source – the HRYCAY report – is unusable as it is deficient in form under F.R.C.P. 26(a)(2)(B), deficient by being incomplete, deficient in relying upon out of date science, and manifestly lacking in objectivity, and unusable as the expert has never been made available for deposition. (*See* Point II *supra*). In addition, HRYCAY's opinion as to "Visibility Pre-impact," (D.E. 118-3, pp. 9-11), are directly refuted by Plaintiffs' expert, Professor Fogarty. (D.E. 130-25, Professor Fogarty Report, Appendix T, pp. 166-181 of 184).

43. Disputed. The testimony relates only to being a half mile or 2,640 feet away, when, in fact, due to the curve, and the distance, no human being could have noticed or properly discerned the truck at more than 625 feet, much less its location, lack of movement, or its placement on the rumble strip. (D.E. 130-25, Professor Fogarty Report, at Appendix S, pp. 162-165 of 184 and Appendix T, pp. 166-181 of 184).

44. Disputed. The issue of whether or not the Road Star vehicle was visible and/or discernible, and from what distance, is at the heart of the dispute between the parties. Plaintiffs' expert, Professor Fogarty, has done an extensive analysis of the evidence presented by both Mr. Larson and Mr. Womack's testimonies, and is prepared to testify that much of Mr. Larson's testimony is contradictory and describes scientifically impossible movements.  (D.E. 130-25, Professor Fogarty Report, at Appendix K, pp. 106-110 of 184). Moreover, Plaintiffs' experts, Professor Fogarty, Professor Gibbons, Professor Garvey, and Professor Green, among others, are prepared to explain why and how the disabled vehicle was not visible, nor was its lack

of movement nor location on the rumble strip discernible until it was too late, because of the poor conspicuity of the lights utilized, failure to even turn on the Bauer Built hazard lights, and failure to put out reflective triangles at proper distances. (D.E. 130-25, Professor Fogarty Report, and Appendices A-U, pp. 1-184 of 184; D.E. 130-26, Professor Gibbons Report, pp. 5-10 of 31; D.E. 130-27, Professor Garvey Report, p. 2 of 53; Pl. Exh. 30, Professor Green Report, pp. 1-6).

45.     Disputed. Mischaracterizes the testimony. The testimony referenced only applies to when the disabled truck was a half mile away. Moreover, Plaintiffs' experts, Professor Fogarty, Professor Gibbons, Professor Garvey, and Professor Green, among others, are prepared to explain why and how the disabled vehicle was not discernible beyond 625 feet, nor was its lack of movement nor location on the rumble strip discernible until it was too late because of the poor conspicuity of the lights utilized, failure to even turn on the Bauer Built hazard lights, and failure to put out reflective triangles at proper distances. (D.E. 130-25, Professor Fogarty Report, and Appendices A-U, pp. 1-184 of 184; D.E. 130-26, Professor Gibbons Report, pp. 5-10 of 31; D.E. 130-27, Professor Garvey Main Report, p. 2 of 53; and Pl. Exh. 30, Professor Green Report, pp. 1-6).

46.     Not disputed, but disputed that it was solely his responsibility to insure that the disabled truck was visible. Road Star's driver, *inter alia*, parked on top of the rumble strip (which should have been left clear) even though there was another 1 foot and 3 inches of empty asphalt to the right of the shoulder, and at least 3 feet of flat grass beyond the shoulder. (D.E. 130-24, Fay Engineering Report, p. 15 of 48, ¶ 3, and Attachments 3 and 4, pp. 20-23 of 48; and D.E. 124-8, Saleem Tr. 18:2-6). Moreover, Road Star's additional failures, *inter alia*, to (i) have the proper number of reflective triangles (only two instead of the required three), and (ii) to place such triangles at the proper distances behind the truck (all violations of federal

regulations) resulted in the disabled vehicle not being discernible until it was too late. *See* Plaintiffs' SOUMF ¶¶ 42-45. Moreover, Plaintiffs' experts (Professor Fogarty among others) are prepared to explain why and how the disabled vehicle was not discernible beyond 625 feet, nor was its lack of movement, nor location on the rumble strip discernible until it was too late, due to failure to put out reflective triangles at proper distances. (D.E. 130-25, Professor Fogarty Report and Appendices A-U, pp. 1-184 of 184; including pages 4-5 of 184, pp. 8-9 of 184, pp. 86-88 of 184, p. 93 of 184, pp. 100-105 of 184).

47.    Not disputed, but disputed that it was solely his responsibility to insure that the disabled truck was visible. *See* Response to ¶ 46 *supra*.

48.    Not disputed.

49.    Disputed, as the word "this" is not defined.

50.    Disputed. *See, e.g.,* D.E. 130-25, Professor Fogarty Report and Appendices A-U, pp. 1-184 of 184; D.E. 130-26, Professor Gibbons Report, pp. 5-10 of 31; and D.E. 130-27, Professor Garvey Main Report, p. 2 of 53. *See also* Response to ¶ 41 incorporated herein.

51.    Disputed. Again, Defendant grossly mischaracterizes the testimony. Nowhere does driver Womack testify that he "panicked" in either of the cites in the record to which Defendant points (D.E. 118-2, Womack Tr. 130:14-24 or 156:13-16), or his entire deposition.  In fact, there is no evidence to suggest he panicked, and, instead, testified that in the "split second" he looked in the mirror and saw the pickup truck, he attempted to move left but "had not actually reach[ed] that far," (*id.,* Tr. 130:14-22), and that the time between when he saw the disabled vehicle and his turn to the left was "immediate."  (*Id.,* Tr. 156:13-16).

52.    Disputed. Mr. Womack had seen the grey pickup truck far behind him, and then again saw it close to him, at a time which apparently preceded the final sighting.  (D.E. 118-2, Womack Tr. 116:17-19).

53.    Disputed. Mischaracterizes the testimony. Mr. Womack testified that he thought the grey pickup was traveling faster than he was, he just did not have an estimate of the "actual miles per hour." (D.E. 118-2, Womack Tr. 116:15-22). Mr. Womack also did in fact note the distance between the pickup truck and his truck. (Id., Tr. 33:23-34:17).

54.    Disputed. Again, Defendant blatantly mischaracterizes the testimony, which was as follows:

> Q:    Is it fair to say that the accident itself happened so fast that you may not be 100 percent certain of anything in terms of timing or what struck what or all those things; is that fair?
>
> A:    That's fair.

(D.E. 118-2, Womack Tr. 227:15-19). Responding to a loaded question calling for absolute certainty on timing and on what part of the truck struck where is a far cry from "admit[ting] . . . [that] he is unable to be certain of much of it."

55.    Disputed. Again, Defendant mischaracterizes the cited testimony pages, nowhere in which does Mr. Womack state that he either (1) "sensed" the grey pick up might be close or (2) "steered his vehicle hard back to the right." Instead he testified that "I looked in my [left] mirror, and there is a pickup on my [left] at the rear of my trailer. . . . It appeared to me that he was in the area of my trailer wheels on the left side," (D.E. 118-2, Womack Tr. 32:12-18), and that "my conscience told me to maintain my lane." (Id., Tr. 33:3-4).

56.    Not disputed.

54

57.     Partly disputed. As Mr. Womack steered back into the right lane, he stayed in that lane.  (D.E. 118-2, Womack Tr. 213:16-20).

58.     Disputed. As Defendant knows well, the issue of "causation" is a legal conclusion and is improperly included in a Statement of Facts. Plaintiffs do not dispute that Mr. Womack testified to the quoted language in paragraph 58. Moreover, Mr. Womack is clear in the context of the quote that he did not create the original "problem." Road Star and Bauer Built did. Moreover, Plaintiffs' experts, Professor Fogarty, Professor Gibbons, Professor Garvey, and Professor Green, among others, are prepared to explain why and how the disabled vehicle was not discernible, nor was its lack of movement nor location on the rumble strip discernible until it was too late, because of the poor conspicuity of the lights utilized, failure to even turn on the Bauer Built hazard lights, and failure to put out reflective triangles at proper distances. (D.E. 130-25, Professor Fogarty Report, and Appendices A-U, pp. 1-184 of 184; D.E. 130-26, Professor Gibbons Report, pp. 5-10 of 31; D.E. 130-27, Professor Garvey Report, p. 2 of 53; Pl. Exh. 30, Professor Green Report, pp. 1-6).

59.     Not disputed.

60.     Disputed. Again, Defendant mischaracterizes the record. Clete Larson testified that he saw only one triangle and that he observed the flatbed truck drive over it.  (D.E. 118-6, Larson Tr. 26:9-22). But Larson's testimony completely lacks credibility. *See* Response 40, *supra*. Trooper Allen recalled seeing two crushed triangles but never identifies what happened to them.  (D.E. 118-7, Allen Tr. 12:8-14).

61.     Disputed. This is a legal conclusion that is improperly included in a Statement of Facts. Plaintiffs do not dispute that Mr. Womack testified to the quoted language but dispute that this is an admission of causation or fault or liability. The absence of triangles,

proper parking, proper lights, etc., were the true causes of this accident. Moreover, Plaintiffs'

experts, Professor Fogarty, Professor Gibbons, Professor Garvey, and Professor Green, among

others, are prepared to explain why and how the disabled vehicle was not discernible, nor was its

lack of movement nor location on the rumble strip discernible until it was too late, because of the

poor conspicuity of the lights utilized, failure to even turn on the Bauer Built hazard lights, and

failure to put out reflective triangles at proper distances. (D.E. 130-25, Professor Fogarty Report,

and Appendices A-U, pp. 1-184 of 184; D.E. 130-26, Professor Gibbons Report, pp. 5-10 of 31;

D.E. 130-27, Professor Garvey Main Report, p. 2 of 52; Pl. Exh. 30, Professor Green Report, pp.

1-6).

> 62.    Disputed. *See* Response to 60, *supra*, incorporated herein.

> 63.    Not disputed.

> 64.    Not disputed.

> 65.    Not disputed.

> 66.    Not disputed that Mr. Womack was aware of the Move Over Law in

Nebraska, Neb. Rev. Stat. § 60-6,378. Plaintiffs dispute, however, Defendant's characterization

and incomplete summary of that law, which actually provides, in pertinent part:

>> (1)    (a) A driver in a vehicle on a controlled-access highway approaching or passing a stopped authorized emergency vehicle or road assistance vehicle which makes use of proper audible or visual signals shall proceed with due care and caution as described in subdivision (b) of this subsection.

>> (b) On a controlled-access highway with at least two adjacent lanes of travel in the same direction on the same side of the highway where a stopped authorized emergency vehicle or road assistance vehicle is using proper audible or visual signals, the driver of the vehicle shall proceed with due care and caution and yield the right-of-way by moving into a lane at least one moving lane apart from the stopped authorized emergency vehicle or road assistance vehicle unless directed otherwise by a peace

56

officer or other authorized emergency personnel.  If moving into another lane is not possible because of weather conditions, road conditions, or the immediate presence of pedestrian or vehicular traffic or because the controlled access highway does not have two available adjacent lanes of travel in the same direction on the same side of the highway where such a stopped authorized emergency vehicle or road assistance vehicle is located, the driver of the approaching or passing vehicle shall reduce his or her speed, maintain a safe speed with regard to the location of the stopped authorized emergency vehicle or road assistance vehicle, the weather conditions, the road conditions, and vehicular or pedestrian traffic, and proceed with due care and caution or proceed as directed by a peace officer or other authorized emergency personnel or road assistance personnel.

****

(5) . . . A road assistance vehicle shall emit a warning signal utilizing properly displayed emergency indicators such as strobe, rotating or oscillating lights when stopped on a highway.

67.    Not disputed that Mr. Womack testified that, if he observed a disabled vehicle, obviously impliedly in a reasonable time, and/or a service vehicle with proper lights, and/or triangles at proper distances, his practice and obligation was to move to the left.  (D.E. 118-2, Womack Tr. 36:17-37:11; 90:6-11).  Again, Defendant blatantly mischaracterizes the testimony as to the remainder of this paragraph.  There is no reference at all in the quoted section to "a half mile away."  And the testimony immediately preceding the portion is blatantly miscited by Defendant as Mr. Womack states he "may have" or "may not have" had an obstruction to his view even at a half, even a quarter of a mile away.  (*Id.*, Tr. 89:24-90:5).

68.    Not disputed.

69.    Not disputed, but the marks' very location after the impact point means they were obviously made after the engine and truck impacted.  HRYCAY is again trying to mislead the Court.  Further disputed on the basis that the only listed source for this assertion – the HRYCAY report – is unusable as it is deficient in form under

57

being incomplete, deficient in relying upon out of date science, and manifestly lacking in objectivity, and unusable as the expert has never been made available for deposition. (*See* Point II *supra*).

70.     Not disputed, but by its very location after the impact point the marks obviously came after the engine and truck impacted. HRYCAY is again blatantly trying to mislead the Court. Further disputed on the basis that the only listed source for this source – the HRYCAY report – is unusable as it is deficient in form under F.R.C.P. 26(a)(2)(B), deficient by being incomplete, deficient in relying upon out of date science, and manifestly lacking in objectivity, and unusable as the expert has never been made available for deposition. (*See* Point II *supra*). In addition, Defendant Road Star provides no reference to where in HRYCAY's thirty-seven page report this alleged fact comes from in violation of Nebraska Civil Rule 56.1(a)(2) and should be stricken. However, if the Court does not strike paragraph 69, Plaintiffs dispute it. HRYCAY first "attended the accident site" on November 18, 2015, (D.E. 118-3, HRYCAY Report, p. 2), a full three months after the accident.  There is nothing in its Report that indicates why anyone could conclude that tire marks discovered on November 18, 2015, were attributable to the accident or were pre-impact.

71.     *See* Response 70 incorporated herein.

72.     *See* Response 70 incorporated herein.

73.     *See* Response 70 incorporated herein.

74.     Not disputed.

75.     Not disputed.

76.     Not disputed.

77.     Not disputed.  Because Defendant fails to provide the page cite and the FTSA is lengthy, Plaintiffs direct this Court's attention to D.E. 118-8, p. 5, ¶ D.

78.     Not disputed.

79.     Not disputed.

80.     Not disputed that Southern Pride and Thunder Rolls entered into an Independent Services Agreement ("ISA"), a copy of which is D.E. 118-10. Plaintiffs dispute, however, the characterization of the agreement as "sub-contracting" work.  The Relationship of the Parties defines Contractor [Thunder Rolls] as "an independent contractor for for-hire motor carriers."  (D.E. 118-10, p. 1).

81.     Not disputed, although Defendant's recitation of the excerpted contract term is incomplete.  The ISA provides that: "CONTRACTOR'S obligation under this Agreement is to furnish to CARRIER a complete transportation service, including as may be necessary, and subject to the terms thereof, loading and unloading at destination, by a manner and means and over routes selected by CONTRACTOR."  (D.E. 118-10, p. 1).

82.     Not disputed that this language appears in the ISA.  However, the Bill of Lading, which references only Southern Pride, was nothing more than a document "identifying the lading [cargo]".  (D.E. 118-8, FTSA, at ¶ 2, stating "under Bills of Lading" that the FTSA terms shall control over bills of lading; and D.E. 118-10, ISA, p. 7, stating that the bills of lading are for "identifying the lading [cargo]").

83.     Not disputed.

84.     This alleged fact calls for a legal conclusion and, as such should be stricken. Should the Court not strike it, however, Plaintiffs dispute it.  As set forth in Plaintiffs' Brief in Opposition to Motion for Partial Summary Judgment of Defendants Southern Pride and

Thunder Rolls at pp. 25-33 (D.E. 109), Thunder Rolls was not in fact covered at all by the FTSA, but had its own contract with Southern Pride under which it agreed to be responsible for cargo damage with no limitation of liability and it was required to procure $500,000 in insurance.

85.     This alleged fact calls for a legal conclusion and, as such should be stricken. Should the Court not strike it, however, Plaintiffs dispute it. The Bill of Lading was nothing more than a document "identifying the lading"/cargo.  (D.E. 118-8, FTSA, at ¶ 2, stating "under Bills of Lading" that the FTSA terms shall control over bills of lading; and D.E. 118-10, ISA, p. 7, stating that the bills of lading are for "identifying the lading [cargo]").

86.     *See* Response 85.

87.     Not disputed.

Plaintiffs incorporate their Statement of Additional Material Facts, *supra*, ¶¶ 1-70, which require denial of Road Star's Motion.

## IV.

## PLAINTIFFS' RESPONSE TO BAUER BUILT'S
## STATEMENT OF UNDISPUTED FACTS

1.     Not disputed.

2.     Not disputed.

3.     Not disputed.

4.     Not disputed.

5.     Not disputed as to the language of the Independent Service Agreement, except (i) that the "customer of Carrier" is Boeing, not Southern Pride, and (ii) note that the Agreement lacks a Himalaya Clause extending any limitation of liability rights to Thunder Rolls, and to the contrary states that Thunder Rolls "assumes complete financial responsibility for any and all damages and/or loss." (D.E. 118-10, p. 17; D.E. 124-3, p. 17). Moreover, Mr. Womack

clearly testified that he was directly obligated to Boeing under the Service Agreement. (D.E. 118-2, Womack Tr. 17:11-22).  It is not disputed that "Carrier" under the ISA refers to Southern Pride.  (D.E. 118-10, p. 1; D.E. 124-3, p. 1).

6.      Not disputed.

7.      Not disputed.

8.      Not disputed.

9.      Not disputed.

10.     Not disputed.

11.     Not disputed that Interstate 80 has two 12-foot lanes in each direction. Disputed that it is a "two lane road."  Interstate 80 is properly described as a four lane divided highway.  (D.E. 118-3, p. 2, ¶ 2.1).

12.     Not disputed that Mr. Womack was carrying a "wide load," but dispute the dimensions.  As the load was 11 feet 10 inches (*see* D.E. 124-6, GE Shipping Document), and the truck was 8 feet 6 inches (D.E. 118-2, Womack Tr. 105:1-8), the overhang on each side was only 1 foot 7 inches.

13.     Not disputed, except to clarify that Mr. Womack, who worked for Thunder Rolls, had an Independent Service Agreement with Southern Pride, (D.E. 118-10), and Southern Pride had a Freight Transportation Services Agreement with Boeing.  (D.E. 118-8). The bill of lading was a mere receipt. (D.E. 118-8, p. 1; D.E. 124-2, p.1; D.E. 118-10, p. 7; and D.E. 124-3, p. 7).

14.     Not disputed.

15.     Not disputed.

16.     Not disputed.

17.    Not disputed, except as to location vis-à-vis the fog line, and to add that the first triangle was placed "10 to 12 feet behind the trailer, and the second was between 30 and 40 feet behind the trailer." (D.E. 118-4, Saqib Tr. 28:4-7). At least one triangle was placed well inside the fog line, (*id*, Tr. 26:12-16), which would naturally give oncoming traffic the false impression that the disabled truck was placed even further inside that line.

18.    Not disputed.

19.    Disputed, as the term "visible" is ambiguous. Meaningful discernment of the vehicle's actual location from that distance is impossible for any human being. (D.E. 130-25, Professor Fogarty Report, Appendix J, pp. 94-105 of 184; Appendix S, pp. 162-164 of 184).

20.    Disputed. D.E. 118-1, the Nebraska Investigator's Supplemental Truck and Bus Accident Report, at Sheet 6, designates the Bauer Built truck as "more than 26,000 pounds." Moreover, D.E. 118-1, at Sheet 6, indicates the truck weighed 26,000 pounds before liquids were added and equipment was installed.

21.    Not disputed.

22.    Not disputed.

23.    Disputed. Defendant Bauer Built mischaracterizes the testimony. Mr. Womack said that, when he first saw the truck that ended up in front of him, he was three or four miles back (before accident site) and could see that truck ahead of him a mile away.  (D.E. 118-2, Womack Tr. 66:10-19). Paragraph 23 of Bauer Built's Statement of Material Facts misleadingly references the curved distance leading up to the accident site.

24.    Disputed. Again, the testimony has to do with a location several miles back, while the cited fact misleadingly suggests this was true even on the curve leading up to the accident site. Mr. Womack also testified that he "may have had" an obstructed view of the

disabled vehicle when he was a quarter of a mile away. (*Id.*, Womack Tr. 89:24-90:1). He also had a curve on his route (D.E. 130-24, Fay Engineering Report, Attachment 1, p. 17 of 48; D.E. 130-25, Professor Fogarty Report, p. 6 of 184). The witness nowhere says he had an unobstructed view of the disabled Road Star truck, and, in fact, does not mention the disabled truck in his answers to the pertinent questions. Moreover, the disabled truck, its lack of movement and location on the rumble strip were not even reasonably discernible on a curve at a half-mile away, but only would begin at 625 feet away, or less than 1/8 of a mile. (D.E. 130-25, Professor Fogarty Report, p. 10 of 184).

25.     Disputed. At such distances, witness estimates are rarely close to being accurate. (D.E. 130-25, Professor Fogarty Report, Appendix K, p. 109 of 184).

26.     Not disputed.

27.     Not disputed.

28.     Disputed. *See* Response 25 incorporated herein.

29.     Disputed. Again, Defendant Bauer Built mischaracterizes the testimony. The testimony was:

Q:      So we can agree that you're a half mile behind the tractor trailer in front of you, that tractor trailer is not obstructing your vision to the side of the road to the right –

Counsel:     Form.

Counsel:     Objection to the form.

Q:           --correct?

Counsel 1:   And I'll object to form also.

A:      Not as much, no.

(D.E. 118-2, Womack Tr. 74:5-15). First, the testimony in context references only to obstructions by the preceding truck and not to obstructions by the curve. Second, he in fact testified only that he did not have "as much" of an obstruction (*id.*), may or may not have had an obstructed view (*id*, Tr. 89:24-90:1), and that the tractor trailer in front of him prevented him at some points from seeing the disabled truck on the side of the road. (*Id.*, Tr. 83:19-22).

30. Disputed. While Mr. Womack did not recall seeing the truck, studies show roadside objects of the size of the Road Star trailer beyond 625 feet may be seen but not discerned as memorable (and thus presumably would not even be recalled). *See* D.E. 130-25, Professor Fogarty Report, Appendix T, pp. 173-179 of 184.

31. Not disputed, but that view was much too far away to allow for discernment of the disabled truck, without triangles or stronger hazard lights. (D.E. 130-25, Professor Fogarty Report, p. 10 of 184 and Appendix J, p. 100 of 184).

32. Disputed. The actual view of the shoulder varied with the varying distances. (D.E. 130-25, Professor Fogarty Report, Appendix J, p. 100 of 184). Defendant Road Star's expert apparently did not bother to do these calculations. (D.E. 118-3).

33. Not disputed.

34. Disputed. Mr. Womack's estimate was not consistent with the actual distances, as is typical of witnesses in such situations. (D.E. 130-25, Professor Fogarty Report, at Appendix J, pp. 99-100 of 184; Appendix K, p. 109 of 184).

35. Disputed. The proposed material fact is vague as to time. Mr. Womack, in any event, does not "allege" anything. He testified merely that the truck in front of him played a role only at certain points in shielding him from the disabled vehicle. (D.E. 118-2, Womack Tr. 42:11-14).

36.     Disputed. *See* Response 34 incorporated herein.

37.     Not disputed.

38.     Not disputed.

39.     Not disputed.

40.     Not disputed.

41.     Disputed. Mischaracterizes the testimony. Mr. Womack actually said that he "overcorrected" in response to a preceding "problem" – namely the problem created by Road Star and Bauer Built. And expert testimony will establish that Mr. Womack's reactions here were the normal and best possible reactions of a professional, careful and alert driver who was trapped by other's negligence. (D.E. 118-2, Womack Tr. 213:12-14. *See also* D.E. 130-25, Professor Fogarty Report, pp. 10 and 15 of 184, and Appendix U, pp. 182-184 of 184).

42.     Not disputed.

43.     Disputed. Estimates in such an exigent situation are typically not very accurate. (D.E. 130-25, Professor Fogarty Report, Appendix K, p. 109 of 184). *See also* Point VIII.A., *infra* (swiftly moving events exception exists because witnesses testifying as to moving events are inaccurate on distances).

44.     Not disputed.

45.     Not disputed.

46.     Not disputed.

47.     Not disputed.

48.     Disputed. Plaintiffs' expert, Professor Fogarty, will demonstrate that the distances to which Clete Larson testified, as well as other significant portions of his testimony, cannot be accurate.  (D.E. 130-25, Professor Fogarty Report, Appendix K, pp. 106-111 of 184).

49. Disputed. *See* Response 48 incorporated herein.

50. Disputed. *See* Response 48 incorporated herein.

51. Disputed. *See* Response 48 incorporated herein.

52. Not disputed that Mr. Larson saw a triangle behind the Road Star truck. However, this alleged fact does not state when, or at what distance.

53. Not disputed.

54. Disputed. *See* Response 48 incorporated herein.

55. Disputed. *See* Response 48 incorporated herein.

56. Disputed. *See* Response 48 incorporated herein.

57. Disputed. *See* Response 48 incorporated herein.

58. Disputed. *See* Response 48 incorporated herein.

59. Disputed. *See* Response 48 incorporated herein.

60. Not disputed.

61. Not disputed.

62. Disputed. Plaintiffs' expert, Professor Fogarty, is prepared to challenge the accuracy of Mr. Larson's perceptions. (D.E. 130-25, Professor Fogarty Report, Appendix K, pp. 106-111 of 184). Moreover, while he may have some relevant experience (he held a commercial driver's license, for example), he has not been designated as an expert by any party, and has not been subject to cross examination in that capacity. His personal opinions are not relevant, and Bauer Built's attempt to pass off his opinions as "facts" should not be countenanced by this Court.

Plaintiffs incorporate its Statement of Additional Material Facts, *supra*, ¶¶ 1-70, which require denial of Bauer Built's Motion.

**V.**

**ARGUMENT**

**GIVEN THE MYRIAD OF FACTUAL ISSUES IN DISPUTE, SUMMARY
JUDGMENT FOR DEFENDANTS ROAD STAR AND BAUER BUILT
SHOULD BE DENIED; A DETERMINATION AS TO THE
PROXIMATE CAUSE OF THE ACCIDENT MUST BE MADE BY THE JURY**

The Eighth Circuit has made clear that "summary judgment is rarely appropriate in a negligence action because such a claim often involves a multitude of factual issues and abstract concepts which become particularly elusive when applied to varying situations." *Hughes v. American Jawa, Ltd.*, 529 F.2d 21, 23 (8th Cir. 1976). This is especially true in accident cases because the evidence can produce "more than one theory as to the manner in which the accident may have occurred." *Burk v. Thorson, Inc.*, 66 F. Supp. 2d 1069, 1076 (D. Minn. 1999) (denying summary judgment in traffic accident where conflicting testimony as to whether plaintiff tried to pass defendant and whether construction signs may have caused confusion). *See also Bale v. Nastasi*, 982 F. Supp. 2d 250, 255 (S.D.N.Y. 2013) (finding that negligence is a "factual determination in all but the most extreme situations," and denying summary judgment where there were disputed facts over the speed plaintiff was travelling, the suddenness of his stop, and the degree of force).

Causation, the issue upon which Defendants now seek summary judgment, is "ordinarily a question for the trier of fact." *Heatherly v. Alexander*, 421 F.3d 638, 642 (8th Cir. 2005). "Only where the evidence is such that **only one inference** can be drawn is it for the court to decide whether a given act or series of acts is the proximate cause of the injury." *Id.* at 642 (emphasis supplied). With the facts outlined in Plaintiffs' Statement of Additional Undisputed facts, *supra*, ¶¶ 1-70, as well as all the disputes over facts set forth in Plaintiffs' Responses to both the Road Star and the Bauer Built Statements of Fact, and where, here, there is

67

overwhelming evidence that Road Star and Bauer Built had a duty of care imposed on them by federal regulations as well as the Nebraska commercial driver's license manual, that they breached that duty by ignoring and/or failing to comply with what the law required of them, and that the breach caused damage, there can be no single inference that Mr. Womack's driving was the proximate cause of the accident as a matter of law.

As set forth below, Plaintiffs are prepared to prove at trial that had Defendants simply complied with the law, the accident could have been avoided. Given the strength of the evidence to support Plaintiffs' claims, which directly refute Defendants' contention that the overcorrection alone is the cause of $18 million in damage, summary judgment should be denied.

## VI.

### NEITHER ROAD STAR NOR BAUER BUILT ARE ENTITLED TO SUMMARY JUDGMENT

### A.   Plaintiffs' Tort Claims Against Road Star Are Subject to Federal Common Law and Against Bauer Built Are Subject to Nebraska State Law

Plaintiffs plead simple tort/negligence claims against Road Star and Bauer Built. (D.E. 115, ¶¶ 33-37). Road Star was moving another cargo in international and interstate commerce from Canada at the time its vehicle became disabled,[15] and thus was operating with that cargo pursuant to federal law, namely the Carmack Amendment, while the truck was in the United States.[16] *Atlas Aerospace LLC v. Advanced Transportation, Inc.*, 2012 WL 5398027, at

---

[15] At the time of the incident the Road Star truck was en route from Ontario, Canada to Utah delivering office furniture. (D.E. 113-3, Saqib Tr. 15:1-8; D.E. 113-14, Road Star Bill of Lading; D.E. 113-15, Road Star Manifest).

[16] Road Star's additional cases cited at pp. 101-102 of its Amended Memorandum (D.E. 191-1) miss the point. Plaintiffs are not arguing that a violation of the Federal Motor Carrier Safety Regulations in and of itself confers Federal Question jurisdiction. As demonstrated herein, federal common law governs the claims against Road Star in order to preserve uniformity with

*4 (D. Kan. Nov. 2, 2012) (court holding that shipments to or from Canada are covered by the Carmack Amendment); *Audio Visual Services Corp. v. Felter International, Inc.*, 2006 WL 1030078, at *1 (S.D. Tex. Apr. 18, 2006) (finding that equipment shipped from Canada to Texas that was damaged in Texas is subject to Carmack).

   While Road Star was not handling the Plaintiffs' cargo pursuant to the Carmack Amendment at the time of the loss, as a general rule, as far back as *Michigan Central R. R. Co. v. Myrick*, 107 U.S. 102 (1883), the Supreme Court expressed a clear requirement that, in order to preserve uniformity with respect to the movement of interstate cargo – even in the absence of a federal statute – that federal common law must generally prevail in losses involving interstate cargo, over state common law.[17] *Id.* at 109-110. As the Supreme Court explained more recently in the leading case on the entire subject, *Norfolk Southern Ry. Co. v. Kirby*, 543 U.S. 14 (2004):

> . . . Article III's grant of admiralty jurisdiction 'must have referred to a system of law coextensive with, and operating uniformly in, the whole country.  It certainly could not have been the intention to place the rules and limits of maritime law under the disposal and regulation of the several States, as that would have defeated the uniformity and consistency at which the Constitution aimed on all subjects of a commercial character affecting the intercourse of the States with each other or with foreign states.'

*Id.* at 28 (internal citations omitted). The Supreme Court's ultimate test to choose between federal and state law was quite succinct:

---

respect to interstate carriage of goods. Moreover, **none** of these other cases pertain to damage to cargo being carried in interstate commerce (*i.e.* under federal law). Both *Baumann v. Zhukov*, 802 F.3d 950 (8th Cir. 2015), and *Johnson v. Welsh Equip., Inc.*, 518 F. Supp. 2d 1080 (D. Minn. 2007) involved personal injury matters. *Blue Dane Simmental Corp. v. American Simmental Ass'n*, 952 F. Supp. 1399 (D. Neb. 1997) involved RICO and *Cuellar-Aguilar v. Deggeller Attractions, Inc.*, 812 F.3d 614 (8th Cir. 2015) pertained to an employment dispute.

[17] In this regard, it is worth noting that both Bauer Built and Road Star also frequently cite to and rely upon federal common law. (D.E. 197, p. 7-8 of 9; D.E. 199, p. 18-19 of 29).

> The case is not inherently local. . . . Though some state interests are surely implicated in this case, those interest cannot be accommodated without defeating a federal interest; thus, federal law governs.

*Id.* at 16. Here, too, the application of completely differing state laws in similar future trucking losses in different states would undermine an important national interest in uniformity arising out of interstate cargo losses involving Carmack Amendment movements. *Id.*

This interest in uniformity is critical in applying federal law to cargo losses during interstate transit even if it is damaged by non-Carmack defendants. Thus, in *Ingram Micro, Inc. v. Airoute Cargo Express, Inc.*, 154 F. Supp. 2d 834 (S.D.N.Y. 2001), the District Court (Scheindlin, J.) determined that federal common law had to be applied to a claim for damage to goods carried by a trucker (even one not carrying the goods in question under the Carmack Amendment) rather than the law of any relevant state. *Id.* at 839. Its rationale derived from three principles:

(i) "[M]ost forms of interstate transportation are governed by federal law that has entirely preempted state regulation of common carriers."

(ii) "Federal common law has been used to cover contracts for air carriage **that fall within the gap** left between the Warsaw Convention and interstate carriage," and

(iii) Federal common law "is properly applied where the particular facts of a case may fall outside the literal coverage of a federal statute," to "fill gaps in the congressional statutory pattern."

*Id.* at 839 (emphasis supplied). This analysis is consistent with *Kirby*, 543 U.S. at 22-23. *See also Arkwright-Boston Mfrs. Mut. Ins. Co. v. Great Western Airlines, Inc.*, 767 F.2d 425, 427-428 (8th Cir. 1985) (finding that federal common law supplies the rule of decision governing cargo loss during interstate transportation contributed to by third-party if liability is not covered by federal statute); *Kaiser Aluminum & Chemical Corp. v. Illinois Central Gulf Railroad Co.*,

615 F.2d 470, 479 (8th Cir. 1980) (reversing District Court's denial of plaintiff's damages and applying federal common law to non-statutory claim against railroad).

The analysis of whether to apply federal common law in *Ingram Micro* is applicable here because the defendant in *Ingram Micro,* like Bauer Built and Road Star here, was a non-Carmack carrier of goods. The plaintiff, Ingram Micro, hired a carrier to transport over two thousand boxes of its software products from Quebec to Pennsylvania. The carrier hired a trucking company to carry the cargo by ground. Instead of storing the cargo inside its warehouse before departure, as agreed, the trucking company put the cargo in a trailer outside its warehouse. The trailer did not have a security system, and the goods were stolen. Ingram Micro sued the carrier, asserting that federal common law applied, 154 F. Supp. 2d at 837, whereas the defendant argued that Canadian, Belgium, English law or the law under certain U.S. states (California, Pennsylvania, or New York) should govern. *Id.* at 838 & n.4. The court acknowledged that Carmack did not apply to the shipment, but neither did state law apply. It then looked to a large number of cases, including U.S. Supreme Court precedents, which specify that "most forms of interstate [cargo] transportation are governed by federal law that has entirely preempted state regulation . . ." *Id.* at 839. The court then concluded:

> Moreover, courts have held that **federal common law is properly applied [to damage to cargo moving in interstate commerce] where the particular facts of a case may fall outside the literal coverage of a federal statute,** but the use of common law will fill gaps in the congressional statutory pattern. *See United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 593, 93 S.Ct. 2389, 37 L.Ed.2d 187 (1973); *Quasar Co. v. Atchison, Topeka and Santa Fe Ry. Co.*, 632 F.Supp. 1106, 1112 (N.D.Ill. 1986). In sum, common law principles have long been used to fill gaps in or supplement the Interstate Commerce Act. Therefore, federal common law may be applied to this carriage of goods, rather than the laws of any of the relevant states.

*Id.* at 839 (emphasis supplied).

Thus, generally, consistent with *Kirby* and *Ingram Micro*, cargo claims arising out of services rendered in connection with an international (or interstate) cargo movement such as this one are exclusively subject to federal common law. *See Commercial Union Ins. Co. v. Forward Air, Inc.*, 50 F. Supp. 2d 255, 258-60 (S.D.N.Y. 1999) (noting the application of federal common law to parties engaged in interstate transportation who are not carriers is important to ensure that remedies involving interstate cargo transportation loss are uniform); *Fireman's Fund Ins. Co. v. Panalpina, Inc.*, 153 F. Supp. 2d 1339, 1343 (S.D. Fla. 2001) (claim against truck stop assisting in interstate transportation subject to federal common law); *Mitsui OSK Lines, Ltd. v. MAK Transp., Inc.*, 2006 WL 2987711, at *1 (S.D. Tex. Oct. 14, 2006) (claims against storage yard assisting carrier in international transportation held subject to federal common law); *Quasar Co. v. Atchison, Topeka & Santa Fe Railway Co.*, 632 F. Supp. 1106, 1112 (N.D. Ill. 1986) (applying federal common law to damage to cargo by interstate carrier not caused while carrying cargo interstate, but instead while cargo was at rest, citing numerous cases); *Royal & Sun Alliance Ins., PLC v. UPS Supply Chain Solutions, Inc.*, 2011 WL 3874874, at *3, n. 3 (S.D.N.Y. Aug. 31, 2011) (finding that reliance on federal common law is "appropriate" where a non-carrier's negligence combines with a Carmack carrier's conduct to cause damage); *Royal & Sun Alliance Ins., PLC v. Rogers Transport. Management Services, Inc.*, 737 F. Supp. 2d 154, 158, n. 31 (S.D.N.Y. 2010) (citing *Ingram Micro* and finding that federal common law applied to claims against carriers during cargo moving in interstate transit who is not subject to the Carmack Amendment). *See also Mid-Continent Intern. v. Evergreen Marine Corp.*, 1987 WL 28266, at *2, 1988 A.M.C. 1371, 1372, n. 2 (N.D. Ill. Dec. 14, 1987) (suggesting that federal common law should govern a negligence claim between interstate transportation providers not covered by Carmack); *Byrton Dairy Products, Inc. v. Harborside Refrigerated Serv. Inc.*, 991 F. Supp. 977,

985 (N.D. Ill. 1997) (finding that, in a contribution action between a maritime shipper and an inland carrier, the indemnification claim was governed by federal common law and not state law).

The *Fireman's Fund*, *Mitsui OSK*,[18] and *Quasar Co.* decisions are all particularly illuminating here, as all three decisions apply federal common law to defendants generally engaged in a service to interstate commerce (one a highway truck stop, the second a transit storage yard, and the third a railroad yard) performing work not in any way unique to the cargo at issue, and thus not subject to a federal statute, yet federal common law still applied. As explained in detail in *Quasar Co.*:

> This court concludes that federal law still preempts state law in the area of carrier liability for interstate TOFC/COFC services. Insofar as our previous order rested on state law, then, it cannot stand.
>
> ****
>
> Federal courts have the power to develop remedies which are outside the precise scope of what has been prescribed by Congress by drawing on federal common law. *Illinois v. City of Milwaukee,* 406 U.S. 91, 103, 92 S.Ct. 1385, 1392, 31 L.Ed.2d 712 (1972). The use of federal common law is particularly appropriate where, as here, the question falls in an area where federal law has preempted state law, *Sola Electric Co. v. Jefferson Electric Co.,* 317 U.S. 173, 176, 63 S.Ct. 172, 173, 87 L.Ed. 165 (1942), and federal policy dictates a need for uniformity throughout the nation, *United States v. Yazell,* 382 U.S. 341, 354, 86 S.Ct. 500, 507, 15 L.Ed.2d 404 (1966). Federal common law is also properly applied where the particular facts of a case may fall outside the literal coverage of a federal statute, but the use of common law will fill gaps in the congressional statutory pattern or otherwise make that pattern effective. *United States v. Little Lake Misere Land Co., Inc.,* 412 U.S. 580, 593, 93 S.Ct. 2389, 2397, 37 L.Ed.2d 187 (1973). Thus common law principles have long been used to fill gaps in or supplement the Interstate Commerce

---

[18] In the *Mitsui OSK* case, the Court did however also consider the contract terms to determine the applicable law. 2006 WL 2987711, at *1.

> Act. *See Elmore & Stahl,* 377 U.S. at 137, 84 S.Ct. at
> 1144; *Missouri Pacific Railroad Co. v. Porter,* 273 U.S. 341, 345,
> 47 S.Ct. 383, 384, 71 L.Ed. 672 (1927); *Southern Express Co. v.
> Byers,* 240 U.S. 612, 36 S.Ct. 410, 60 L.Ed. 825 (1916); *Cudahy
> Packing Co. v. Munson Steamship Line,* 22 F.2d 898 (2d
> Cir.1927), *cert. denied* 277 U.S. 586, 48 S.Ct. 433, 72 L.Ed. 1000
> (1928). Therefore, when a question of the liability of a carrier falls
> outside statutory coverage, rather than leave the shipper without a
> remedy courts have turned to federal common law. *First
> Pennsylvania,* 731 F.2d at 1115–1118; *cf. Strachman v.
> Palmer,* 177 F.2d 427 (1st Cir.1949).

*Quasar Co.,* 632 F. Supp. at 1112.

This analysis is correct under either Nebraska or federal choice of law rules,

which both follow the Restatement (Second) Conflict of Laws § 145 (1971), which focuses on

the "most significant relationship" test. The Restatement (Second) Conflict of Laws § 145 (1971)

states:

> (1) The rights and liabilities of the parties with respect to an issue
> in tort are determined by the local law of the state which, with
> respect to that issue, has the **most significant relationship** to the
> occurrence and the parties under the principles stated in § 6.[19]
> (2) Contacts to be taken into account in applying the principles of §
> 6 to determine the law applicable to an issue include:
>   (a)  the place where the injury occurred,
>   (b)  the place where the conduct causing the injury occurred,
>   (c)  the domicil, residence, nationality, place of incorporation

---

[19] Section 6, in turn, outlines the following general principles:

> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative
>     interests of those states in the determination of the particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f)  certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.

*See Eli Lilly Do Brasil, Ltd. v. Federal Exp. Corp.,* 2005 WL 2312547, at *4 (S.D.N.Y. Sept. 21,
2005).

and place of business of the parties, and

(d)  the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

(Emphasis supplied). Cf. *Eli Lilly*, supra, 2005 WL 2312547, at *4 with *Fanselow v. Rice*, 213 F. Supp. 2d 1077, 1080-81 (D. Neb. 2002). Road Star thus should be subject to federal common law here, as both the injury and conduct occurred on a federal highway, and because Road Star's (unlike Bauer Built's) only Nebraska connection is its fortuitous truck break down in the state. Thus, the federal system "has the most significant relationship to the occurrence" here. *See Kirby*, 543 U.S. at 27-28 (applying the following test to determine if state law applies to an international cargo loss: "Is this case inherently local"). Cf. *Ingram Micro*, supra, 154 F. Supp. 2d at 840 (finding after conducting grouping of contacts analysis under New York law that federal common law applies to losses caused by parties not covered by Carmack during interstate transportation of goods); *Eli Lilly*, supra, at *3 (applying Restatement § 6 principles to determination of which law applied to cargo loss caused by carrier defendant).

Bauer Built, in contrast, was engaged in a service call from its Grand Island Nebraska terminal, from which it routinely handled Nebraska truck breakdowns on state or federal highways. (D.E. 118-5, Salisbury Tr. 170:2-6). Bauer Built thus had a "significant relationship" with Nebraska, and Nebraska state law should apply only to the direct claims against it.[20]

---

[20] This is a judgment call; and needless to say, the Court could disagree and choose to apply federal law.

**B.      Road Star's Violations of 49 C.F.R. § 392 Renders Them Negligent *Per Se* Under Federal Law**

Plaintiffs here have pled federal negligence *per se* clauses under 49 C.F.R. § 392[21] against Road Star. D.E. 189, ¶ 38-46.[22] Thus, as set forth *supra*, the primary law of this case is federal law, which treats such statutory violations are negligence *per se*.[23]  *See Holt v. Bose*, 2011 WL 5130256, at *2 (D. Neb. Oct. 27, 2011) (refusing to dismiss claim for negligence per se based on violations of the FMCSR).

Factually, Road Star's reliance on *Dmitruk v. George and Sons' Repair Shop, Inc.*, 217 Fed. App'x 765 (10th Cir. 2007) is misplaced. In *Dmitruk*, the district court's grant of summary judgment was upheld where the plaintiffs failed to present any evidence that the failure to put out warning triangles was the proximate cause of the accident. *Id.* at 769-770. Here, however, Plaintiffs are prepared to demonstrate – and have put forth substantial evidence even though discovery is still not complete – that had the warning triangles been placed in compliance with the federal safety regulations, the accident would have been avoided, as Mr. Womack would have had up to 1500 feet (for better placed hazard lights), or up to 1,160 feet, 500 feet plus

---

[21] Road Star attempts to argue that a violation of 49 C.F.R. § 392 is merely negligence, and not negligence *per se*. (D.E. 117 at 35). Plaintiffs, however, have filed a Motion for Partial Summary Judgment on this exact issue, *see* D.E. 111, and incorporate herein that argument by reference. (Brief in Support, D.E. 112, at pp. 34-38). *See also* the revised version of same Motion filed on November 13, 2017 (D.E. 189), also incorporated herein by reference.

[22] Plaintiffs originally plead in its Amended Complaint (D.E. 115) that Bauer Built was also negligent *per se*, but has since determined that it will not be pursuing that claim. That claim (*see* D.E. 115, Plaintiffs' Fifth Cause of Action) can be dismissed with prejudice, but only as against Bauer Built. Of interest, however, Bauer Built concedes in its amended brief that violations of state and federal safety ordinances are "evidence of negligence." (D.E. 193 at 41 of 55).

[23] Plaintiffs do not dispute that Nebraska law in contrast does not recognize negligence *per se* for a statutory violation, but does consider it as evidence of negligence. *In re Derailment Cases*, 416 F.3d 787, 795 (8th Cir. 2005).

660 feet of warning (for triangles), instead of 300 feet. *See* D.E. 130-25, Professor Fogarty Report, pp. 12-13 of 184, Appendix J, pp. 99-100 of 184 and pp. 103-104 of 184.  Road Star's blanket assertion that it was not the proximate cause of the accident is not adequate to counteract Plaintiffs' overwhelming and compelling evidence.

Here, by contrast, the "causation evidence [does] show that the injury would not have occurred if the negligence had not occurred." *Reinicke v. Aeroground, Inc.*, 167 S.W.3d 385 (Tex. App., 14th Dist., 2005) Womack, who had safely driven 81 oversize jet engines on this exact same route, (D.E. 118-2, Womack Tr. 10:12-16), who kept a "proper lookout" while he was driving, (*id.*, Tr. 54:4-10), and who had a practice of changing lanes whenever he saw triangles put out behind a tractor trailer, (*id.*, Tr. 36:12-16), did not discern the disabled Road Star truck with adequate time to change lanes because Road Star and Bauer Built failed to do what the law required them to do to warn oncoming traffic. (D.E. 130-25, Professor Fogarty Report, p. 10 of 184). Unlike *Reinicke*, then, there is an explanation here – because there was no warning, the disabled truck was undiscernible.

> **C.    It Is Clear That Road Star Violated Federal Law. Road Star's Brief Completely Misapplies 49 C.F.R. § 392.22; the Appropriate Provision for this Situation Requires that Three Reflective Triangles be Placed at Specified Distances of up to 500 Feet to Warn Oncoming Traffic, and It is Undisputed that Road Star Failed to Comply with this Federal Safety Regulation, Putting Their Triangles Out Only 20% of Even the Minimum Distance**

Road Star does not dispute that it is a commercial motor carrier subject to federal regulations. Nor does it dispute that Interstate 80, the location of the accident, was a four-lane divided highway. (D.E. 117, Road Star SUF, ¶ 4). Rather, it disputes which sub-provision of 49 C.F.R. § 392.22 controls. (D.E. 117 at 21). As set forth below, if the road is deemed to be on a curve, an issue that Road Star inexplicably disputes, § 392.22(b)(2)(iv) governs.  However, even

were the Court to conclude that the road was not a curve, **as a divided highway**, §
392.22(b)(2)(v) controls the placement of the reflective triangles, and there is no doubt but that
Road Star failed to comply with this regulation.

Specifically, 49 C.F.R. § 392.22, provides, in pertinent part:

(a) Whenever a commercial motor vehicle is stopped upon the
traveled portion of a highway or the shoulder of a highway for any
cause other than necessary traffic stops, the driver of the stopped
commercial vehicle *shall immediately activate the vehicular
hazard warning flashers* and continue the flashing until the driver
places the warning devices required by paragraph (b) of this
section . . .

(b)(1) Except as provided in paragraph (b)(2) of this section,
whenever a commercial motor vehicle is stopped upon the traveled
portion or the shoulder of a highway for any cause other than
necessary traffic stops, the driver *shall, as soon as possible, but in
any event within 10 minutes*, place the warning devices required by
§393.95 of this subchapter in the following manner:
(i) One on the traffic side of and 4 paces (approximately 3 meters
or 10 feet) from the stopped commercial vehicle in the direction of
approaching traffic;
(ii) One at 40 paces (approximately 30 meters or 100 feet) from the
stopped commercial vehicle in the center of the traffic lane or
shoulder occupied by the commercial motor vehicle and in the
direction away from approaching traffic; and
(iii) One at 40 paces (approximately 30 meters or 100 feet) from
the stopped commercial vehicle in the center of the traffic lane or
shoulder occupied by the commercial motor vehicle and in the
direction of approaching traffic.

(2) Special rules
****
(iv) Hills, curves, and obstructions. If a commercial motor vehicle
is stopped within 500 feet of a curve, crest of a hill, or other
obstruction to view, the driver shall place the warning signal
required by paragraph (b)(1) of this section in the direction of the
obstruction to view a distance of 100 feet to 500 feet from the
stopped commercial motor vehicle so as to afford ample warning
to other users of the highway.
(v) Divided or one-way roads. If a commercial motor vehicle is
stopped upon the traveled portion or the shoulder of a divided or
one-way highway, the driver shall place the warning devices

required by paragraph (b)(1) of this section, one warning device at a distance of 200 feet and one warning device at a distance of 100 feet in a direction toward approaching traffic in the center of the lane or the shoulder occupied by the commercial motor vehicle. He/she shall place one warning device at the traffic side of the commercial motor vehicle within 10 feet of the rear of the commercial motor vehicle.

In an attempt to mislead the Court as to the applicable standard, Road Star claims that "49 U.S. [sic] § 392.22 (1)" applies. (D.E. 117 at 23). It then quotes the language from regulation 49 C.F.R. § 392.22(b)(1), and argues that "40 paces" is unclear, and, in any event, the driver complied because "the expectation as to where the reflective triangles are to be placed are described in approximations." (Id.).[24] This argument is specious. First, Interstate 80 is a divided highway – a fact that Road Star does not even dispute in its Undisputed Facts (D.E. 117, Road Star SUF, ¶ 4), and which Road Star's own "expert" reiterates. (D.E. 118-3, HRYCAY Report, p. 2, ¶ 2.1 ("I-80 in the vicinity of the collision is a 4 lane divided asphalt roadway running generally east-west with two lanes in each direction, white skip lane dividers…")). Therefore, Special Rules (2)(v) – for "Divided or one way roads" applies.[25] Second, 49 C.F.R. § 392.22(b)(2)(iv) nowhere mentions "paces." The requirement there is for three triangles – one at

---

[24] The parties are not arguing over whether the third triangle was 98 or 100 feet, the "confusion" that Road Star claims is created by 30 meters versus 100 feet. Rather, here, there was no third triangle whatsoever even carried on the truck and the second triangle was placed at 40 feet. The difference between 40 feet and 200 feet or 500 feet as a signal to oncoming traffic is both significant and causative of highway accidents. (D.E. 130-25, Professor Fogarty Report, Appendix J, pp. 99-100 of 184 and pp. 103-104 of 184).

[25] Road Star appears to concede that the regulation upon which it relies has no bearing on the current situation when it claims that "the third reflective triangle would have been placed in front of the Road Star vehicle and would therefore not be relevant to the present accident, as Mr. Womack's vehicle was traveling in the same direction as the Road Star vehicle had been traveling in before it was forced to stop." (D.E. 117 at 24). A triangle placed in front of a vehicle is relevant only when the road is not divided. This was not the case here.

ten feet, one at 100 feet, and one at 200 feet. Third, there can be no doubt but that Road Star placed **only two triangles at a distance of at most 40 feet** from the trailer.[26] As the driver testified at his deposition:

> Q:    So you put out two triangles in total?
>
> A:    Yes.  I put two triangles, and the first triangle that I put in was about 10 to 12 feet behind the tractor, and the second one was between 30 and 40 feet behind the trailer.

(D.E. 118-4, Saqib Tr.  27:4-7. *See also* D.E. 118-5, Salisbury Tr. 84:15-18, 99:14-100:9, 102:2-6).   And Road Star cannot rely on Bauer Built's compliance because Bauer Built's driver could not have been clearer that **he placed no triangles out at all.**  (D.E. 118-5, Salisbury Tr. 89:8-10).

> Q:    Did you put triangles out the day of the accident?
>
> A:    No.

(*Id.*, Tr. 164:11-13).

49 C.F.R. § 392.22(b) further requires that warning devices be placed by a commercial motor vehicle driver as soon as possible but in no event more than ten minutes after the vehicle has stopped.  The ten minutes is not a grace period:

> A plain reading of the statute suggests that the warning devices must be placed as soon as possible.  There are a myriad of reasons that would prevent placing the hazard devices immediately, such as exigency, safety or rescue, but the regulation requires that, under no circumstances, should more than ten minutes elapse before doing so.  Thus . . . the duties under the regulation are two-fold: in as little as time as possible, set up the hazard devices, but in absolutely no circumstances take more than ten minutes.

---

[26] HRYCAY's estimates that the second triangle may have been placed out at least 50 feet behind the Road Star trailer, but he "cannot place their original position with certainty." This is a distinction without a difference. (D.E. 118-3, p. 12).

*McGarity v. FM Carriers, Inc.*, 2012 WL 1028593, at *14 (S.D. Ga. Mar. 26, 2012).  Here, there can be no genuine issue as to whether an "exigency, safety or rescue" created a delay; the accident occurred **at least a half hour after the truck had become disabled and the tire change had been completed**.  (D.E. 117, Road Star SUF, ¶ 22; D.E. 118-5, Salisbury Tr. 69:2, 70:21-22).

Thus, two triangles placed toward on-coming traffic at 40 or even 50 feet simply cannot be deemed in compliance with a safety regulation that requires three reflective triangles at distances up to 200 (or 500, as set forth *infra*,) feet on an undivided highway so that there is ample warning to oncoming traffic.

    **D.**    **Plaintiffs Further Contend that the Appropriate and Safest Distance for the Third Triangle Here was 500 Feet. In Any Event, Road Star Cannot Prevail on Summary Judgment as to the Adequacy and Effect of the Deficient Reflective Triangle Warning Placement because There Is a Genuine Issue of Fact as to Its Effect**

Defendant disputes that where the Road Star truck pulled over was on a "hill, curve or obstruction" such that a third triangle (which the Road Star truck was not even carrying) would have to be placed at a distance of 500 feet pursuant to 49 C.F.R. § 392.22(b)(2)(iv).  In support of this contention, Road Star relies on (i) the Report of HRYCAY Consulting Engineers[27] and (ii) the testimony of Joseph Womack.  Neither is conclusive evidence of the nonexistence of a curve.

First, Plaintiffs' engineers, Fay Engineering, conducted an extensive analysis of the roadway, which included detailed measurements, and concluded that the location of the accident was on a curve.

---

[27] As previously noted, *see* II. A., HRYCAY's Report is so fundamentally both deficient and flawed that it must be either stricken or ignored. *See* fn. 3, *supra*.

> Where the crash occurred, "[t]here was a long shallow right curve in the westbound lanes of I-80 that was about 5000 feet long. The disabled Road Star truck was stopped near the end of the right curve. The rear of the disabled semi-trailer was about 4500 feet west of the beginning of the right curve, or about 500 feet from the end of the right curve.

(D.E. 130-24, Fay Engineering Report, p. 4).

Second, HRYCAY misleadingly contends that "there are no design criteria for curves on highways with a speed limit of 75 mph which exceed a radius of 14,000 feet." (D.E. 117 at 22). This conclusion is grossly erroneous. As Professor Fogarty has explained, the American Association of State Highway and Transportation Officials (AASHTO):

> . . . provides design criteria for many aspects of highways. These provisions are in several forms. Some of the design criteria are given in verbal discussion. Some of the discussion is given in Tables, some is given in Figures and some is given in Reference Lists. Mr. Drew's criticism in one specific area, in the failure to include a design speed of 75 mph in a Table dealing with design speed and horizontal curvature is puzzling. Tables III-8, III-9, III-10 and III-11, displayed hereinafter, provide design data for design speed and horizontal curvature. It is true that they do not address a design speed of 75 mph. Also, they do not address a design speed of 35 mph, of 45 mph, or of 55 mph. They do provide design data for a radius of 22,918 feet for all listed speeds which is, certainly, greater than the 14,000 foot radius Mr. Drew offers in his presentation. Incidentally, the radii listed throughout AASHTO for horizontal curvature is usually a minimum radius that, for the design condition (usually lateral acceleration) being considered, is a minimum value for a maximum acceleration rate. One can always utilize greater radii in their analysis and in so doing make the lateral acceleration experienced while traveling the horizontal curve less forcefully applied. That aside, AASHTO does provide a Table, specifically Table III-12, shown hereinafter. It provides data Mr. Drew should have entertained in that which appears to be some sort of criticism relative to this accident case.
>
> ****
>
> Within Table III-12 AASHTO provides design criteria for curves on highways with a speed limit of 70 mph and calls for a minimum radius of 18,440 feet for the assumed design lateral acceleration

rate chosen for design.  Note that the Table also addresses a design speed of 65 mph for which a minimum radius of 16,520 feet is given.  Their design criteria for a speed limit of 60 mph calls for a minimum radius of 14,710 feet.  These are all minimum radii.  To be minimum means that one can elect greater radii (with the consequence of making the experience felt in changing direction of travel by lessening the maximum allowable safe design lateral acceleration rate).  This aside, 14710 feet exceeds 14000 feet as does 16520 feet and 18440 feet.  The "routine' being demonstrated by AASHTO is that, as you increase the speed limit you increase the minimum curve radius to provide for the chosen design lateral acceleration rate.  The later part of Mr. Drew's offering sets a condition that the design criteria must exist in AASHTO in the form of a Table.  It does not.    The existing AASHTO Table illustrated on the previous page can answer Mr. Drew's seeming criticism of AASHTO.  It doesn't publish the minimum recommended radius for a 75 mph speed but it doesn't take a rocket scientist to see that since some of the minimum radii values given do exceed 14,000 feet, all of the remaining higher design speed radii listed would also exceed 14,000 feet (Mr. Drew's challenge).  Simply put, if a 60 mph design speed calls for a minimum radius of 14,710 feet and a 65 mph design speed calls for a minimum radius of 16,520 feet and a 70 mph design speed calls for a minimum radius of 18,440 feet it must logically follow that a design speed of 75 mph would call for a radius far in excess of 14,000 feet (Mr. Drew's challenge).   To add to this, note that the same Table doesn't indicate minimum radii for speeds of 25, 35, 45, or 55 mph either.

It appears that Mr. Drew is advancing a premise that, since the radius of the roadway curve in question is 17,000 feet and that since AASHTO doesn't provide for curves with radii greater than 14,000 feet (actually they do), the existing curve radius, being so much larger than 14,000 feet, means that one should preclude the application of the CFR mandate of emergency warning device placement for curved sections of roadways.  His premise is faulty.  When a premise is faulty the finding must be reexamined on some other basis so the new premise supports the finding desired.

AASHTO does provide verbal instructions with appropriate mathematical formulae for making independent determinations for specialized designs of curved roadways.  They do not publish design criteria that conflicts with CFR matters.

(D.E. 130-25, Professor Fogarty Report, Appendix T, pp. 173-174 of 184).

Third, although Defendant's mantra seems to be Mr. Womack's testimony that "you could see a mile," this generalized statement does not mean there was no curve or obstruction in the road. In fact, Mr. Womack's testimony on this issue related to a location at one point in time miles before the curve. (D.E. 118-2, Womack Tr. 66:10-16).

Clearly, 49 C.F.R. § 392.22(b)(2)(iv) applies here and by law the third triangle had to have been placed up to 500 feet away from the disabled tractor trailer. At a minimum, since 49 C.F.R. § 392.22(b)(2)(v) does apply, the third triangle had to be placed at least 200 feet out, and this Road Star admits it failed to do, (D.E. 118-4, Saqib Tr.  27:4-7), and this was indisputably negligence *per se*.

**E. The Canadian Trucker Road Star also Violated Numerous Other Provisions of the U.S. Federal Safety Regulations Governing Commercial Motor Carriers and Disregarded Standards Set Forth in the Nebraska Commercial Driver's Manual**

Commercial vehicles always have a common law duty of care in the operation of their vehicles on a highway. *Tortu v. A-1 Quality Limousine Service*, 2008 WL 3887612, at *2 (D.N.J. Aug. 18, 2008). This duty includes compliance with federal and state regulations regarding highway safety, including the Federal Motor Carriers Safety Regulations, 49 C.F.R. § 390 *et seq*. *Darling v. J.B. Exped. Services, Inc.*, 2006 WL 2238913, at *20 (M.D. Tenn. Aug. 3, 2006).  These regulations relate to public safety, *id.*, and were "promulgated to create uniform standards for the benefit of motor carriers and the public." *Hageman v. TSI, Inc.*, 786 P.2d 452, 454 (Colo. App. 1989), *citing Interstate Motor Lines, Inc. v. Great Western Ry. Co.*, 161 F.2d 968, 970 (10th Cir. 1947).

Here, Road Star failed to comply with 49 C.F.R. § 393.95, which states, in pertinent part:

**§393.95 Emergency equipment on all power units.**

Each truck, truck tractor, and bus (except those towed in driveaway-towaway operations) must be equipped as follows:

****

(f) *Warning devices for stopped vehicles.* Except as provided in paragraph (g) of this section, one of the following options must be used:

**(1) Three bidirectional emergency reflective triangles that conform to the requirements of Federal Motor Vehicle Safety Standard No. 125, §571.125 of this title**; or

(2) At least 6 fusees or 3 liquid-burning flares. The vehicle must have as many additional fusees or liquid-burning flares as are necessary to satisfy the safety requirements of §392.22.

(3) Other warning devices may be used in addition to, but not in lieu of, the required warning devices, provided those warning devices do not decrease the effectiveness of the required warning devices.

49 C.F.R. § 392.8 prohibits any truck from being driven on a U.S. highway without this required safety equipment:

**§392.8 Emergency equipment, inspection and use.**

No commercial motor vehicle shall be driven unless the driver thereof is satisfied that the emergency equipment required by §393.95 of this subchapter is in place and ready for use; nor shall any driver fail to use or make use of such equipment when and as needed.

Nebraska's own standards concerning warning devices contained in its 2005 Commercial Driver's Manual[28] at section 2.5.2 further state as follows:

If you must stop on a road or the shoulder of any road, you must put out **your emergency warning devices** within ten minutes. Place your warning devices at the following locations:

---

[28] While not having the force of law, standards in a state driving manual do form a legal standard, and the failure to follow that standard is negligence. *Malburg v. Grate*, 2014 WL 4473786, at *5 (E.D. Mich. Sept. 9, 2014) (CDL manual does establish "the knowledge that he [the driver] was expected to possess . . . while operating his commercial vehicle").

If you must stop on or by a one-way or divided highway, place warning devices 10 feet, 100 feet, and 200 feet toward the approaching traffic.

If you stop on a two-lane road carrying traffic in both directions or on an undivided highway, place warning devices within 10 feet of the front or rear corners to mark the location of the vehicle and 100 feet behind and ahead of the vehicle, on the shoulder or in the lane you stopped in.

Back beyond any hill, curve or other obstruction that prevents other drivers from seeing the vehicle within 500 feet.  If line of sight view is obstructed due to hill or curve, move the rear-most triangle to a point back down the road so warning is provided.

(D.E. 130-20, Nebraska CDL Manual, at p. 2-12).

To avoid any misunderstanding, the Nebraska Commercial Driving Manual even contains the following diagram designating the proper distances to place triangles:



## Figure 2.8



**Figure 2.10**

(*Id.*, p. 2-13).  Similarly, Section 2.20 – Accident Procedures in the same Nebraska CDL Manual states:

> **2.20.01 – Protect the Area**
> The first thing to do at an accident scene is to keep another accident from happening in the same spot.
>
> To protect the accident area:
>
> If your vehicle is involved in the accident, try to get it to the side of the road. This will help prevent another accident and allow traffic to move.
>
> If you're stopping to help, park away from the accident. The area immediately around the accident will be needed for emergency vehicles.
>
> Put on your flashers.
>
> **Set out reflective triangles to warn other traffic. Make sure other drivers can see them in time to avoid the accident.**

(D.E. 130-20, pp. 2-38).

Thus, in addition to violating the federal regulations, Road Star violated the standards set by Nebraska State law as well by failing to timely set up warning devices at proper distances.

The reason for Road Star's failure to comply with the requisite federal regulations (and the guidelines set forth in the Nebraska CDL Manual) may well have been because the Road Star drivers, Mr. Saqib and Mr. Saleem, received no training on federal law as to how many emergency warning devices to carry or at what distances such devices should be placed. (D.E. 118-4, Saqib Tr. 20:14-23; D.E. 124-8, Saleem Tr. 9:3-11).  In fact, despite running more than 80 trucks into the United States at any given time (Pl. SOUMF ¶ 54), the Road Star employee in charge of Recruiting, Licensing and Safety (including driver training), was not aware of the U.S. requirements regarding a minimum of 3 warning devices or the distances at

which they should be placed. (D.E. 130-4, Ullman Tr. 16:15-17:15; 36:10-23).  Thus Road Star

will also be liable for failing to provide adequate safety training. *Harmon v. Grande Tire Co.,*

*Inc.*, 821 F.2d 252, 256 (5th Cir. 1987) (truck company liable for failing to require the driver to

comply with federal regulations because it had not given him adequate instruction on what to do

in the event the vehicle becomes disabled).[29]

> ### F.  The Overwhelming Evidence of Road Star's Negligence Also Warrants Denial of Summary Judgment Because Any Overcorrection by Womack Cannot Be the Sole Legal Cause of the Accident "As a Matter of Law"

Plaintiffs contend that the issue at trial will be whether Road Star's and Bauer

Built's failure to perform their duties – all of which were simple and could have been done if

their employees had complied with either (a) industry practice or (b) federal regulations - caused

the accident. And, as previously stated, Plaintiffs are prepared to prove through expert accident

reconstruction testimony that this accident likely would have been avoided if they had simply

complied.

At this stage of the litigation, however, where courts are faced with the issue of

proximate cause, summary judgment must be denied.  *See, e.g.*, *Burnett v. Swift Transportation,*

*Inc.*, 2011 WL 533603, at *13 (M.D. Penn. Feb. 8, 2011) (in denying motion for summary

judgment brought by trucker in multi-vehicle accident on a foggy roadway, court determined that

a reasonable jury could conclude that the driver "failed to use his flashers and reflective signals

when stopped in the roadway and that this failure constituted a breach of the standard of care he

---

[29] Indeed, violations of this type have even been held to justify punitive damages. *Snow v. Oneill*, 2006 WL 1837910, at *3 (M.D.N.C. June 5, 2006) (denying summary judgment for defendant where the evidence showed that the driver failed to use reflective triangles, knew that the accidents occurred when trucks were parked outside the lane of travel, and had a duty to stop at a rest stop).

owed"); *Tortu*, 2008 WL 3887612, at *3 (denying summary judgment where a genuine issue of material fact existed as to whether defendant took reasonable precautions to warn oncoming motorists of the broken down bus); *Snow*, 2006 WL 1837910, at *3 (denying summary judgment where truck driver pulled over to sleep and failed to turn on hazard lights or employ reflective triangles); *McGarity*, 2012 WL 1028593, at *14 (denying summary judgment because whether or not it was possible to place warning devices prior to the accident was a jury question); *Shaw v. Stewart's Transfer*, 2010 WL 2943202, at *3, n. 5 (D. Me. July 22, 2010) (whether driver of tractor-trailer which had struck a moose could have placed warning devices out in the roadway within 10 minutes is a question of fact so summary judgment was denied); *Johnson v. Gmeinder*, 2000 WL 246585, at *2 (D. Kan. Feb. 10, 2000) (denying defendants' motion for summary judgment where  accident occurred within ten minutes of the defendant's stopping his truck so question of whether warning devices could have been set out); *Florea v. Werner Enterprises, Inc.*, 2009 WL 2421853, at *8 (D. Mont. July 29, 2009) (in a multi-vehicle accident, defendant's motion for summary judgment denied where driver had been stopped for only a few minutes when he was hit by the first car but as many as 15 minutes before hit by the second. Instead of putting out the warning devices, the driver spent the time with the driver of the first collision inspecting the damage).  The rationale for this denial is that:

> . . . a reasonable jury could find that a truck driver, when parked . . . with no hazard lights on or reflective triangles in place, could have foreseen that an oncoming vehicle may run into the rear of the rig and that injuries could result.  Indeed, the foreseeability of such rear-end collisions is precisely the reasons why DOT Regulations require the use of flashers and warning triangles.

*Bishop v. Wagner Trucking*, 2014 WL 636987, at *8 (N.D. Ala. Feb. 18, 2014) (denying summary judgment even though truck driver was not required by 49 C.F.R. § 392.22(b) to put out reflective triangles where the accident occurred in the emergency lane). *Compare Norton v.*

*Canadian American Tank Lines*, 2009 WL 86603, at *4 (W.D. Ky. Jan. 12, 2009) (granting summary judgment for **plaintiff** injured in accident with truck that had parked partly on the roadway in violation of a state statute where Kentucky has a codified negligence *per se* rule; court did not reach issue of whether driver also violated federal regulations because he placed no warning devices such as reflective triangles or flares in violation of 49 C.F.R. § 392.22).[30]

Completely disregarding this case law, Defendant Road Star claims that Mr. Womack's testimony – that he tried to move to the left lane and then overcorrected as he moved back into the right lane – establishes that he <u>alone</u> was the proximate cause of the accident. (D.E. 117 at 25). In advancing this claim, however, they misconstrue established law on both intervening cause and on the concept of "passive negligence." Since neither legal construct provides the assistance Road Star needs, its motion for summary judgment should be denied.

> **1.  Established Case Law Makes Clear That Womack's Conduct Was Not an Intervening Cause Because There Was a Direct Collision Between Womack and the <u>Negligently Parked Truck</u>**

Proximate cause consists of three elements: that "(1) but for the negligence, the injury would not have occurred; (2) the injury is the natural and probable result of the negligence, and (3) there is no efficient intervening cause." *Heatherly,* 421 F.3d at 641-42 (applying Nebraska law). It is this third element upon which Road Star relies in seeking summary judgment.[31] The law is clear that where there is a collision with a negligently parked

---

[30] Road Star's puzzling attempt at pp. 117-118 of its Amended Memorandum (D.E. 191-1) to distinguish a few of Plaintiffs' cases falls far short. The issue of causation being an issue of fact for the jury was front and center in *Hughes*, 529 F.2d at 26; *Tortu*, 2008 WL 3887612, at *3; *McGarity,* 2012 WL 1028593, at *15; and *Shaw,* 2010 WL 2943202, at *2-3.

[31] Of special note, Plaintiffs in contrast took the reasonable position in our initial motion to acknowledge that "the issue of causation still remains for trial." (D.E. 112, p. 7, n.2). That is because proximate cause is generally a question for the trier of fact and cannot be resolved on

truck, **any negligence by the driver of the other vehicle cannot be an "intervening cause."** *Id.*

at 644. *See also Baumann*, *supra*, 802 F.3d at 956 (finding that defendant, who negligently

caused first crash, was not liable for second crash, because there was a long line of traffic and

properly placed vehicles nearby which "turned on their hazard lights" and "activated their lights

and sirens."). *Id.* The facts here are the opposite – the disabled truck was not properly marked.

> As a matter of law, an efficient, intervening cause is:
>
> A new and independent act, itself a proximate cause of a result,
> which breaks the causal connection between the original wrong
> and the result.  A person is not legally responsible for a result if it
> would not have resulted but for the interposition of an efficient
> intervening cause, which he **should not have reasonably
> anticipated and reasonably foreseen.** . . .   An intervening cause
> will act to cut off a tort-feasor's liability **only when the
> intervening cause is not foreseeable.**

*Tapp v. Blackmore Ranch, Inc.*, 254  Neb. 40, 49-50 (1998) (emphasis supplied). *See Delaware,*

*By and Through Delaware v. Valls*, 226 Neb. 140, 145 (1987) (finding property owner adjacent

to intersection, who failed to trim his hedge, was not liable for an accident that occurred when a

motorcyclist pulled out into an intersection when he could not see what he needed to see to do so

safely, and was hit).

In contrast, here, that an accident might occur as a result of vehicles on the

shoulder of the road (the shoulder being part of the highway)[32] that failed to put out reflective

triangles in compliance with 49 C.F.R. § 392.22 is clearly a highly foreseeable event – that is the

---

summary judgment. *Heatherly*, 421 F.3d at 642; *Hughes*, 529 F.2d at 23.  Like the other issues
raised by Defendants Road Star and Bauer Built, only after a full presentation of all the evidence,
including the expert opinions, will a trier of fact be able to determine the proximate cause of this
catastrophic accident.

[32] Per Neb. Rev. Stat. § 60-661: "shoulder shall mean that part of the highway . . ." *See also*
*People v. Lopez*, 197 Cal. App. 3d 93, 99 (4th Dist. 1987) ("The term 'highway' has been held to
include . . . the asphalt shoulder adjoining a paved road.").

very reason why the regulations were created. *See* 37 Fed. Reg. 5038 (March 9, 1972) (demonstrating that 49 C.F.R. § 392.22 was designed to prevent rear end collisions between oncoming traffic and disabled vehicles). It is obviously commonplace for oversized vehicles to travel I-80 in Nebraska. (D.E. 118-5, Salisbury Tr. 72:24-73:5). Moreover, a "driver who negligently creates a highway obstruction even on the shoulder (*see Baumann*, 802 F.3d at 956) – here a few inches from the fog line – 'must reasonably foresee the probability of some injury from his negligent acts, not only from careful drivers of other vehicles but also from negligent ones, so long as the act of the other driver is not so 'extraordinary' as to be not reasonably foreseeable." *Baumann*, 802 F.3d at 956.

At a minimum, whether Mr. Womack's overcorrection was an intervening cause is a matter for the jury. *Heatherly*, 421 F.3d at 644. In this regard, *Heatherly* is directly on point. In *Heatherly*, a motor home was struck by a stolen car, which sent it into a truck that had pulled off to the side of the road. In a suit against the trucking company, the District Court directed a verdict for the defendant because it found that the truck driver's conduct in parking where he did, while negligent, was not a proximate cause of the injury. *Id.* at 641. The Eighth Circuit reversed, finding that jury must be allowed "to perform its duty of calibrating the limits of liability flowing from an established duty and breach thereof with regard to the collision between the motor home and the negligently parked MST truck." *Id.* at 644. In making this assessment, "the question of whether an act is a proximate cause, or simply a non-actionable condition, is determined by whether it was foreseeable that the initial act could join with the intervening act to cause the alleged injuries." *Id.* at 643. Even in *Baumann*, 802 F.3d at 956, the Court, citing to *Heatherly*, makes the distinction that if the parked vehicle is "unsafely parked on the shoulder," which

obviously has to include a vehicle a few inches off of the fog line and not properly outfitted with warning devices, an accident is foreseeable. *Id.*

      Nebraska state law is fully in accord. In *Looney v. Pickering*, 232 Neb. 32 (1989), the Supreme Court of Nebraska addressed the application of this superseding cause doctrine in the context of a motor vehicle accident similar to the instant case.  The plaintiff's son was driving in the right-hand lane behind a car that was behind a van. The right lane had "no parking" signs posted along it. The plaintiff's son observed both the car and the van "move suddenly from the outside lane to the inside lane.  He looked in his rearview mirror to see if he could also change lanes," but there was another car on the left-hand side and he determined that he "could not safely change lanes."  He applied his brakes but could not avoid colliding with the defendants' truck and trailer, which were parked in the curb lane, in a no-parking zone. "[N]either the truck nor the trailer was equipped with emergency flashers, nor were there any other signs, flags, or flares to warn approaching traffic that the truck and trailer were stopped." *Id.* at 34. In reversing the trial court's dismissal following trial, the court determined the issue of the foreseeability of the intervening cause is a fact specific inquiry for the jury to decide. *Id.* at 40.

### 2.      Road Star's Active Preexisting Negligence Was Not A Passive Condition

      Nebraska adheres to the rule that "passive negligence which does nothing more than furnish a condition by which injuries are made possible through the subsequent independent negligence of another is not actionable." *Valls*, 226 Neb. at 142.[33] However, the state courts

---

[33] As set forth *infra*, federal common law of negligence applies to at least Road Star's conduct in this action given that it involved interstate commerce.  However, in the interest of completeness, Plaintiffs will address Road Star's arguments under state law as well.

distinguish between "passive preexisting negligence" and "those situations in which active preexisting negligence combines with subsequent independent acts of negligence to cause injury." *Id.* at 143.  And numerous courts have found that the failure to warn of an obstruction in the road (and of course the shoulder is part of the highway, as discussed *supra*) is "continuing negligence as distinguished from a condition." *Chesler v. Trinity Industries, Inc.*, 2002 WL 1733250, at *4 (N.D. Ill. July 25, 2002).  *See Looney*, 232 Neb. at 40.

*Maresh v. Nebraska*, 241 Neb. 496 (1992), upon which Road Star heavily relies, precisely supports Plaintiffs' position. In *Maresh*, the estate of a passenger injured in a car accident sued the State of Nebraska for negligence in failing to warn of a drop-off on the roadway created by on-going construction. The Court found that the state's failure to comply with its own manual, "which constitutes its own regulations," regarding the placement of warning devices was sufficient evidence of the state's breach of its duty of care. *Id.* at 512.  In finding that this breach was the proximate cause of the injury, the Court concluded that,

> [A]ny of the reasonable precautions the state failed to take – providing an edge line, placing the object markers nearer to the drop-off, putting up barricades or drums – would have in some measure reduced the likelihood of this accident.

*Id.* at 514.  That the driver may have been negligent in straying off the road did not make that driving an intervening cause because "there is nothing in this case to indicate that [the driver's] negligence was not foreseeable. **Inadvertent straying onto the shoulder is a foreseeable activity**." *Id.* at 515 (emphasis supplied). Just as in *Maresh*, that an oversized load driving on Interstate 80 may drive slightly over the rumble strip does not excuse Road Star's failure to adhere to the standard of care set forth in 49 C.F.R. § 392.22.

Similarly, Road Star, and Bauer Built both rely upon *Valls*, *supra*, 226 Neb. 140,[34] and presumably upon the cases listed therein, all of which are easily distinguishable because the accident here did not involve "passively" negligent third-party conduct. *See, e.g., Childers v. LCW Apartments*, 214 Neb. 291, 293-94 (1983) (holding that where a jury found evidence to support the adequacy of the lighting, and, under Nebraska law, a landlord has no duty to protect a tenant from criminal activities of third parties that are not foreseeable, any inadequacy in the lighting was not a concurrent cause of the tenant's injuries as a result of her assault by a third party); *Bringewatt v. Mueller*, 201 Neb. 736, 740-41 (1978) (finding that a landlord, who had leased property under which the lessee had a duty to maintain the fence and control his horses, was not liable for injuries resulting to a driver when his motor vehicle hit an escaped horse); *Connolley v. Omaha Public Power Dist.*, 185 Neb. 501, 508 (1970) (finding that power company was not liable in trespass action for injuries to child resulting from shock received when metal flagpole he was installing came in contact with active power line that hung 6 inches over into plaintiff's property line; if the negligence charged "furnishe[d] only a condition by which the injury is made possible, and a subsequent independent act of a third party cause[d] the injury, the two acts are not concurrent"); *Bruno v. Gunnison Contractors, Inc.*, 176 Neb. 462, 466-67 (1964) (finding that contractor, who had fulfilled his duty to warn traveling public of a highway obstruction by the installation of a flare barricade, was not liable for injuries to plaintiff when plaintiff was hit by a driver, who had successfully cleared the obstruction, but then hit him on the unimpeded portion of the road); *Jarosh v. Van Meter*, 171 Neb. 61, 69-70 (1960) (finding that double-parked truck, of which plaintiff was aware when she tried to cross the road, was a condition and not a concurrent cause of plaintiff's injuries when she was struck

---

[34] *Compare* D.E. 117 at 32 with *Valls*, 226 Neb. at 142-43.

97

by a car); *Anderson v. Byrd*, 275 N.W. 825, 827 (Neb. 1937) (finding that smoke was not the cause of an accident when the driver was driving on the wrong side of the road).[35]

Here, Road Star's negligence was not a passive condition - the damage would not have occurred without it.  The truck carrying the jet engine collided directly with it.  Had Road Star fulfilled its duty of care by taking proper safety precautions to warn on-coming traffic, Mr. Womack would have seen the disabled truck with adequate time to change lanes, as he routinely did.  Or, given that "inadvertent straying onto the shoulder" was foreseeable, *Maresh*, 241 Neb. at 515, Road Star should have pulled far enough off the road so that traffic could have passed safely through in the right hand lane.

More importantly for purpose of these Motions, however, the distinction between a condition and a cause is an issue for the trier of fact. *See, e.g., Johnson v. Metropolitan Utilities Dist.*, 176 Neb. 276, 280-81 (1964) (denying summary judgment where defendant, who failed to warn of obstruction created by parking a tractor so it protruded into the street; issue of whether truck constituted a continuing negligence and was thus proximate cause of the accident was for the jury). *See also Chesler*, 2002 WL 1733250, at *4. To decide such an issue on summary judgment, then, is premature.

---

[35] The holding in *Anderson*, moreover, has been called into question by *Becarra v. Sulhoff*, 21 Neb.App. 178 (2013) (reversing summary judgment for railroad, which negligently maintained a concrete barrier, where plaintiff was injured when her car was struck by a train and then propelled into barrier).

98

G. **Plaintiffs' Overwhelming Evidence, Including Testimony from Four Competent Professors of Accident Reconstruction/Conspicuity Experts, Demonstrate that Bauer Built's Breach of Its Duty of Care Was Also One of the Proximate Causes of This Accident**

The evidence of Bauer Built's breaches of its duty of care is also substantial. The overwhelming evidence demonstrates an utter failure to do what the law required of it, as the provider of emergency services to interstate truckers. That evidence includes:

1. The driver failed to park the repair truck in the rear of the disabled tractor-trailer as a warning to on-coming traffic, **as required** in written standards issued by Tire Industry Association/industry standards; (D.E. 130-28, Martina Report, p. 3, ¶ 5).

2. He failed to park his truck at a diagonal to the disabled tractor-trailer as a standard warning to oncoming traffic; (D.E. 130-28, Martina Report, p. 3, ¶ 6).

3. The service technician did not turn on his emergency flashers, even though he did have on his overhead rotating light; (D.E. 130-29, still photo from video taken by Road Star Driver) and

4. The overhead lighting on the Bauer Built truck was ineffective, and far below that required by national recommended safety standards (as set forth in the industry standard -- NCHRP Report 624). (D.E. 130-26, Professor Gibbons Report, p. 10 of 31).

5. The Bauer Built technician also failed to ensure that triangles were placed at appropriate intervals behind the two trucks, as required by his industry standards as well. (D.E. 130-28, Tire Service Expert Martina Expert Report, pp. 3 and 4 (roadside technician is also required to ensure Bauer Built triangles are put out at legally required intervals or to put them out himself or herself); D.E. 130-21, Transcript of Tire Industry Association Training Video, quoted below; *see also* D.E. 130-23, Bauer Built Training Questionnaire, quoted below). As expert Martina states in his Report, in pertinent part, per standard industry practice:

> 3) Before getting out of the service truck activate hazard lights and amber beacon light if present.

**\*\*\*\***

99

6) Parking the truck on an angle can be dangerous if the service truck is struck from behind by another vehicle. This ensures only one area becomes a hazardous zone. Before beginning to work, technicians must place reflective triangles in the appropriate positions per Federal regulation 49 CFR PART 392.22.

7) On a **divided highway**, one triangle should be about 10 feet behind the vehicle, another triangle placed at about 100 feet from the vehicle and the final one placed at 200 to 500 feet from the triangle placed at 100 feet.

8) In a situation where the disabled vehicle is stopped on a road within 500 feet of a curve, crest of a hill, or other obstruction, the triangle in the direction of the curve or obstruction must be viewable between 100 and 500 feet so other drivers have ample warning.

(D.E. 130-28, p. 3 of 27 (emphasis in original); (*see also id.*, p. 4).

Specifically, Bauer Built used a training video entitled "Roadside Service Safety" issued by the Tire Industry Association to train its employees, and yet here its technician virtually ignored everything that he was trained to do. An excerpt from the Bauer Built/TIA training video states as follows:

[Caption: Pete Bilotta, ASE Master Technician:] "Responsible driving not only protects your driving record, it makes the road safer for other motorists. Now, let's look at how to position your service truck on the side of the road."

[Narrator]: The first step is to make sure you have a safe place to work, particularly when working on wheel positions on the driver's side of the vehicle. **Once you've determined the area to be safe, park your truck approximately 30 feet behind the disabled vehicle.** Turning the wheels or parking the truck on an angle can be dangerous if the service truck is struck from behind by another vehicle.

By keeping everything facing straightforward in a direct line with the other vehicle, only one area becomes a hazardous zone. Technicians should never get caught between two vehicles on any highway or road service.

100

Put the truck in park or neutral. Apply the parking brake and **activate the hazard lights** and Amber beacon light if present. Before beginning to work on the disabled vehicle, technicians must place reflective triangles in the appropriate positions. **On a divided highway, one triangle should be placed ten feet behind the disabled vehicle, another triangle placed at 100 feet, and the final one placed at 200 feet.**

On a two-lane highway or road without a median, one triangle should be placed 100 feet in front, one triangle ten feet behind, and the final one placed at 100 feet behind the disabled vehicle. In situations where the vehicle is located on a road without a median **on a curve** or near an obstruction, **the triangle in the direction of the curve or obstruction may need to be more than 100 feet from the vehicle.**

[Bilotta:] By the way, reflectors and reflective tape can be added to the service truck to make it more visible when it's parked on the side of the road. It's also a good idea to use the reflectors when working in a parking lot or jobsite to make the truck more visible.

(D.E. 130-21, Transcript of Training Video; emphasis supplied).

Further training material provided by Bauer Built to all of their roadside service technicians, including the technician at issue, included questionnaires that contained the following multiple choice questions:

10. On road calls, the service vehicle should be parked how many feet behind the disabled vehicle?

11. On divided highways, the triangles should be placed at how many feet behind the disabled vehicle?

(D.E. 130-22, Training Questionnaires).

And an additional Bauer Built training pamphlet entitled "Tire Service on the Edge" noted the following safety advice among the "company's **requirements**:"

- When you get to the location make sure that the other unit is parked safely.

- [Make sure] the vehicle is marked with safety reflectors as are required.

101

- Park your service unit behind the customer's vehicle as close to the edge of the highway as possible.

- Mark sure that all of your lights are on including the amber flashing light.

None of these "requirements" was reliably adhered to.

(D.E. 130-23, Training Questionnaires).

Plaintiffs have retained several highly regarded and competent accident reconstruction and conspicuity professors. They will testify as to the effects of Bauer Built's and Road Star's failure to use safety triangles and the failure to use flashers as the primary and direct causes of this accident. This testimony includes:

1.     Ronald Gibbons, a Professor at Virginia Tech, and the nation's leading expert in illumination engineering, with a specialty in transportation lighting and visibility, completely reconstructed this accident with a virtually identical service truck with identical lights and an identical disabled truck at the same locations in Nebraska (per photos on the adjoining pages). His report is attached as D.E. 130-26. As a result of that reconstruction, he will testify that:

(i)     The industry standard recommendations for proper emergency lights are NCHRP 624, "The Selection and Application of Warning Light on Roadway Operations Equipment," require them to be seen at 1,500 feet, or roughly 15 seconds away, per the chart below:



Figure 2 – Lighting configuration on Rear of Tire Service Vehicle

(D.E. 130-26, Professor Gibbons Report, p. 6 of 31).

(ii)    Bauer Built's lighting layout and the output of its overhead warning lights are "not able to be seen," and become "barely visible," just beginning to become visible, at 700 feet, per the photo below. (*Id.*, pp. 7-8 of 31).

(iii)    Similarly, when placed at 40 feet, the vehicle safety triangles blend in with the truck, and are only "barely visible," per the same photo below. (*Id.*, p. 10 of 31).



Figure 4: Re-enactment Photo – Visibility with the triangles at 40 feet and the service vehicle with overhead warning lights beside the stopped tractor trailer at 700ft (*Id.*, p. 8 of 31).

(iv)   Note how visible the 500 foot marker (similar to a triangle) warning is in the photo below at 1,000 feet, again with plenty of time, or roughly 10 seconds away. (*Id.*, p. 9 of 31).



Figure 5: Re-enactment Photo – Visibility with marker at 500 feet and the service vehicle with overhead lights on beside the stopped tractor trailer at 1000ft. (*Id.*, p. 9 of 31).

(v) Keeping the Bauer Built service truck behind the disabled truck (which was not done on the day in question) and using its red flashing hazard lights (which the Bauer Built truck here failed to turn-on) would have increased visibility to 1,500 feet (again, with plenty of time, roughly 15 seconds away) per the photo below – note also that the triangle placed at 500 feet is also just beginning to become visible, as it was shown to be visible from 700 feet beyond their location (but only if not placed in a cluttered position too close to the truck).[36] (*Id.*, p. 10 of 31).



Figure 6: Re-enactment Photo – Visibility with the service vehicle with overhead lights on and parked behind the stopped tractor trailer 1500ft, plus triangle at 500ft. (*Id.*, p. 10 of 31).

---

[36] The difficulty of seeing a triangle when cluttered too close to a truck, such as at the 40 foot placement done here by Road Star, is discussed in detail in D.E. 130-25, Professor Fogarty Report, pp. 8 of 184, 11 of 184.

(vi)   Finally, Professor Gibbons' study of the "flashers" on the Road Star truck, as well as similar standard truck lighting tested in the field, established that such generic lights provided little, if any, advance warning to oncoming traffic beyond 400-500 feet. (D.E. 130-26, Professor Gibbons Report, p. 10 of 31).

The bottom line then, when these re-enactment results from the actual accident scene are combined with Professor Fogarty's and Professor Gibbons' study and calculations, below, is that with a triangle put out at 500 feet or with the Bauer Built truck parked behind the Road Star truck and with its hazard lights activated, Mr. Womack would have had plenty of time (up to 11 or 15 seconds) and would likely have avoided this accident. (D.E. 130-25, Professor Fogarty Report, Appendix J, pp. 99-100 of 184 and 103-104 of 184).

Absent the proper triangles and hazard lights, the driver Womack had no way to discern (a) if any truck which he saw ahead was moving or broken down, or (b) if it was parked in such a location as to be problematic for his vehicle. His final, emergency responses were thus as timely as possible, proper and normal, not negligent. (D.E. 130-25, Professor Fogarty Report, Appendix U, pp. 183-184 of 184).

2.   Similarly, Professor Philip M. Garvey, a Professor at Penn State, and equally one of the nation's leading expert in Transportation Human Factors.  A copy of his report is attached as D.E. 130-27.  He will testify that:

(i)   He analyzed the purpose of the Federal Motor Carrier Safety Administration's code 393.22 regarding warning devices. (D.E. 130-27, Professor Garvey Report, Exh. A, p. 4 of 53).

(ii)   Because a 17-inch triangle, such as that used by Road Star, is expected to be visible to a driver with 20/40 vision at only 287 feet, federal regulations require three triangles – one placed ten feet, one placed 100 feet, and one placed 200 feet from the disabled vehicle and, if the disabled vehicle is within 500 feet of a curve, the triangles are to be placed at 100, 200 and 500 feet, and such triangles normally can be seen up to 700 feet upstream of their placement. (Id., Exh. A, pp. 4-6 of 52).

107

(iii)     Of high significance in this regard is a 2005 Penn State University Study entitled: "Study Regarding Emergency Road Flare Effectiveness in Enhancing The Safety Zone" M. de la Riva, et al., prepared by the Pennsylvania Transportation Interstate, which found that 89% of vehicles changed lanes when warning devices were placed at proper distances, per the attached graphic. (*Id.*, Exh. E, p. 52 of 52).



(iv)     That study also concluded, in part, that the combination of flares and emergency lights caused 95.7 percent of traffic to timely move over at least one lane. (*Id.*, p. 3 of 5, ¶ 2 and Exh. B, p. 24 of 52).

(v)     Triangles have a similar effect to flares, as above. (*Id.*, p. 3 of 5, ¶ 3).

(vi)     Garvey further found that triangles (such as here would have been placed at 500 feet) are typically visible at an additional visible at 700 feet or 1,200 feet in total (nearly 12 seconds of warning). (*Id.*, p. 3 of 5, ¶ 1).

108

3. Further, Professor William J. Fogarty, a full Professor of Accident Reconstruction, with 57 years teaching this and similar disciplines, who is also one of the most experienced federal accident reconstructionist in the country, having reconstructed over 3,500 accidents for the NHTSA and US DOT, whose report is set forth in D.E. 130-25, will further testify that:

> (i) Had appropriate flashing lights been activated at the site of the disabled vehicle, the driver carrying the jet engine would have had an opportunity to see those lights when he was **more** than 1500 feet (or roughly 15 seconds) away from the disabled truck; (D.E. 130-25, Professor Fogarty Report, Appendix J, pp. 101-103 of 184).

> (ii) Had warning triangles been placed at the appropriate intervals (up to 500 feet), the driver could have had an opportunity to see them when he was up to 660 feet away or 1,160 feet (or over 11 seconds) away from the disabled vehicle; (*Id.*, p. 103-104 of 184).

> (iii) Had this professional driver had the foregoing warning, he would have had a reasonable opportunity to and would almost certainly have avoided the accident by either partially changing lanes or decelerating and then changing lanes, either of which could entirely have been accomplished by a professional driver in well under 10 seconds. (*Id.*, pp. 7-8 of 184).

> (iv) If Road Star had just parked on foot further over on the paved shoulder, Mr. Womack would not have had to change lanes at all! (*Id.*, Appendix U, p. 184 of 184).

In short, looked at another way, **96% of trucks** move to the left lane when they see both emergency warning lights and roadside warning devices. There is absolutely no reason to think that, with adequate warning, Mr. Womack carrying the jet engine would not have done the same, and **he in fact also so testified that he always did so**.

4. Professor Marc Green, a Professor of Ophthalmology at The University of West Virginia Medical School, and an expert on "conspicuity" in vehicle accidents, offers further important accident reconstruction opinions, especially concerning the cause of the loss

not being solely the actions of the truck driver, Joseph Womack, (Pl. Exh. 30, Professor Green Report, pp. 4-6), but rather the poor lighting of the Bauer Built vehicle and the inadequate triangle placement. (*Id.*, pp. 4-6). Professor Green concludes that:

> Further, the service vehicle was not highly conspicuous, which is why it was required to have signal lights. The Gibbons report concluded that the service vehicle lighting was below NCHRP Report 624 recommendations. The rooftop strobe was located against the bright sky background, which created low contrast and hence low visibility and low conspicuity. Moreover, the rear lights were also turned at an angle, which would lower the amount of illumination reaching Mr. Womack's eye.

(*Id.*, p. 4).

5.      Finally, further supporting Professor Fogarty, roadside service expert Mike Martina has also concluded that the Bauer Built vehicle could simply have been parked in a more prudent manner further from traffic, utilizing the rest of the asphalt shoulder and part of the firm flat grass shoulder, and that obviously would have prevented the collision altogether. (D.E. 130-28, Martina Report, p. 4 of 27).

Professor Fogarty will further testify that all of the evidence upon which HRYCAY relies on in its Report (D.E. 118-3), deals with "visibility" and ignores questions of discernibility and perspective loss, both of which have significantly greater causal importance to actual conspicuity and human factors experts (of which HRYCAY's expert is clearly not one) in the field of scientific accident reconstruction.  (D.E. 130-25, Professor Fogarty Report, Appendix T, p. 166 of 184).  As Professor Fogarty explains,

> Discernibility relates to the identification of the object that was transmitted from the eye and forms the beginning of the judgment process dealing with the decision to take some sort of action or response. Identification occurs prior to determining what action is required due to location of the object, hazards that may be encountered, etc. It is the process of actually knowing what was initially seen by the eye. Discernibility is the key to understanding

> causal relationships in the field of scientific accident reconstruction. . . . Mr. Drew never speaks to the discernibility of the tractor trailer or even why regulations such as the CFR are promulgated and enforced. They exist because objects visible to an **alerted** observer have been announced by the presence of other objects (emergency warning cones, flashing lights, flagmen, etc.) based on years of study and experience that have preceded the passage of the regulations.

(*Id.*, Professor Fogarty Report, Appendix T, p. 167 of 184). He will testify that given all of the facts here, and given that the disabled vehicle was not readily discernible at safe distances allowing time for an evasive maneuver – *i.e.* if it could not be perceived as (i) not moving; (ii) located on the rumble strip; and (iii) flush up against the travel lane, because there was no proper triangle warnings given, or other required lighting or safety warnings provided – Mr. Womack's driving was hardly the sole proximate cause of the accident. In fact, this driver, with four million accident free miles, was a victim of a negligence trap set by Road Star and Bauer Built.

Given this overwhelming evidence of causation, a jury should have no difficulty in finding liability on the part of Defendants Road Star and Bauer Built. *See, e.g., Thurston v. Ballou*, 23 Mass. App. Ct. 737, 740-41 (1987) (truck driver broken down on shoulder's failure to put out triangles at proper distances and failure to show lights was sufficient to support jury's verdict of negligence); *Mayo v. Triborough Bridge and Tunnel Auth.*, 179 A.D. 2d 471, 472 (N.Y. App. Div., 1st Dept., 1992) (tow truck driver held negligent for failing to set out cones and illuminate lights behind stopped vehicles); *Freightways, Inc. v. Stafford*, 217 F.2d 831, 836 (8th Cir. 1955) (finding that tractor trailer which hit stalled car could not be stopped within 129 feet and could not be expected to see vehicle without lights on); *Snow*, 2006 WL 1837910, at *3 (Trucker's failure to place reflective triangles behind truck parked on shoulder during daytime held to violate 49 C.F.R. § 392.22 and to potentially constitute gross negligence); *Gmeinder*, 2000 WL 246585, at *2 (denying summary judgment where trucker's failure to place reflective

111

triangles behind truck held to violate 49 C.F.R. § 392.22); *First Tennessee Bank, N.A. v. Wilson Freight Lines, Inc.*, 907 F.2d 1122, 1124-25 (11th Cir. 1990) (trucker's failure to operate flashing lights or to put out triangles during daytime behind truck parked on shoulder; liability held to be jury question).

## VII.

### CHOICE OF LAW: UNDER BOTH SUPREME COURT AND FEDERAL CIRCUIT COURT PRECEDENTS, WHICH APPLY HERE,[37] THE POST-SETTLEMENT LIABILITY OF THE NON-CARMACK DEFENDANTS IS JOINT AND SEVERAL, WITH NO CONTRIBUTION FROM THE CARMACK CARRIERS, WHOSE SETTLEMENT PAYMENT WILL ULTIMATELY BE DEDUCTED *PRO TANTO*.

### A.    A Recent Partial Settlement Took Place Under the Carmack Amendment[38]

As noted previously, this case has now settled with the two Carmack carriers only, Southern Pride and Thunder Rolls, for their limit of liability of $250,000. Per the Settlement Agreement and Release, said settlement (which has now been paid) is being made with them "under the Carmack Amendment and as Carmack carriers." (Pl. Exh. 32, Settlement Agreement and Release, ¶ 1). The Settlement Agreement by its express terms does not impact and is entirely "without prejudice" to Plaintiffs' claims against Road Star or Bauer Built. (*Id.*, ¶

---

[37] For the reasons set forth below and in Section VI.A. *supra*, state (Nebraska) law has no role on the effect of Plaintiffs' settlement of federal claims in this matter, which has been brought before the Court pursuant to Carmack/federal question jurisdiction, on the issue of joint and several liability. *See Pinchback v. Armistead Homes Corp.*, 907 F.2d 1447, 1453 (4th Cir. 1990) ("The effect of the release on [plaintiff's] federal claims against [non-settling defendant] is a question of federal law," citing authority.).

[38] Road Star inexplicably spends seven pages of its Amended Memorandum arguing that Plaintiffs have no claim at all against Thunder Rolls, and only Carmack claims against Southern Pride. (D.E. 191-1, Amended Memorandum, pp. 132-139). As Plaintiffs' claims as against Thunder Rolls and Southern Pride are resolved, and Road Star's arguments have nothing to do with its own motion, Plaintiffs are not responding to what is now an irrelevant, academic question.

3). The settlement is based upon Southern Pride and its sub-contractor, Thunder Rolls, contractual limitation of liability of $250,000 (D.E. 110-7 at ¶ 3.0(b), p. 24 of 61), after Plaintiffs agreed that they were both covered by the Carmack Amendment and the Boeing-Southern Pride Freight Transportation Services Agreement[39] ("FTSA"). Indeed, it was pointed out to us that the FTSA here can also be read to cover Southern Pride's sub-contractors. (*See* D.E. 110-7 at ¶ II(a)(i), p. 41 of 61: "Service Provider shall ensure all carriers / trucks assigned to all loads will use the Service Provider's rate structure and insurance requirements covered in this agreement"; *see id.*, ¶ 31.4, p. 34 of 61: "Contracted carrier will be responsible for all claims for shortage or loss"; *see also* additional Pl. Exh. 32, Settlement Agreement and Release, ¶ 1). Plaintiffs only reached this decision after carefully reviewing 49 U.S.C. § 14706, which confirms that the Carmack Amendment covers: "The carriers and **any other carrier** that delivers the property . . ."[40] (Emphasis supplied).

---

[39] Bauer Built, in its Opposition to the Motions of Southern Pride and Thunder Rolls, (D.E. 199), spends a significant amount of time arguing that the $250,000 limit did not apply here, because it was stated to be a minimum, ignoring the fact that the Plaintiffs have already settled for that amount and that the relevant Boeing witness submitted a declaration that the word "minimum" was intended by all parties to the contract to operate as a maximum. (D.E. 110-6, ¶ 3).

[40] We ultimately concluded that Thunder Rolls also was liable in contract – under either the FTSA or its own Independent Services Agreement. (*See again* D.E. 110-7, ¶ 3.14, p. 34 of 61 (indicating that Thunder Rolls as a contracted carrier is "responsible for all claims for shortage or loss"); and D.E. 91-3, p. 17 of 20 (stating that contractor assumes responsibility "for any and all damages and/or loss occurring to any property transported by CONTRACTOR . . .")). In *EFS Nat'l Bank v. Averitt Express, Inc.*, 164 F. Supp. 2d 994 (W.D. Tenn. 2001), the District Court considered whether a carrier who did not issue the bill of lading (Motor Cargo) was entitled to the limitation of liability negotiated by a predecessor carrier (Averitt Express). *Id.* at 996. After finding that Averitt Express had properly limited its liability under the Carmack Amendment, the District Court applied Averitt's liability limitation to Motor Cargo, finding them jointly and severally liable for the limited liability amount. *Id.* at 1002.

**B.    Per the Supreme Court's *McDermott* Decision, Federal Common Law, Not State Law, Normally Determines the Effect of a Settlement Reached Under a Federal Claim. This Is Particularly True When the Settlement Is Reached Under a Federal Statute**

By way of further delineation of the proper law here (should the Court even reach the issue of joint and several liability, which is not necessary to the resolution of the motions), in allocating fault between a defendant liable under a federal statute such as the Carmack Amendment and other defendants liable under federal or state common law, a federal common law rule still must be applied to determine the result,[41] and that rule will result in a "*pro tanto*" reduction of the Plaintiffs' claims by the sum of the statutorily liable party's ultimate judgment or settlement.

The leading case on what law to apply to a settlement in a federal case is *McDermott v. AmClyde*, 511 U.S. 202 (1994). There, a crane owner brought an admiralty action against a crane manufacturer, a crane hook manufacturer, and several steel sling suppliers, seeking to recover from damage to a crane and an offshore platform deck that fell from the crane after a hook and sling broke. The jury fixed damages at $2.1 million, and the crane owner settled with the "sling defendants" for $1 million before trial. At the trial, the jury allocated 32% of the fault to AmClyde (the crane manufacturer), 38% of the fault to River Don (the hook

---

[41] Bauer Built relies heavily upon the Eight Circuit decision in *In re Derailment Cases*, 416 F.3d 787 (2005), for the proposition that Nebraska state law applies to all of the issues here. *In re Derailment* is a personal injury case which actually supports Plaintiffs' position, because the Eighth Circuit held that federal law applied to the negligence claims. *Id.* at 794. As for the remaining negligence *per se* and strict liability claims, the Court, not surprisingly, relied upon the personal injury section of the Restatement (Second) Conflict of Laws § 146 (1971), "to determine which state's law applies to a personal injury claim." *Id.* That portion of the decision thus has no application at all to the law to be applied in cases involving the interstate movement of goods, much less in cases involving settlements made pursuant to a federal statute. As set forth *supra* in Section VI, Restatement (Second) Conflict of Laws § 145 is more appropriate here.

supplier), and 30% of the fault jointly to the plaintiff crane owner (McDermott) and the sling defendants. 511 U.S. at 202. On appeal to the Supreme Court, the court ruled that the liability of the non-settling defendants in admiralty cases should be calculated with reference to the jury's allocation of proportionate responsibility, rather than by giving the non-settling defendants credit for the dollar amount of the settlement. Thus, River Don was liable for 38% of the total damages, or $798,000 (38% of $2.1 million). *Id.* at 210.

Importantly, however, *McDermott* was not a settlement made under the regulatory effect of a federal statute, nor was it a settlement with a strictly liable defendant – both of which circumstances exist here.[42]

Although *McDermott* was an admiralty case, and the present case is not, *McDermott*'s choice of law general principles apply in the present case because admiralty law is a species of federal common law. *See generally Clipper Wonsild Tankers Holding A/S v. Biodiesel Ventures, LLC*, 851 F. Supp. 2d 504, 508-09 (S.D.N.Y. 2012); *In re Oswego Barge Corp.*, 664 F.2d 327, 333-34 (2d Cir. 1981) ("To the extent that maritime law is judge-made, it can be viewed as simply one branch of federal common law."); *Horak v. Argosy Gaming Co.*, 648 N.W.2d 137, 143 (Iowa 2002) ("General 'admiralty' or 'maritime' law is not codified. It exists as 'a species of judge-made federal common law.'").

---

[42] The Supreme Court in *McDermott* confirms that contribution or indemnity claims against a settling defendant are barred. *McDermott*, *supra*, 511 U.S. at 209 ("under this approach, no suits for contribution from the settling defendants are permitted . . . "). It is odd therefore that both Bauer Built and Road Star spend page after page in their respective memoranda arguing for the viability of their contribution claims, as if the settlement here had never taken place. (*See* D.E. 197, pp. 6-8 of 9; D.E. 199, pp. 11-19 of 29). The Defendants are therefore effectively asking this Court to overrule the Supreme Court and, not surprisingly, doing it by citing to at least two cases which precede the *McDermott* decision. Defendants also cite largely to cases decided under maritime law or rely upon the maritime law precedent in *Gordon H. Mooney, Ltd. v. Farrell Lines, Inc.*, 616 F.2d 619 (2d Cir. 1980). *See Byrton Dairy Products, Inc.*, *supra*, 991 F. Supp. 997; *Hartog Trading Corp. v. M/V Presidente Ibanez*, 1991 WL 33605 (E.D. La. Mar. 6, 1991).

Indeed, post-*McDermott*, its analysis has been routinely applied outside of admiralty as general principles of federal common law. *E.g.*, *Harrington v. Wilber*, 743 F. Supp. 2d 1013, 1020 (S.D. Iowa 2010); *State Farm Mut. Auto. Ins. Co. v. Graftman*, 968 F. Supp. 2d 480, 482 (E.D.N.Y. 2013); *Allstate Ins. Co. v. Kumar*, 2013 WL 2395748, at *3 (S.D.N.Y. June 3, 2013); *Johnson & Johnson v. Azam Int'l Trading*, 2013 WL 4048295, at *16 (E.D.N.Y. Aug. 9, 2013); *Nunez v. B&B Dredging, Inc.*, 108 F. Supp. 2d 656, 663 (E.D. La. 2000), *rev'd on other grounds*, 288 F.3d 271 (5th Cir. 2002); *cf.* *Ameripride Servs. v. Tex. E. Overseas Inc.*, 782 F.3d 474, 486-88 (9th Cir. 2015).

Thus, setting aside the fact that federal law generally applies here, as detailed *supra* in Section VI.A., it is equally correct, as a result of *McDermott*, and even beforehand, that when a claim settles under a federal statute, federal law should be looked to exclusively to determine the effect of the settlement. *Singer v. Olympia Brewing Co.*, 878 F.2d 596, 599-600 (2d Cir. 1989). In *Singer*, a federal securities action, the Second Circuit made two important findings of law. *Firstly*, the Circuit Court held that federal law should govern the issue of setoff in a 10b-5 action because the "adoption of state statutes governing credit for settlement would lead to disparate results in cases . . ." *Secondly*, the Court held that the "one satisfaction rule" should apply, following the Restatement (Second) of Torts § 885(3) (1979):

> Under this rule, when a plaintiff receives a settlement from one defendant, a nonsettling defendant is entitled to a credit of the settlement amount against any judgment obtained by the plaintiff against the nonsettling defendant as long as both the settlement and judgment represent common damages.

*Singer*, 878 F.2d at 600-01 (finding that the district was right to deduct the settlement amount from the judgment). This principle is also followed in the cases in Sections C-H below.

**C.**   **Under Federal Common Law Rules, Both Pre- and Post-**
**_McDermott_, the Leading Cases Require the Use of a _Pro Tanto_**
**Set Off When a Claim Is Settled Under a Federal Statute. Road**
**Star and Bauer Built Thus Still Remain Jointly and Severally**
**Liable in Negligence for the Full Loss of the Damaged Jet**
**Engine, after Deducting the Truckers' Settlement of $250,000**

Legally, Defendants Road Star and Bauer Built cannot utilize state law to avoid
their full liability simply because the separate liability of Southern Pride and Thunder Rolls was
governed and was settled under a federal statute, the Carmack Amendment. This is a matter of
longstanding Supreme Court precedent. _Edmonds v. Compagnie Generale Transatlantique_, 443
U.S. 256, 260, n.8 (1979).

_Edmonds_ is a personal injury case, where a primary defendant's liability was
governed by a federal statute, but the same principles that apply there would clearly apply here,
where two primary defendants' (Southern Pride and Thunder Rolls) cargo liability is similarly so
covered. In _Edmonds_, a longshoreman employed by a stevedore was injured while unloading
cargo containers. He received statutory benefits from the stevedore pursuant to the
Longshoremen's and Harbor Worker's Compensation Act (which provides statutory benefits in
exchange for the loss of the right to sue the employer for negligence), and sued the ship-owner
for negligence. A jury determined that the plaintiff suffered total damages of $100,000, that he
was responsible for 10% of the total negligence resulting in his injury, that the stevedore's fault
contributed 70% and that the ship-owner was accountable for 20%. 443 U.S. at 258. The award
was reduced by 10% to account for the plaintiff's own negligence, but the judge refused to
further reduce the damages assessed to the ship-owner based on the 70% negligence of the non-
party stevedore. _Id._

The Supreme Court determined that the existence of a limitation of liability
pursuant to a federal statute (there, the Longshoremen and Harbor Worker's Compensation Act,

117

but here the Carmack Amendment) demonstrated, absent specific statutory language to the contrary, that Congress did not intend to alter the common law rule as to common law defendants that they be made to pay all of the unpaid damages not due to the plaintiff's own negligence. *Id.* at 271. The Supreme Court held that changing the law as Congress understood it could "knock out of kilter" the delicate balance of statutory and judge-made law in this area. *Id.*, at 273. The same principle applies here.

       The basic principle of insuring the potential for a full plaintiff recovery that the Supreme Court insists be followed when federal statutory liability schemes and common law rules intersect was emphasized in *Norfolk & Western Ry. Co. v. Ayers*, 538 U.S. 135 (2003). (quoting '*The Atlas*', 93 U.S. 302, 315 (1876)).[43] Ayers was a railroad employee who suffered from asbestosis and mental anguish caused by his fear of getting cancer due to his exposure. He and other employees sued their railroad employer under FELA (Federal Employers Liability Act, found at 45 U.S.C. § 51 (1908)) and won. Among other things, the railroad argued that the lower court erred by instructing the jury not to apportion the damages between the railroad and the other tortfeasors. The Supreme Court disagreed and affirmed the decision. *Id.* at 137-38.

       The Court discussed the statutory language of FELA and determined that it did not expressly address the apportionment of damages with respect to non-statutory claims. *Id.* at 159-60. The statute clearly states that "every common carrier by railroad" even if negligent only "in part," will be liable to the injured employee. *Id.* at 160. But the railroad argued that the plaintiff's exposure to asbestos was the result of "outside causes," and therefore, its share of

---

[43] It is worth noting, however, that although the Supreme Court in *Ayers* gave much emphasis to the wording of the statutory text (and the lack thereof) to interpret the statute, there was also significant discussion of the law of joint and several liability under federal common law. *Ayers*, 538 U.S. at 159-65.

damages should be reduced by the other contributing tortfeasors' level of harm. *Id.* The Court refused because FELA "expressly prescribes no other apportionment" and doing so would be "inconsistent with [FELA's] overall recovery facilitating thrust." *Id.* at 161.

FELA and the Carmack Amendment are thus both federal statutes that apply to determine the liability of common carriers while they are engaged in interstate commerce. *See id.* at 160 (applies to railroad carriers and their employees, while engaging in interstate commerce); *see also* the Carmack Amendment, 49 U.S.C. § 14706 (1906) (applies to motor carriers and the shippers of cargo, while engaging in interstate commerce).[44] Congress drafted and enacted both FELA in 1908 and Carmack in 1906 to streamline the plaintiff's rights against such common carriers. *See Ayers,* 538 U.S. at 161 (discussing statutory context and the intent to remove plaintiff's limits on ability to recover); *Certain Underwriters at Interest at Lloyds v. United Parcel Service of America, Inc.,* 762 F.3d 332, 335 (3d Cir. 2014) (Court stating "[t]he Carmack Amendment struck a compromise between shippers and carriers. In exchange for making carriers strictly liable for damage to or loss of goods, carriers obtained a uniform, nationwide scheme of liability, with damages limited to actual loss – or less of the shipper and carrier could agree to a lower declared value of the shipment.").

The *Ayers* Court *citing* to '*The Atlas*', 93 U.S. 302, 315 (1876), thus stated unequivocally:

> **'Nothing is more clear than the right of a plaintiff, having suffered ... a loss [of cargo], to sue in a common-law action all the wrong-doers, or any one of them, at his election; and it is equally clear, that, if he did not contribute to the disaster, he is entitled to judgment in either case for *the full amount of his loss*.'**

---

[44] There is also a nearly identical railroad section of the Carmack Amendment found at 49 U.S.C. 11706 (1995).

*Ayers,* 538 U.S. at 163 (emphasis supplied). The bottom line is that there is nothing in the textual content of either statute that permits the apportionment of damages with non-statutory defendants, even when there are third-party tortfeasors. **Moreover, there is nothing in Carmack that limits the recovery of the shipper from third-party tortfeasors after settlement with the Carmack carrier.** That sort of limitation was never Congress's intent. The intent was solely to facilitate prompt cargo settlements without ever even addressing negligence. *Certain Underwriters at Interest at Lloyds,* 762 F.3d at 335. Thus, the reasoning of *Ayers* strongly supports a decision by this Court not to permit the Plaintiffs settlement under the Carmack Amendment here to in any manner impact their recovery against third-parties, other than by simply having it deducted *pro tanto*.

Precisely this same rule – that no apportionment of fault with the settling party is required where that defendant's liability is limited by federal statute and the others are subject to common law – and was similarly reaffirmed by the Seventh Circuit in *Schadel v. Iowa Interstate R.R., Ltd.,* 381 F.3d 671, 678 (7th Cir. 2004) (holding that when a settlement occurs subject to a federal statutory scheme (FELA), no state law right of apportionment exists).

In *Schadel,* the plaintiff was a railroad employee who was seriously injured while working when a motorist struck him. Schadel sued his employer under FELA in federal court and the motorist for negligence in state court. The motorist and Schadel settled their dispute. The FELA action ended up before a jury, and the district court would not allow any evidence of the settlement with the motorist. The court instructed the jury to allocate fault between Schadel and the railroad only. The court then subtracted the amount of the settlement from the jury award to get the amount that the railroad owed to Schadel. The railroad appealed, arguing that the district court should have instructed the jury to apportion fault between the three parties involved in the

120

accident (thus, taking a *pro rata* approach), instead of using the *pro tanto* method to allocate damages. *Id.* at 673-74.

After much discussion of whether to use federal common law versus state law to allocate fault among the three parties, and after closely studying *McDermott*, the Seventh Circuit affirmed the lower court's *pro tanto* approach. *Id.* at 678. The Court of Appeals begins its analysis by examining the statute that brought the action to federal court. It found that:

> Nothing in the statutory text [] instructs that the amount of damages payable by a liable employer bears reduction when the negligence of a third party also contributed in part to the injury-in-suit.

*Id.* at 675. Here, as well, there is no language in the Carmack Amendment that reduces the open-ended liability of negligent third parties simply because strictly liable motor carriers get the special statutory benefit of reducing their liability through an agreed statutory mechanism. *See* 49 U.S.C. § 14706. Moreover, the *Schadel* Court decided that federal common law had to be applied instead of state law because "uniformity of result" was essential to maintaining the integrity of statutory intent. *Id.* at 677.

Here, applying state law concerning the allocation of liability would reduce Plaintiff's ability to fully recover the amount of its loss, but more importantly, applying state laws in future cases to lawsuits brought under the umbrella of the Carmack Amendment and pendant thereto could result in widely varied outcomes depending upon the complete fortuity of which state an accident during interstate commerce occurred in. "State laws vary considerably in the way they treat issues such as claim reduction, contribution, indemnity, comparative fault, and the like." *Schadel*, 381 F.3d at 677. Three out of the four defendants in this action are carriers of cargo under Carmack. In the interest of consistently deciding Carmack actions with third-party

tortfeasors, federal common law must be applied, and therefore, the *pro tanto* approach is most equitable, particularly when the federal statute demands strict liability.

Indeed, a state court precedent geographically within the Eighth Circuit suggests that there could even be no set off at all permitted by negligent common law defendants for a settlement with an interstate carrier liable under the strict liability terms of a federal statute. *See Palmer v. Union Pacific R. Co.*, 311 S.W.3d 843, 855-56 (Mo. Ct. App. 2010) (finding that no set off is allowed between defendants when there is no statutory text to support proportionate liability in the FELA). FELA is analogous in the personal injury context to the Carmack Amendment in the property damage context.[45] The *Palmer* court wrote, "'[n]othing in the statutory text [of FELA] instructs that the amount of damages payable by a liable employer bears reduction when the negligence of a third party also contributed in part to the injury-in-suit.'" *Id.* at 856 (quoting *Norfolk & W. Ry. Co. v Ayers*, 538 U.S. 135, 160 (2003)). The state appellate court found that because "the U.S. Supreme Court held [in *Ayers*] that FELA did not authorize apportionment of damages," no setoff for the settlement could be allowed. *Id.*

### D.   The Carmack Amendment By Its Savings Clause Requires the Preservation of Federal Common Law Claims

Significantly, the Carmack Amendment contains a Savings Clause, which specifically reserves all additional rights and remedies not inconsistent with the statute:

> The remedies provided under this part are in addition to remedies existing under another law or common law.

---

[45] As detailed *infra* in Section VII.C., the Carmack Amendment is a strict liability statute.

49 U.S.C. § 13103.[46] This preservation of rights is mirrored in the FTSA, Boeing's contract with

Southern Pride, in applying Carmack. That contract specifically acknowledges the broad rights

afforded to Boeing in pursuing liability outside of the FTSA by providing that:

> Except as otherwise limited in this Agreement, the rights and
> remedies set forth herein are cumulative and in addition to any
> other rights or remedies the parties may have at law or in equity.

(D.E. 118-8, p. 14).

### E.   Most Significantly, Where, as Here, the Settling Defendants Are Strictly Liable, That Also Excludes Their "Percentage" of Fault from Being Deducted After A Settlement

Bauer Built concedes in its Amended Memorandum, that, independent of the

settlement, it "cannot be jointly liable for the damages caused by Southern Pride and Thunder

---

[46] The Savings Clause, 49 U.S.C. § 13103, preserves the rights and remedies that are not inconsistent with the rules prescribed by the provisions of the Carmack Amendment. *AIG Aviation, Inc. v. On Time Express, Inc.*, 2005 WL 2416382, at *3 (D. Ariz. Sept. 30, 2005) (finding that the Savings Clause does not preserve any other remedies the shipper may have against the carrier with respect to claims for damages resulting from the shipment and delivery of goods interstate); *Owner-Operator Independent Drivers Ass'n, Inc. v. Landstar Inway, Inc.*, 2007 WL 473995, at *4 (M.D. Fla. Jan. 12, 2007) (finding that Section 13103 does not expand the shipper's remedies to include restitution damages); *Hoover v. Allied van Lines, Inc.*, 205 F. Supp. 2d 1232, 1240 (D. Kan. 2002) (finding that the shipper's remedies against the carrier are limited to the "bargained-for limitation of a carrier's liability for negligent damage to shipper's goods"). Against the carrier, the only rights preserved are those arising under other federal statutes. *Fyke Trading USA, Inc. v. New England Motor Freight*, 2008 WL 4443222, at *3 (W.D.N.Y. Sept. 28, 2008). However, the savings clause does allow the shipper to pursue other remedies based on common law liability (negligence and breach of contract) against non-Carmack carriers. *See, e.g., Oliver Products Co. v. Foreway Management Services, Inc.*, 2006 WL 2711515, at *1 (W.D. Mich. May 24, 2006) (finding that claims against broker were preserved by Savings Clause); *Winn Dixie Stores, Inc. v. Aspen Transp., LLC*, 2013 WL 4780125, at *3 (M.D. Fla. Sept. 5, 2013) (same). And it allows for claims to be brought that do not arise merely from the acts damaging the cargo, such as Plaintiffs' claim here against Southern Pride and Thunder Rolls for failure to procure insurance. *See, e.g., Frey v. Bekins Van Lines, Inc.*, 748 F. Supp. 2d 176, 181 (E.D.N.Y. 2010) (claims against movers for breach of good faith and fair dealing not pre-empted). Of course, here, Defendants Bauer Built and Road Star are not being sued as carriers of the jet engine. Rather, they are being sued because their negligence was the proximate cause of the Plaintiffs' injuries (the $18 million in damages).

Rolls." (D.E. 123, p. 33 of 41). Bauer Built even expressly pleads the same in its Answer to the Amended Complaint, stating that it "cannot be held jointly and severally liable for the acts and/or omissions of a person or entity . . . that may be strictly liable . . ." (D.E. 178 at 8). **These are material, binding concessions**. **We agree.**

It is also undisputed that liability under the Carmack Amendment is a form of strict liability, no fault (negligence) need be shown. *Missouri Pacific R.R. Co. v. Elmore & Stahl*, 377 U.S. 134, 137-38 (1964) (delineating specific carrier defenses, and that negligence need not be established by the plaintiff); *Sompo Japan Ins. Co. of America v. Norfolk Southern Ry. Co.*, 762 F.3d 165, 171 (2d Cir. 2014) (the "Carmack Amendment . . . imposes something close to strict liability . . ."); *Certain Underwriters at Interest at Lloyds, supra*, 762 F.3d at 335 ("The general rule is that an interstate carrier is strictly liable for damages . . .").

Furthermore, under federal law, unless both the settling and the non-settling defendants are true tortfeasors liable based in tort (with the final allocation, to be based upon individual fault), the liability of non-settling defendants will not be altered, except that the settlement amount will be deducted *pro tanto*. *See Chisolm v. UHP Projects, Inc.*, 205 F.3d 731, 738-39 (4th Cir. 2000) (setting forth the principle that where the liability of a defendant arises under no fault principles, *McDermott* does not apply, and any prior settlements are merely deducted "as an offset to the amount received."); *see also Boykin v. China Steel Corp.*, 73 F.3d 539, 544-45 (4th Cir. 1996) (where settling defendant's liability arises under a no-fault doctrine, *McDermott* case is not applicable). Similarly, it has also been held that where, as here, one defendant is liable in contract and the other defendant is liable in tort, the plaintiff's settlement sum with the contractual defendant is merely an offset. *Short v. Marinas USA Ltd.*

*Partnership*, 78 Mass. App. Ct. 848, 859 (2011) (settlement amount with contractually liable defendant should be deducted from the amount attributed to tort defendant).

In *Boykin*, like here, there was a settling defendant, who was strictly liable with two remaining tortfeasor defendants (the "steel defendants"), who were found to be at fault because of their relationship to the hazardous cargo. The Fourth Circuit court held that the strictly liable defendant and the steel defendants were not joint tortfeasors, and as such, the proportionate share rule could not apply. *Id.* at 544.

The petitioner (vessel owner) in *In re Martin K. Eby Const. Co., Inc.*, sought exoneration from liability or at least a limitation on liability concerning the death of a woman after the vessel refueled a dredge. 2003 WL 23335931, at *1 (M.D. Fla. Dec. 16, 2003). There were two claimants – the decedent's representative and the owner and operator of the dredge. The two claimants filed counterclaims against the vessel owner and the vessel owner crossclaimed against the dredge owner and operator for indemnity and contribution. Soon thereafter, the vessel owner and the decedent's representative reached a settlement, and the vessel owner moved for summary judgment stating that the settlement eliminates any claims between it and the dredge owner for indemnity or contribution because the Eleventh Circuit has adopted the proportionate fault approach. *Id.* at *1-2 (citing *Murphy v. Florida Keys Elec. Co-op. Ass'n, Inc.*, 329 F.3d 1311, 1314-18 (11th Cir. 2003)). The decedent's relative agreed and moved to dismiss her crossclaim against the dredge owner without prejudice. *Id.* The dredge owner claimant, however, argued against the summary judgment motion because it was the non-settling tortfeasor, who could also be found to be vicariously liable for the decedent's death, and if so, the dredge owner would lose its claim for indemnity against the vessel owner. *Id.* at *2. Although the Court granted the summary judgment motions and dismissed the decedent's claims

against the dredge owner without prejudice, it did so only because both the vessel owner and the decedent's claimant admitted that "there is no viable non-fault basis of liability which would preclude application of the proportionate fault approach." *Id.* (citing *Chisolm v. UHP Projects, Inc.,* 205 F.3d 731, 734-39 (4th Cir. 2000)). The Court wrote that the vessel owner's "position was well-taken" and "[a]n application of the proportionate fault approach in such situation, one not involving strictly alleged *joint* tortfeasors, would effectively permit the settling alleged tortfeasor to limit its liability to the amount of the settlement, but would leave the non-settling tortfeasor exposed to unlimited liability on a non-fault basis, without the remedy of indemnity." *Id.* at *2 (emphasis in original).

A District Court decision arising out of a Carmack case in the Tenth Circuit is also instructive. The District Court decision is described in *Mercer Transp. Co. v. Greentree Transp. Co.*, 341 F.3d 1192 (10th Cir. 2003). There, a shipper sued the broker for the full damage to its cargo. *Id.* at 1194. The parties settled and the shipper assigned its rights to pursue claims to the broker. *Id.* Broker as plaintiff then brought an action against the carrier and another company deemed by law to be liable as a carrier, due to the use of its logo on the truck. *Id.* Between two carriers the liability would normally be apportioned jointly and severally, but when the shipper and the carrier settled their dispute, the District Court held that the logo defendant was entitled to only a *pro tanto* setoff of the settlement amount. *Id.* at 1194. The Tenth Circuit reversed the finding of liability on other grounds, but did not criticize the District Court on the setoff determination. *Id.* at 1197.

F.    **Road Star and Bauer Built Are Not Entitled to Contribution Either**

Non-settling common law tortfeasors will also not be permitted any contribution here from the statutorily liable parties, Southern Pride and Thunder Rolls. *North American Van*

*Lines, Inc. v. Pinkerton Security Systems, Inc.*, 89 F.3d 452, 458 (7th Cir. 1996) (no state law contribution permitted where shipper's claim arises under cargo damage statute).[47]

These familiar rules result in no windfall. Plaintiffs have suffered a severe $18 million loss which the jury may well find was due in part to the negligence of Defendants Road Star and Bauer Built. Nothing in the Carmack Amendment, which, as described below, for public policy reasons, is designed to allow truckers to limit their liability, even suggests that a settlement under that statute should in any manner limit the full recovery of the cargo owners/insurers from non-Carmack defendants. Indeed, the Carmack Amendment's Savings Clause, pointed to above, says exactly the opposite, as does the Supreme Court's decision in *Edmonds*. Unless the Supreme Court were to choose to rewrite the *Edmonds* rule, which effectively carves out *pro tanto* settlements under federal statutes governing shipping movements (there a personal injury settlement, but is of no import), the ruling remains persuasive in this situation. "Joint and several liability allows a plaintiff to recovery from one of multiple defendants, when plaintiff's recovery from other tortfeasors is limited by outside facts . . . making other defendants, rather than the innocent plaintiff, responsible for the shortfall." *Doyle v. Graske*, 565 F. Supp. 2d 1069, 1082 (D. Neb. 2008), *rev'd in part and aff'd in part*, 579 F.3d 898 (8th Cir. 2009).

---

[47] *See also* the numerous cases cited in Southern Pride and Thunder Rolls' "Amended Brief in Support of Motion for Summary Judgment," D.E. 188 at pp. 17-20 of 22, establishing that contribution and indemnity claims by Road Star and Bauer Built against them are "preempted" by the Carmack Amendment as such would violate the "uniform national policy governing liability of interstate carriers" for the cargo damage they cause to their shippers. Plaintiffs incorporate those cases herein in full by reference.

**G.   Defendants' Ninth Circuit Case Law Conflicts with Precedents from Both Supreme Court and Other Circuits and Relies Upon a Particularity of California Law Holding Strictly Liable Defendants To Be Joint Tortfeasors**

*Mason and Dixon Intermodal, Inc. v. Lapmaster International, LLC*, 632 F.3d 1056 (9th Cir. 2011), upon which Bauer Built heavily relies, does not support their position.  In that case, a carrier appealed the dismissal of its contribution action against a broker, who had settled its case with the shipper and its insurer for damage to cargo. The broker's settlement under California state law had been approved in that case under California's unique good faith settlement law. The Ninth Circuit found that Carmack did not preempt the California state statute under which the broker settled its state law claims; the motor carrier and the broker were joint tortfeasors, and the state law barred the motor carrier's action against the broker, which had merely been sued for negligence under state law. *Id.* at 1063-64. Another key there was that unlike under the federal law cases cited above, "California courts have held that strictly liable defendants may be held responsible as joint tortfeasors alongside negligent defendants." *Id.* at 1063.

*Mason and Dixon* is also clearly distinguishable from the present case because it involves the effect of a settlement under state law on a Carmack carrier's contribution action, not the effect of a federal statutory (Carmack Amendment) settlement upon the liability of third-parties. Moreover, to the extent that *Mason and Dixon* may conflict with the Supreme Court's *McDermott* decision, and its progeny, it could not control the present case.

Another key distinction between *Mason and Dixon* and the instant case is that the former court was settling in diversity, with a mandate to follow California choice of law rules. Even more significantly, the state law claims (not federal common law claims, as here against Road Star) which were being pursued were by the carrier against a third-party broker. It is thus

128

understandable why there was little sympathy in *Mason and Dixon* for a carrier who was seeking to obtain contribution and to go beyond the very Carmack liability boundaries that it must reasonably have expected to apply when it set its freight routes.

In addition, the *Mason and Dixon* Court's analysis that applying 50 diverse state settlement laws one-by-one (with an endless variety of *pro rata* and *pro tanto* adjustments in payments) after partial settlements in multi-truck accidents will not affect the Carmack Amendment's goal of making common carrier exposure predictable defies common sense. The high litigation costs alone associated with being subject to such a patchwork of outcomes could bankrupt some small truckers. Rather, a single nationwide federal rule where shippers first settle with their truckers, as here, have their claim reduced *pro tanto*, and then pursue non-Carmack defendants, as necessary, with no contribution claim permitted against the carriers, will best keep carrier litigation costs low. This in turn will also fulfill Congress' mandate of the "uniform application" of laws to carriers. *Southeastern Express Co. v. Pastime Amusement Co.*, 299 U.S. 28, 29 (1930) ("The broad purpose of the federal act [Carmack Amendment] is to compel the establishment of reasonable rates and to provide for their uniform application."). This result will also best fulfill the Supreme Court's express public policy directive in *Ayers*, 538 U.S. at 163, that a shipper have access to the "**full amount of his loss**" whenever it is not limited by the express terms of a federal statute. (Emphasis supplied). Indeed, since the Carmack Amendment was enacted in 1906 for the very purpose of relieving the inconsistent outcomes caused by a patchwork of state laws governing a carrier's liability for damage to goods in interstate carriage; *see Adams Express Co. v. Croninger*, 226 U.S. 491, 505 (1913) ("The Congressional action [the passage of the Carmack Amendment] has made an end to this diversity, for the national law is paramount and supersedes all state laws as to the rights and liabilities and exemptions [of

carriers]"), applying 50 diverse state laws to the type of claims at issue here would clearly defy that century old intent.

Given that California law is not at issue here and that the Carmack Amendment liability of a Defendant such as Southern Pride arises in strict liability, not in negligence, we have already seen that no apportionment of fault between a tortfeasor and a Carmack carrier could ever be proper. *See Chisolm*, *supra*, 205 F.3d at 738-39 (setting forth the principle that where defendant's liability arises under a federal transportation law that incorporates no fault principles, "[n]o apportionment of culpability between the defendants is possible" and any prior settlements are merely deducted "as an offset to the amount received"); *Boykin*, 73 F.3d at 544-45 (where settling defendant's liability arises under a no-fault doctrine, the *McDermott* proportionate share rule does not apply).

In fact, Defendant Bauer Built in its latest filing "Defendant Bauer Built's Answer and Affirmative Defenses to Plaintiffs' Amended Complaint," specifically pleads and **admits** that it is "not a joint tortfeasor with such defendants [Southern Pride and Thunder Rolls]," who are plead to be "strictly liable" under the Carmack Amendment, thus putting this issue to rest once and for all. (D.E. 178, p. 8 of 9).

Moreover, the cases cited at pp. 143-144 in Road Star's Amended Memorandum (D.E. 191-1) do not support Road Star's argument that federal common law provides for allocation of liability on the basis of individual fault rather than joint and several. *Franklin Stainless Corp. v. Marlo Transport Corp.*, 748 F.2d 865, 870 (1984) did not address the issue of joint and several liability vis-à-vis the plaintiff, but rather allocation of **contribution** among the defendants. *United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397, 411 (1975) addressed admiralty ship collision cases which has its own special rules. The other two cases address

contribution among defendants: *Smith & Kelly Co. v. S/S Concordia Tadj*, 718 F.2d 1022, 1029-30 (11th Cir. 1983); and *Kohr v. Allegheny Airlines, Inc.*, 504 F.2d 400, 403 (7th Cir. 1974). It is black letter law that federal common law does generally require joint and several liability. *Jessica Howard Ltd. v. Norfolk S. Ry. Co.*, 316 F.3d 165, 169 (2d Cir. 2003); *Project Hope v. M/V IBN SINA*, 250 F.3d 67, 75-6 (2d Cir. 2001); *Gordon H. Mooney, Ltd.*, *supra*, 616 F.2d at 625; *Cutten v. Allied Van Lines, Inc.*, 349 F. Supp. 907, 912 (C.D. Cal. 1972); *EFS National Bank.*, *supra*, 164 F. Supp. 2d at 1002; *Just Take Action, Inc. v. GST (Americas) Inc.*, 2005 WL 1080597, at *4 (D. Minn. May 6, 2005). *See also Commercial Union Ins. Co.*, *supra*, 50 F. Supp. 2d at 259-60.

### H. Even If Nebraska Law Applies to Determine the Effect of the Settlement Under the Carmack Amendment, Which It Does Not, the Result Is the Same

Plaintiffs have settled with Defendants Southern Pride and Thunder Rolls under the Boeing-Southern Pride Freight Transportation Agreement (D.E. 110-7) for the contractually agreed amount of $250,000, (*id.* ¶ 3.0(b), at p. 24 of 61). Under Nebraska law,[48] settlements are deducted *pro tanto* when contract and negligence claims are both pled, and one settles. *Vowers & Sons, Inc. v. Strasheim*, 254 Neb. 506, 515-16 (1998) (allowing *pro tanto* reduction of judgment against defendant liable for breach of contract by amount of pretrial settlement with negligent defendant). This is especially true when two defendants are liable for the same acts, here the

---

[48] The two cases previously cited by Defendant to avoid this simple rule are *Shipler v. General Motors Corp.*, 271 Neb. 194 (2006) and *Shelton v. Young's Welding and Machine Shop, LLC*, 2015 WL 247834 (D. Neb. Jan. 20, 2015). In fact, neither lends support to Defendants' assertion that Nebraska law precludes joint and several liability here as to our Defendants. In *Shipler*, the Court merely held that a strictly liable defendant was not permitted to assert a claim of contributory negligence against a plaintiff. 271 Neb. at 220. Similarly, *Young's Welding* merely held that because that plaintiffs' claim against a defendant was in strict liability, that defendant could not maintain a contribution action against a third-party defendant based on negligence. 2015 WL 247834, at *3.

truck driver's acts, *Nebraska Plastics, Inc. v. Holland Colors Americas, Inc.*, 408 F.3d 410, 419 (8th Cir. 2005) (where they are not "separate acts leading to separate injuries," settlement is deducted *pro tanto*). The claims against Southern Pride and Thunder Rolls also arise here under the Carmack Amendment, 49 U.S.C. § 14706, a strict liability statute, and when a settlement is reached in a claim that arises in strict liability, that settlement amount is also reduced *pro tanto*. *Jameson v. Liquid Controls Corp.*, 260 Neb. 489, 492, 498 (2000) (Court, following "the rule set forth in *Vowers*," finding strict liability defendant entitled to *pro tanto* reduction of judgment for amount of settlement by co-defendant sued in both strict liability and negligence).

Another Nebraska Statute § 25-21,185.11 reduces a settling defendants "share of the obligation" *pro rata*. But that statute only applies to "Civil actions to which contributory negligence is a defense." Contributory negligence is obviously not a defense to the settling claims in this Civil Action, which were claims expressly settled under contracts and strict liability (Carmack). *See Shipler*, *supra*, 271 Neb. at 218 (contributory negligence does not apply in strict liability action); *Jay v. Moog Automotive, Inc.*, 264 Neb. 875, 882 (2002) (contributory negligence does not apply to contract actions).

Since this is thus not a "Civil Action" as to which contributory negligence is a defense to all of the claims, as the statute contemplates, § 25-21,185.11 thus does not apply. More specifically, the section provides that if a plaintiff enters into "a release, covenant not to sue, or similar agreement" with a defendant, then that defendant is "discharge[d] . . . from all liability" and the plaintiff's "claim . . . against other persons shall be reduced by the amount of the released [defendant's] share of the obligation as determined by the trier of fact." *See* Neb. Rev. Stat. § 25-21,185.11. "[C]laim" there refers to claims that are subject to a defense of contributory negligence – that is, claims of negligence. Here, Plaintiffs have asserted separate

claims against several defendants and there are Carmack strict liability defendants and negligence defendants. There is now a settlement between Plaintiffs and the two Carmack strict liability defendants only. There is no settlement here under negligence theories with any of the negligence defendants. Because there has not been a settlement with the negligence defendants, § 25-21,185.11 thus does not operate to reduce any liability of the negligence defendants.

Thus, regardless of whether Nebraska law instead of federal common law applies to the issue of weighing the actions of the Carmack strict liability defendants versus the negligent defendants, both the Supreme Court of Nebraska and the Eighth Circuit Court of Appeals apply Nebraska's *pro tanto* settlement rule to the situation we have here. *Nebraska Plastics, Inc.*, 408 F.3d at 419-20 (affirming district court's grant of *pro tanto* settlement under Nebraska law in strict liability, negligence and contractual claims action); *The Village of Hallam v. L.G. Barcus & Sons, Inc.*, 281 Neb. 516, 522 (2011) (affirming the lower court's judgment and application of *pro tanto* off-set of settlement amount in case involving mixed strict liability and negligence claims).

In *Nebraska Plastics*, the plaintiff produced white PVC fencing. It wanted to develop colored fencing, so it hired pigment supplier defendant HCA to create the colored PVC fencing. A particular ingredient used in the fencing was calcium carbonate, which was supplied by defendant OMYA. This ingredient, defendants knew but never informed or warned plaintiff, caused the colored fencing to weather "abnormally." 408 F.3d at 414. Plaintiff sued defendants for breach of warranties, products liability claims, negligent misrepresentation, and fraudulent concealment. *Id.* at 413. The district court granted OMYA's summary judgment motion, leaving only the negligent misrepresentation and fraudulent concealment claims against it for the jury. *Id.* at 415. All of the claims against OMYA except the express warranties and fraud claims were

133

dismissed by the Court, and then OMYA settled those claims with Nebraska Plastics before the trial ended. *Id.*

The jury found against defendant HCA on all claims but one, including the negligence claim. *Id.* The District Court then granted HCA's motion for the reduction of the award with a *pro tanto* settlement credit. Nebraska Plastics appealed on this issue and others. *Id.* at 415. Taking into account the mixed nature of the claims, which were not all merely uniform negligence claims, the Eight Circuit affirmed this "*pro tanto*" approach to mixed claim settlements. *Id.* at 419. Notably, as with the other cases cited in this section, neither the Court nor any parties ever even argued that Section 25-21,185.11 applied to such a mixed claim settled.

This all of course assumes that Nebraska state law applies to determine the effect of a Carmack Amendment settlement – but, again, as explained previously, it does not.

## VIII.

### ADDITIONAL REASONS WHY BAUER BUILT CANNOT PREVAIL ON ITS MOTION FOR SUMMARY JUDGMENT GIVEN THE OVERWHELMING EVIDENCE OF ITS CAUSATIVE NEGLIGENCE

#### A. Contrary to Bauer Built's Assertions, the Testimony of Joseph Womack, a Nonparty Employee of a Co-Defendant, Cannot Legally Bind The Plaintiffs

Bauer Built mistakenly asserts that Mr. Womack's testimony constitutes a "judicial admission." (D.E. 123, p. 21 of 41). This claim is absurd. As the cases cited by Bauer Built make clear, "where **a party** testifies clearly and unequivocally to a fact which is within his knowledge, such testimony may be considered as a judicial admission." *Southwestern Truck Sales & Rental Co. v. Johnson* 165 Neb. 407, 417 (1957) (emphasis supplied). *See Alford v. Neal*, 229 Neb. 67, 74 (1988) (finding defendants' own testimony, which was unequivocal, was a "judicial admission conclusive **as against them**") (emphasis supplied). Here, Joseph Womack,

the truck driver for Thunder Rolls, is not a party to the litigation but, rather, an employee of Defendant Road Star. There is nothing in the case law or rules of evidence that binds Plaintiffs to the deposition testimony of a witness for an adversary.

Moreover, even if portions of Mr. Womack's testimony are somehow considered admissions, Mr. Womack's estimates here such as of his distance and visibility also fall squarely within the well-recognized "swiftly moving events" exception to the doctrine of judicial admissions. *See Brummet v. Farel*, 217 Ill. App. 3d 264, 268 (Ill. App. Ct., 5th Dist., 1991); McCormick on Evidence § 258.

> The 'swiftly moving event' exception to the general rule [regarding judicial admissions] more appropriately allows the trier of fact to evaluate credibility and resolve conflicts in the testimony. Automobile accident cases often turn on the perceptions of the eyewitnesses, and the total picture of the event cannot rest on one witness's testimony alone.

*Brummet*, 217 Ill. App. 3d at 268 (refusing to treat plaintiff's testimony that defendant did not cross the center line as a judicial admissions because of the "rapidly moving, startling events" which caused the accident). Thus, it is for the jury to evaluate Mr. Womack's credibility in light of other evidence, an evaluation that cannot take place at the summary judgment stage.

**B. Contrary to Bauer Built's Assertions, Whether Womack's Conduct was an Intervening Cause Cannot Be Resolved on Summary Judgment**

Bauer Built raises three issues which, it claims, make Mr. Womack's driving an "intervening cause" and thereby excusing its own breach of duty as the proximate cause of the accident: that he (i) failed to keep a proper lookout in violation of Nebraska's range of vision

law;[49] (ii) followed another tractor too closely in violation of Neb. Rev. Stat. § 60-6,140; and (iii) "overcorrected" and drove onto the shoulder of the highway in violation of Neb. Rev. Stat. § 60-6,142.  (D.E. 123, pp. 22-29 of 41).

As already set forth, *supra*, what constitutes an intervening cause is an issue for the jury. *Heatherly*, 421 F.3d at 644. *Wheeler v. Estes Express Lines*, 53 F. Supp. 3d 1032 (N.D. Ohio 2014), upon which Defendant Bauer Built relies, does not demand a different result. There, the court granted summary judgment to the **plaintiffs** - the driver of a disabled truck and the tow truck operator who were injured when a semi-truck sideswiped them. The tow truck operator, expecting to tow the disabled vehicle, had parked in front of it.  He activated his flashers and the emergency lights on the top of the truck but did not place the reflective triangles out. *Id.* at 1035. Experts for the defendant opined that plaintiffs had a duty to put out the triangles and, had they done so, the triangles would have provided the warning earlier and alerted drivers to a disabled vehicle. *Id.* at 1036. However, even though, under Ohio law, violations of road regulations are negligence *per se*, the court found that they were not the proximate cause of the accident.  "A jury could not rationally find that the collision between . . . [the] trucks was a foreseeable result of the lack of triangles or the location of [plaintiff's] truck," where the **defendant testified to seeing the hazard lights flashing and knew there was a large truck on the shoulder**. *Id.* at 1041. Instead, defendant's own negligence (he was swerving back and forth over the lane lines)

---

[49] The additional cases regarding a driver's "lookout" obligations cited by Road Star at p. 107 of its Amended Memorandum are not on point. In *Kasper v. Carlson*, 232 Neb. 170, 174 (1989), the court held the "lookout" rule did not even apply in that case. Moreover, *Mantz v. Continental Western Ins. Co.*, 228 Neb. 447, 453 (1988) actually strongly supports Plaintiffs' position. The court held the lookout rule did not apply "where the object cannot be observed by the exercise of ordinary care in time to avoid a collision"; and that the issue of whether a driver failed to keep a proper lookout was "a question of fact which should have been submitted to the jury for resolution."

was the proximate cause of the accident. *Id.* at 1043. Here, by contrast, the evidence is overwhelming that the driver did not see the disabled tractor-trailer until it was too late because the emergency lights were not flashing and the reflective triangles were not put out at the appropriate distance to give adequate warning.

Furthermore, Plaintiffs are prepared to demonstrate that:

1.      Bauer Built's so-called "range of vision rule" is inapplicable here because the disabled truck was not properly made discernible. Although the range of vision rule may make it negligent in certain circumstances to operate a motor vehicle in a manner where the operator cannot stop or turn to avoid a collision with an obstruction "within the operator's range of vision," there is a specific exception to this rule for obstructions that are not properly made visible to the driver for his attention. *Prime, Inc. v. Younglove Const. Co.*, 227 Neb. 423, 430 (1988).[50] That is precisely the situation here. Because of Defendants Bauer Built and Road Star's failure to take safety precautions to warn oncoming traffic of their presence on the side of the road, Mr. Womack could not avoid a collision because he did not discern that there was something on the side of the road with which he would collide. The evidence is overwhelming that he had a history of safe driving, that he was alert and scanning the road from side to side as

---

[50] In its Amended Brief at p. 25, fn. 5 (D.E. 193), Bauer Built argues the "indiscernible objects exception" does not typically apply to daylight crashes. But the circumstances here are the same as an evening crash – the failure to warn oncoming traffic by way of proper flashing lights and warning triangles at the proper distances made the Road Star truck (parked too close to the fog line) indiscernible to Womack until it was too late. *See* Plaintiffs' Statement of Additional Facts, ¶¶ 68-70; D.E. 130-25, Professor Fogarty Report, pp. 7-8 of 184 and Appendix J thereto, pp. 99-103 of 184. Moreover, the Nebraska Supreme Court in *Bartosh v. Schlautman*, 181 Neb. 130, 133 (1966), acknowledged visibility exceptions exist to the general range of vision rule, where "reasonable minds might differ as to whether the motorist was exercising due care under the particular circumstances." This is thus a classic issue of fact for the jury.

he drove, and that had he seen emergency flashers or warning triangles, he would have changed lanes.

2.    Neb. Rev. Stat. § 60-6,120 on following distance is also inapplicable to the instant case because Mr. Womack testified that he first saw the moving tractor-trailer three or four miles before the site of the accident when he was at that point a mile or a mile and a half behind it, (D.E. 118-2, Womack Tr. 66:12-16), that he was gaining on it, and that, at the time it passed the disabled truck, he was "a hundred feet, 125" from the disabled truck." (D.E. 118-2, Womack Tr. 63:19).   Given this testimony, even using those figures, there is no evidence whatsoever to support Defendant Bauer Built's assertion that Mr. Womack violated a statute that prohibits the "following" of a truck at a distance of less than one hundred feet. Neb. Rev. Stat. § 60-6,120.

More importantly, witness distance estimates are notoriously inexact (D.E. 130-25, Professor Fogarty Report, Appendix K, p. 109 of 184). And here, using Mr. Womack's specific testimony concerning the relative speeds of the two trucks and their final positions, Professor Fogarty (unlike Mr. Drew) has scientifically calculated the actual likely distances between driver Womack and the truck in front of him and found it to be more likely a range of 200-240 feet. (D.E. 130-25, Professor Fogarty Report, Appendix J, pp. 99-100 of 184). Moreover, Professor Fogarty explains in his Report that, because he was engaged in the process of passing, the conclusion that Mr. Womack was following too closely is completely inaccurate:

> Simply put, if you are approaching a vehicle in your lane and to your front and you are traveling faster than that vehicle it is clear you must either slow and **follow** or close the distance and **pass** the vehicle.  The recommendation of maintaining a specific following distance while closing the gap to pass has no meaning for drivers who are in the act of passing the vehicle to their front.

138

> If one wishes to disagree, consider that, such an interpretation would require Womack to pull into the left lane 850 feet behind the other vehicle and, gaining at five feet per second, stay in that lane, blocking it's use for vehicles behind him, for 3.4 miles (170 seconds at 72 mph) before even catching up with the rear of the vehicle to his front.   This is not reasonable or safe or even recommended for passing a vehicle to one's front.  Does Mr. Drew believe that anyone would do this?

(D.E. 130-25, Professor Fogarty Report, Appendix T, p. 172 of 184).

       3.      Additionally, given the "visual traps" set for him by the Defendants, Mr. Womack's so-called "overcorrection" was actually the only right course of action. Mr. Womack was faced with what is known in the law as a "sudden emergency" created by Defendants' failure to provide adequate warning.[51] *See Starns v. Jones*, 500 F.2d 1233, 1236-37 (8th Cir. 1974) (finding that, in automobile negligence cases, the focus is "not the suddenness with which the emergency situation developed but rather the suddenness with which a driver became aware thereof"); *McClymont v. Morgan*, 238 Neb. 390, 393 (1991) (finding that the existence of a sudden emergency is relevant to what a driver should or should not have done under similar circumstances).  Mr. Womack would not drive an 11 foot 10 inch wide load through a 12 foot lane with a truck nearly flush up against the fog line; trucks naturally shift side to side when driven and no truck driver can safely "thread" such a needle. (D.E. 130-25, Professor Fogarty Report, Appendix U, pp. 183-184 of 184). In point of fact, Mr. Womack's driving her was fully safe, professional and careful in light of how he was "trapped" by the other Defendant's

---

[51] Bauer Built at p. 25, fn. 6 of its Amended Brief (D.E. 193) states the obvious that the sudden emergency exception does not apply to a driver who brings the emergency on himself. But there is substantial evidence here (as demonstrated throughout Plaintiffs' Amended Brief in Opposition) that the emergency resulted from the **Defendants'** failure to provide adequate warning and not inattention of Mr. Womack.

negligence. (D.E. 130-25, Professor Fogarty Report, p. 10 of 184 and Appendix U, pp. 182-184 of 184).

These mere allegations of purported intervening causes – none of which are in fact applicable – are hardly enough to relieve Bauer Built of its own negligence as a matter of law.  But more immediately, for purposes of this summary judgment, where there is conflicting testimony and evidence as to what happened and why, and what in a series of acts caused the accident, courts routinely deny summary judgment.  *See Scott v. Western Express, Inc.*, 2009 WL 1065840, at *2 (W.D. Mo. Apr. 21, 2009) (denying summary judgment for defendant in a tractor-trailer accident where factual disputes existed as to whether driver was adequately trained and whether his English was good enough to communicate); *Alfoaddy v. Will Transport, Inc.*, 2015 WL 3649828, at *4 (E.D. Ark. Mar. 19, 2015) (denying summary judgment where there was conflicting evidence as to the cause of the accident, including some evidence of careless driving in violation of the Federal Motor Carrier Safety Administration Regulations); *Mason v. State Farm Mutual Auto Ins. Co.*, 2010 WL 2870667, at *6 (E.D. Mo. July 19, 2010) (denying summary judgment where conflicting testimony and evidence regarding why the car swerved to the left causing it to flip over); *Martin v. Beight*, 2015 WL 1956506, at *7 (W.D.N.Y. Apr. 29, 2015) (denying summary judgment where ambiguity over why the defendant did not see the plaintiff and changed lanes, hitting her); *Thomas v. O'Brien*, 2010 WL 785999, at *6 (E.D.N.Y. Feb. 26, 2010) (denying summary judgment where there was conflicting evidence on the line of sight); *Haust v. United States*, 953 F. Supp. 2d 353, 359 (N.D.N.Y. 2013) (denying summary judgment where issues of fact remained as to whether the truck took proper precautions, where the truck was located prior to the accident, and whether the collision occurred at the rear end or the side of the truck); *Palenchar v. Jarrett*, 507 F. Supp. 2d 502, 511-12 (D. Md. 2007) (denying

summary judgment where a factual dispute existed as to the visibility of a tractor trailer so the jury had to decide what was the proximate cause).

## **CONCLUSION**

For all the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendants' Motions for Summary Judgment.

Dated: Lincoln, Nebraska         FRASER STRYKER PC LLO
        November 22, 2017         Brandon J. Crainer, Esq.
                                      500 Energy Plaza
                                      409 South 16th Street
                                      Omaha, NE 68102
                                      Tel: (402) 978-5378
                                      Fax: (402) 341-8290
                                      Email: bcrainer@fraserstryker.com

                                             -and-

                             MALOOF BROWNE & EAGAN LLC

                             By: _s/David T. Maloof_____
                             David T. Maloof (DM 3350) (pro hac vice)
                             Thomas M. Eagan (TE 1713)
                             411 Theodore Fremd Avenue, Suite 190
                             Rye, New York 10581-1411
                             Tel: (914) 921-1200
                             E-mail: dmaloof@maloofandbrowne.com
                                            teagan@maloofandbrowne.com
                             *Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFIY that I electronically filed the foregoing with the clerk of the Court by using the CM/ECF on November 22, 2017 which will provide a copy of the foregoing document to all counsel of record by CM/ECF and/or another means in accordance with the Federal Rules of Procedure.

  s/David T. Maloof

David T. Maloof, Esq.
